C. D. Michel – SBN 144258
Tiffany D. Cheuvront – SBN 317144
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
cmichel@michellawyers.com

Attorneys for Plaintiffs Adam Richards, Jeffrey Vandermeulen, Gerald Clark, Jesse Harris, On Target Indoor Shooting Range, LLC, Gaalswyk Enterprises, Inc. (D/B/A/ Smokin' Barrel Firearms), Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, and California Rifle & Pistol Association, Incorporated

Donald Kilmer – SBN 179986
Law Offices of Don Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM RICHARDS, an individual; JEFFREY VANDERMEULEN, an individual; GERALD CLARK, an individual; JESSE HARRIS, an individual; ON TARGET INDOOR SHOOTING RANGE, LLC; GAALSWYK ENTERPRISES, INC. (D/B/A/ SMOKIN' BARREL FIREARMS); GUN OWNERS OF CALIFORNIA, INC.; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; and SECOND AMENDMENT FOUNDATION, a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF**<br><br>**(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH];**<br><br>**(2) VIOLATION OF 42 U.S.C. § 1983 [Fourteenth Amendment Equal Protection];**<br><br>**(3) VIOLATION OF 42 U.S.C. § 1983 [Second Amendment];**<br><br>**(4) VIOLATION OF 42 U.S.C. § 1983 [Fifth Amendment-Government Taking];**<br><br>**(5) VIOLATION OF 42 U.S.C. § 1983 [Fourth Amendment-Privacy]**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE** |

NOW COME Plaintiffs Adam Richards, Jeffrey Vandermeulen, Gerald Clark, Jesse Harris, On Target Indoor Shooting Range, LLC, Gaalswyk Enterprises, Inc. (D/B/A/ Smokin' Barrel Firearms), Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, California Rifle & Pistol Association, Incorporated and Second Amendment Foundation (collectively "Plaintiffs"), and through their respective counsel, bring this action against Defendant Attorney General Robert Bonta and Governor Gavin Newsom, in their official capacities, and make the following allegations.

## INTRODUCTION

1. Constitutionally enumerated rights are secured to all Americans. The First Amendment, Second Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment outline some of the most foundational rights.  None is to be treated as a second-class right.

2. In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022), the Supreme Court provided its third statement in recent memory affirming that the Second Amendment is not a second-class right and reiterating that firearm regulations must comport with the original meaning of the amendment's text, as understood in the Founding era.

3. Plaintiffs bring this suit to challenge the constitutionality of California Penal Code Section 26806 (also known as "SB 1384" or "Section 26806"), which violates the constitutional rights of Plaintiffs by imposing Orwellian tactics by the state to view and overhear the private and confidential communications of anyone who enters a gun shop, gun show property, or home of a home-based Federal Firearm Licensee ("FFL").

4. Not only does Section 26806 violate the individual rights of those patrons, customers, family members, friends, clients, and the FFLs themselves, but also it chills the desire to exercise those rights for fear of being video and audio recorded in communications and situations that are confidential in nature.

5. The First Amendment fully protects pure political, ideological, and

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

educational speech. Content and viewpoint-based restrictions on such speech are especially repugnant to the People's rights. Indeed, "above all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley,* 408 U.S. 92, 95 (1972); *see also Ashcroft v. Am. Civil Libs. Union,* 535 U.S. 564, 573 (2002) (the Constitution "demands that content-based restrictions on speech be presumed invalid... and that the Government bear the burden of showing their constitutionality.").

6.     Section 26806 imposes content and speaker-based restrictions on speech and assembly, unlike any restrictions current imposed on other industries in the state. To the knowledge of Plaintiffs, there are no other industries or government licensees that are subject to the type of targeted restrictions and mandates found in Section 26806, as a condition of conducting a commercial transaction.

7.     Section 26806 imposes a content- and speaker-based restriction on protected speech that is viewpoint discriminatory, that serves no legitimate government interest (directly or indirectly), and that is both facially overbroad and far more extensive than necessary to achieve any purported interest. It thus violates Plaintiffs' First Amendment rights.

8.     The First Amendment also protects the right to peaceably assemble and associate. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460 (1959). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 461-62 (emphasis added).

9.     Section 26806 works to discourage persons who may not wish to abdicate their First Amendment, Second Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment rights simply because they enter a FFL shop, gun show, or

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  private at-home FFL dealer space.

2      10.    California has set up a scheme where the only way to purchase a firearm

3  (except in very limited circumstances) is through an FFL. Under Section 26806, this

4  would mean that customers, clients, patrons, and family members would be forced to

5  give up their rights to privacy, speech, assembly, and anonymity in purchasing a

6  firearm, other gun-related item, or otherwise going about their daily lives in a location

7  where an FFL may do business. Section 26806, therefore, violates the right to

8  peaceably assemble and associate without intrusion from the government.

9      11.    Section 26806 also curtails speech and assembly because anything that is

10  recorded under this section can be used against persons in legal actions (civil or

11  criminal), divorce or child custody battles, business litigation, and the like. The

12  recordings can be subpoenaed for any of these uses, which places the FFL and anyone

13  who enters their space in danger of future prosecution.

14      12.    For many of the same reasons that Section 26806 violates Plaintiffs' First

15  Amendment rights, it also violates their right to equal protection under the law.

16          *Section 26806 also violates Plaintiffs rights under the Second Amendment*.

17      13.    The Second Amendment provides that "[a] well regulated Militia, being

18  necessary to the security of a free State, the right of the people to keep and bear Arms,

19  shall not be infringed."

20      14.    Indeed, "[t]he very enumeration of the right takes out of the hands of

21  government – even the Third Branch of Government – the power to decide on a case-

22  by-case basis whether the right is really worth insisting upon.  A constitutional

23  guarantee subject to future judges' assessments of its usefulness is no constitutional

24  guarantee at all." *Heller,* 554 U.S. at 634.

25      15.    Although it seems to go without saying, inherent in the Second Amendment's

26  protection of the right to "keep and bear" firearms is the right to acquire

27  them.  Numerous courts across the country have observed that the Second Amendment

28  protects the manufacture, purchase, and sale of firearms, ammunition, and related

4
COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

items.

16.   Section 26806 infringes on the Second Amendment rights of Plaintiffs, and a prime example of this is FFLs at a gun show[1]. Gun shows are held in various venues that are not owned by the FFLs. FFLs are vendors in those shows. If the properties that are rented by the promoters of the gun shows do not agree to put up permanent cameras to record 24 hours per day and store those records according to the law, there is a big possibility that gun shows will no longer be allowed to occur in these facilities.[2]

17.   On its face, it is clear that Section 26806's purpose and intention are to make a "symbolic" gesture and a "value statement" about the otherwise lawful sale of firearms and related products and of the proliferation of the "gun culture" in California and elsewhere. We know this because there is no evidence that having expensive cameras and audio recordings in a retail location acts as a deterrent to crime. There is even less evidence of this in a home-based business, that is generally only open to pre-screened customers who have already ordered and paid for a firearm. The government making this type of value statement about one segment of the population that they find unfavorable in ideology is a violation of Equal Protection.  California's targeting of gun owners on the basis of their exercise of constitutional rights, makes the violation even more nefarious.

18.   Section 26806 mandates a government taking without just compensation by commandeering space within the FFL businesses or homes for the use of government tracking, and by forcing FFLs to purchase equipment that is unwanted to carry out the government's bidding.

---

[1] Since there is no special exemption for FFLs doing business at a gun show, Plaintiffs assume that Section 26806 also applies to all transactions occurring there as well.  An impossibility, since the surveillance devices required by Section 26806 must be "permanently mounted in a fixed location."

[2] Federal Judges have already ruled numerous times that gun shows, the speech and activities that occur there, are protected constitutional activities. *See, e.g., B&L Prods., Inc. v. Newsom*, 2023 WL 7132054, at *17 (C.D. Cal. Oct. 30, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

19. Finally, Section 26806 violates the privacy of individuals in gun shops, gun shows, and in the private homes of FFLs who conduct business in their home.

20. Because Section 26806 violates rights protected by the First Amendment, Fourteenth Amendment, Second Amendment, Fifth Amendment, and Fourth Amendment and because it violates California's dual consent to be recorded laws, Plaintiffs seek equitable relief in declaring the law invalid and enjoining its enforcement by Defendants, their employees, agents, successors in office, and all local law and state law enforcement, District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office.

**JURISDICTION AND VENUE**

21. The Court has original jurisdiction of this civil action under 28 U.S.C. §1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

22. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. Further, the state of California maintains an office for service of process on the Attorney General in Los Angeles County at 300 South Spring Street, Los Angeles, California 90013-1230.

**PARTIES**

**[Plaintiffs]**

23. Plaintiff ADAM RICHARDS is a resident of El Dorado County, CA. Mr. Richards is a home-based FFL and an attorney that keeps a home office at the same

6

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

location where he conducts his FFL business. He was forced to become a home-based FFL when the City of Sacramento (where his office is located) made the permitting process so expensive that he could not afford to have the FFL located in the same space as his law firm. Rather than waste thousands of dollars on permitting, Mr. Richards chose to operate his FFL out of a separate structure at his residence. He has been an FFL since approximately 2021. The separate structure where the FFL business is conducted is also his home office where he works approximately 50% of his time on his legal practice. This work includes telephone calls with clients, opposing counsel, law enforcement and others. His family also frequently visits him in the mornings and evening in this office/FFL space and having his young children recorded in potentially a partial state of dress before bed and recording private conversations with his children or spouse are greatly concerning to Mr. Richards. Should Section 26806 be allowed to continue, Mr. Richards will have to either stop being an FFL or risk exposing his clients and family to privacy violations because of the constant recording. Plaintiff Richards would continue his FFL business and his legal business out of his home were it not for the intrusiveness of SB 1384 which will force him to remove the FFL business from his home.

24.     Plaintiff JEFFREY VANDERMEULEN is a resident of Amador County, CA. Mr. Vandermeulen is a retired police officer in good standing and an FFL. Mr. Vandermeulen operates a retail sales firearm business and online firearm business, named MountainHouse Firearms, where he sells firearms to customers both inside and outside of California. MountainHouse Firearms is a locally owned business specializing in the sale of new and used consignment handguns, rifles, shotguns and accessories. Mr. Vandermeulen also operates a small aerial ash dispersal business out of his home. Through the operation of his multiple enterprises, Mr. Vandermeulen often has private conversations either with customers asking questions about firearm ownership, firearm collections from their families, or conversations with those who are seeking his services to have a loved one's ashes scattered. If Mr. Vandermeulen is

forced to record all these private conversations in his home office, his customers would find this offensive, and he may lose business because of the requirement. He would be forced to place a sign where these customers could see it stating that they are being recorded, and he would have the expense of purchasing a commercial security system for his small at-home business. Mr. Vandermeulen would also have additional liability for recording people who have not given their consent to be recorded. Mr. Vandermeulen would also be forced to focus a recording device directly at his computer screen to capture online sales with his out-of-California customers, thus sharing information directly and placing those customers in a situation where the state of California is now monitoring their actions outside of the state as well and to which they did not consent. The cost of implementing SB 1384 along with the added liability and customer disapproval may force Plaintiff Vandermeulen to have to give up his home FFL business.

25.    Plaintiff GERALD CLARK is a resident of Orange County, California, and he is an NRA-certified and CRPA-certified instructor. Mr. Clark is the Training and Shooting Sports Director for CRPA. Mr. Clark regularly attends gun shows and gun ranges and frequents gun shops. During Mr. Clark's visits to gun shows, ranges, and gun shops where he purchases lawful firearms and ammunition, has discussions with the FFLs regarding the purchases, his personal information, and discusses politics surrounding the requirements of those purchases. Mr. Clark updates the FFLs on litigation and legislative issues the CRPA is championing. He has political conversations with the FFLS that are private discussions about the current state of gun control in California and what they can do to help protect the rights of the people. Mr. Clark has taught gun safety and training courses for 12 years and teaches those courses at gun show, ranges, and gun shops. During the training courses, Mr. Clark talks to others about their rights, the importance of membership in the CRPA, and the Second Amendment and other constitutional rights. SB 1384 burdens Mr. Clark's right to engage in otherwise lawful speech in places (FFL counters, closed classes, gun shows,

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

etc.) where he is discussing sensitive issues where he may now be constantly monitored. SB 1384 also prevents Plaintiff Clark from freely communicating with FFLs as to ongoing legal and legislative initiatives for fear of being recorded by the government. The use of recording devices with 24-hour monitoring will chill his ability to speak freely for fear of retribution by the government. But for Defendants' adoption and enforcement of SB 1384, Plaintiff Clark would continue attending, informing, teaching, and participating in gun shows and gun shop events.

26.     Plaintiff JESSE HARRIS lives in Siskiyou County, CA and is an FFL that operates out of his uncle's tire and tackle shop where he leases a small space to conduct firearm transfers. Mr. Harris is also a firearms trainer and a field representative for the CRPA. The requirement of SB 1384 would impact Mr. Harris by driving away customers who do not wish to have their exchanges with Mr. Harris recorded. Mr. Harris has confidential conversations with his customers and discusses many issues affecting gun owners in California. Mr. Harris also works for CRPA as a Field Representative in Northern California and Mr. Harris is running for office in 2024. Mr. Harris feels that his speech about gun control, his campaign, and the current politics of California may be chilled because he will constantly have to wonder if the DOJ is listening in. Mr. Harris also knows that the owner of the shop has confidential conversations with his attorney in the shop and has non-gun customers that frequent the premises. All of the attorney conversations and the tire and tackle customers who are not buying firearms would be subject to recording 24 hours per day just because Mr. Harris has a small section of the store that he leases. The requirements under SB 1384 are cost prohibitive to Mr. Harris and since it is a leased space, he does not have the ability to transform his uncle's store so that he can meet the requirements in SB 1384. If SB 1384 is implemented, it would ruin Mr. Harris' small business (both financially and because customers will not want to be recorded) and would cause him to have to stop being an FFL.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

27.     Plaintiff ON TARGET INDOOR RANGE ("On Target") is a for-profit brick-and-mortar gun shop and indoor shooting range located in Orange, County, California. On Target specializes in firearms sales (in-store and e-sales), firearms transfers, ammunition sales, and training classes. As an FFL, On Target has confidential conversations with customers regarding their firearm and safety needs, about what type of training they need for their individualized situation, state and federal laws and how they can be a part of changing those laws by joining groups like CRPA. On Target offers many training opportunities for new gun owners and is specially geared towards women and their unique shooting needs. Twice per month, On Target hosts interesting and informative discussion sessions with gun owners which would be completely recorded under SB 1384. The recording of these sessions would make gun owners less open to asking questions and less likely to attend for fear of the government watching and listening. SB 1384 would also open up Plaintiff On Target to additional liability for recording people who enter the premises without giving their consent to the recording. Plaintiff On Target would also be harmed by being forced to purchase costly commercial recording equipment to meet the requirements and to store the recordings for one full year.

28.     Plaintiff GAALSWYK ENTERPRISES, INC (DBA "SMOKIN'BARREL FIREARMS") is a brick-and-mortar FFL shop in Tulare County, California. Smokin' Barrel Firearms operates a 1300 square foot location which would require 5 cameras plus the hardware to record 24 hours per day (even when they are not open and transacting). Smokin' Barrel Firearms is a family-based business and the estimated $5,000 to $12,000 in order to comply with SB 1384 would be very challenging for them. Smokin' Barrel Firearms handles the sale of firearms, transfers of firearms, layaways, consignment and e-transfers. Smokin' Barrel Firearms has confidential conversations with customers regarding their self-defense needs as well as collecting confidential and personal information in the transactions they conduct. Smokin' Barrel Firearms would also be forced to place a recording device directly at his computer

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

screen to capture online sales with his out-of-California customers, thus sharing information directly and placing those customers in a situation where the state of California is now monitoring their actions outside of the state as well and to which they did not consent. This would also create a "gun registry" that the DOJ could access any time they wanted to do so. They and their customers and students would be harmed by being forced to produce those recordings to DOJ on demand as well as harmed by the fact that those recordings could be open to subpoena in civil and criminal matters. Plaintiff Smokin' Barrel Firearms would also have additional liability for recording persons who have not given their consent to be recorded. SB 1384 is too large of a burden for Plaintiff Smokin' Barrel Firearms and its customers.

29.     Plaintiff GUN OWNERS OF CALIFORNIA, INC. ("GOC") is a nonprofit organization incorporated under the laws of the state of California, with headquarters in El Dorado Hills, California. GOC is dedicated to the restoration of the Second Amendment in California. To that end, GOC and its members frequent FFL shops and gun shows and discuss issues pertaining to legal and political issues with the FFLs to make sure they are aware of compliance issues and upcoming legislative changes. These conversations are not meant for the general public or the prying ear of the government. GOC members often discuss these issues along with protection measures for their homes, families, and businesses with FFLs and those conversations are meant to be confidential and not public.  GOC makes its publications and other materials available for prospective members and the general public in gun stores across California. Through this lawsuit, GOC represents not only its own interests as an entity that may discuss topics meant to be between GOC and gun dealers and their customers, but also the interests of its members as those who enter and transact business and conversations in a store or gun show where recording of those confidential conversations would take place.  GOC and its members are supporters of the right to keep and bear arms for lawful purposes.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

30.     Plaintiff GUN OWNERS OF AMERICA ("GOA") is a California non-stock corporation and a not-for-profit membership organization with its principal place of business in Springfield, Virginia, and is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including residents within this judicial district and throughout the State of California. GOA members and supporters who patronize gun shops and gun shows are damaged by SB 1384 because of the numerous infringements on their constitutional rights.  GOA makes its publications and educational materials available for prospective members and the general public in gun stores across California.  GOA members and the general public seek out these materials and engage with gun stores and GOA about the information that is provided. GOA thus brings this challenge not only on behalf of itself as an organization (as Section 26806 harms GOA's ability to spread its message, reach new members, and raise funds to perform its critical mission), but also on behalf of its members and supporters including gun stores, home-based dealers, and customers of the same, all of whom are directly harmed by Section 26806's provisions.

31.     Plaintiff GUN OWNERS FOUNDATION ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia.  GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country and within this district.  GOF's supporters include those that shop at California's gun stores.

32.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a nonprofit membership organization incorporated under the laws of California, with headquarters in Fullerton, California. Among its

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

other activities, CRPA works to preserve and expand constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. CRPA accomplishes this through its educational offerings, publications, member engagement events, and legislative advocacy and initiatives. CRPA has over 500 business affiliates that they work with across the state, many of which are Federal Firearms Licensees. CRPA enters these Business Affiliate premises to conduct business, update the businesses on news and information, and to discuss important political and legal challenges in the state. CRPA also has trainers in some of these locations that host classes for members and non-member gun owners. CRPA trainers, members, and class participants would be open to privacy violations of having their discussions recorded that have nothing to do with a gun purchase just because they are having them in a store where firearms transactions occur. What's more, CRPA has tens of thousands of members and supporters, many of whom (including Plaintiffs Gerald Clark, Jesse Harris, and Adam Richards) frequent gun stores and gun shows to engage in lawful purchases, expressive activities with like-minded people, including discussions related to firearms, ammunition, accessories, the shooting sports, politics, and the Second Amendment. Recording conversations that are private and confidential and deal with the protection of self and family may be a deterrent to some walking into a store to conduct these activities. Through this lawsuit, CRPA represents not only its own interests as an entity that may discuss other topics meant to be between CRPA and its Business Affiliate only but also the interests of its members as those who enter and transact business and conversations in a store or gun show where recording of those confidential conversations would take place. CRPA and its members are supporters of the right to keep and bear arms for lawful purposes.

33.     Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is a non-profit membership organization. It is incorporated under the laws of the state of Washington and was founded in 1974. SAF has over 720,000 members and supporters nationwide, including thousands of members in California. SAF is dedicated to

promoting a better understanding about our constitutional heritage to privately own and possess firearms through educational and legal action programs designed to better inform the public about gun control issues. SAF has been a pioneer and an innovator in the defense of the right to keep and bear arms, through its publications and public education programs like the Gun Rights Policy Conference. SAF also expends significant sums of money sponsoring public interest litigation to defend its own interests and the interests of its members and supporters. It is critical to the success of SAF that its promotional material, publications, and messages about the "right to keep and bear arms" reach demographic groups that are saturated with gun owners, gun buyers, and people of the "gun culture." It is also crucial that SAF be able to communicate with gun owners in gun stores or at gun shows about political issues, legal cases, firearms and ammunition purchases, etc., without the fear of having every word collected by the government. SAF brings this action on behalf of itself and its members and supporters in California, including Federal Firearms Licensees (those with a storefront and those who operate from their homes) and customers of the same.

**[Defendants]**

34.    Defendant GAVIN NEWSOM is the Governor of the State of California. As Governor, he is vested with "the supreme executive power" of the state and "shall see that the law is faithfully executed." Cal. Const. art. 5, §1. The injunctive and declaratory relief portions of this suit are brought against Defendant Newsom in his official capacity.

35.    Defendant ROBERT BONTA is the Attorney General of the State of California. He is the "chief law officer" of the state and has the duty to 'see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1.

36.    Additionally, Defendant Bonta has "direct supervision over every district attorney" within the State. *Id.* If, at any point a district attorney of the State fails to enforce adequately "any law of the State," Defendant Bonta must "prosecute any violations of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State

of California, "shall assist any district attorney in the discharge" of duties when "required by the public interest or directed by the Governor. . . ." *Id.*

37.     The injunctive and declaratory relief portions of this suit are brought against Defendant Bonta in his official capacity.

38.     The true names and capacities of Defendants named as DOES 1 through 10, inclusive, are individual, corporate, associate or otherwise, and are unknown to Plaintiffs. They are, however, believed to be responsible in some way for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or directly responsible for the acts or omissions of the other defendants or themselves. They are each sued individually and are joined as party defendants. Plaintiffs thus sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil Procedure. Plaintiffs are informed and believed that the Doe Defendants are all California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ascertained.

## FACTUAL ALLEGATIONS

### [Regulations of Brick-and-Mortar Gun Shops in California]

39.     California law requires that essentially all transfers of firearms be done through a Federal Firearms Licensees retailer ("FFL"), including transfers between private parties, gun show sales, gifts, loans, and pawned or consigned weapon redemptions.[3] Prospective firearm purchasers must submit an application to the FFL, who provides purchaser information to CADOJ through electronic transfer. CADOJ

---

[3] There were more than three times as many handgun purchases in California in 2020 as compared to 2010 (666,168 vs. 217,836); handgun purchasing was down in 2021 (519,806) but still up by 140% from 2010. The Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS), a commonly used proxy for firearm sales, shows a similar national rise in purchasing over the last decade and spike in purchasing in 2020. In 2010, there were close to 15 million NICS checks; there were over 28 million in 2019 and almost 40 million in 2020. NICS Firearm Background Checks. https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

then checks state and federal records to determine whether the applicant is legally disqualified from purchasing or possessing firearms under state or federal law. The DROS records include the prospective purchaser information (name, date of birth, sex, race/ethnicity, address); date and time of transaction; the type of transaction (e.g., sale, denial, transfer, pawn); and identifiers for the seller.

40.     Federal law requires all persons who intend to engage in a business involving the sale, manufacture, or importation of firearms to apply for and obtain a federal firearms license ("FFL"). 18 U.S.C. § 922(a). To obtain an FFL, a person must be at least 21 years of age, not be prohibited from owning or possessing firearms, not have willfully violated the federal Gun Control Act ("GCA") or its regulations, not willfully failed to disclose material information or make any false statements on their application and have a premises for conducting business. 18 U.S.C. § 923(d)(1); 27 C.F.R. § 478.47(b).

41.     FFL applicants must also certify their business will not be prohibited by state or local law where the premises are located, will comply with all state and local laws applicable to the conduct of the business, that no business will be conducted until all applicable state and local laws have been met, that they have notified their local law enforcement of their intent to apply for a license, and if seeking to operate as a dealer that secure gun storage or safety devices will be available at any place where firearms are sold. *Id*.

42.     In California, no person may sell, lease, or transfer firearms unless they obtain a state-issued license. Cal. Pen. Code § 26500. To obtain such a license, a person must have a valid FFL, have a regulatory or business license required by local government, have a valid seller's permit issued by the State Board of Equalization, have a certificate of eligibility issued by the California Department of Justice ("CA DOJ"), have any required local business license that states on its face "Valid for Retail Sales of Firearms" and is endorsed by the signature of the issuing authority, and be listed in DOJ's centralized list of firearm dealers in the state. Cal. Pen. Code § 26700.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

43.     California Cities and Counties are generally free to impose additional licensing requirements beyond that required under state and federal law. See Cal. Pen. Code § 26705(a) (stating "duly constituted licensing authority of a city [or] county . . . shall accept applications for, and may grant licenses . . ."). For example, the City of San Jose prohibits persons from selling, leasing, or otherwise transferring firearms without first having obtained a Firearm Business License from the Chief of Police. San Jose Muni. Code § 6.90.090.

44.     Any individual applying for a license with the City of San Jose must also complete a personal history questionnaire, be fingerprinted at a location approved by the San Jose Police Department, be photographed and interviewed, sign an authorization for release of records and information that the Chief of Police considers necessary for a complete investigation, and be at least 21 years of age. San Jose Muni. Code § 6.90.210(B).

45.     Federal law requires all firearm acquisition and disposition ("A&D") records to be recorded in a logbook, commonly referred to as a "bound book," which is an orderly arrangement of loose-leaf pages maintained at the business premises in a format prescribed in federal regulations and numbered consecutively. 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121, 478.125.

46.     Licensed dealers are required to record the acquisitions of a firearm in their bound book no later than the close of next business day, and no later than 7 days for dispositions. 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.125.

47.     The sale or transfer of any firearm by a licensed dealer to an individual requires both the FFL and individual to jointly complete ATF Form 4473. 27 C.F.C. § 478.124. The information contained in ATF Form 4473 is used by the FFL to ensure the individual's eligibility and to process the required federal background check through the National Instant Criminal Background Check System ("NICS"). 18 U.S.C. 922(t); 27 C.F.R. § 478.102.  Generally, completed 4473 forms are retained by the FFL

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

at its business premises indefinitely while the business remains in operation. 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.129(b).

48.     California is one of 13 full point of contact ("POC") states, meaning CA DOJ is designated to conduct firearm background checks for FFLs in California in lieu of the FFL transmitting the information contained in ATF Form 4473 to NICS directly. To process the required background check, California FFLs are instead required to submit a Dealer Record of Sale ("DROS") through a web-based application known as the DROS Entry System ("DES"). Regardless, California FFLs must still complete and maintain ATF Form 4473 for all firearm transactions. California FFLs are then required to print and retain a copy of the DROS paperwork in consecutive order with the required ATF Form 4473. Cal. Pen. Code § 28215.

49.     Local jurisdictions in California may also impose additional recordkeeping requirements.

50.     To ensure compliance with all licensing and recordkeeping requirements, federal law requires FFLs to allow ATF officers to enter during business hours, including places of storage, for purposes of inspecting or examining the records, documents, ammunition, and firearms. 27 C.F.R. § 478.23(b). ATF officers may conduct such inspections for insuring compliance with the recordkeeping requirements every 12 months, during a reasonable inquiry, during a criminal investigation of a person or persons other than the FFL, or when such inspections may be required for determining the disposition of one or more firearms during a bona fide criminal investigation. *Id.*

51.     Similarly, California law allows CA DOJ to conduct inspections of FFLs at least once every three years to ensure compliance with California firearm laws. Cal. Pen. Code §§ 26720, 28480. During such inspections, the FFLs bound book, DROS verification numbers, and any other records requested by CA DOJ must be made available for review. Cal. Pen. Code § 26480(c). CA DOJ is required to audit a sampling of at least 25 percent but no more than 50 percent of each record type. Cal.

Pen. Code § 26720(a)(2). FFLs are also required to pay an annual fee to cover the cost of this inspection ($115). Cal. Pen. Code § 26720(b).

52.     Local jurisdictions are free to adopt their own inspection program to ensure compliance with firearms laws. As noted above, the City of San Jose requires imposes its own local ordinances regarding FFL inspections. San Jose Muni. Code § 6.90.340. In addition, San Jose requires FFLs to conduct a physical inventory check and report its findings to the Chief of Police in the form of a signed affidavit under penalty of perjury. San Jose Muni. Code § 6.90.350.

53.     FFL dealers who do not comply with these requirements are in violation and may be fined or, worse, not allowed to continue conducting business (or even criminally charged). Most FFLs take these requirements very seriously, as this is their livelihood.

**[Regulations of Gun Show Events in California]**

54.     FFLs who operate at a gun show are also subject to Section 26806's recording requirements because, under their licenses, the only two places they are allowed to do business are at the address listed on their licenses or at a gun show. The Gun show is a "de facto" place of business. 27 CFR Part 478.100.   This means that every facility that hosts a gun show will have to "permanently affix" recording equipment and record 24 hours per day. Cal. Pen. Code § 26806(a)(2)-(4). Many religious, political, youth groups or private groups such as weddings and class reunions, use the same facilities that gun shows. Given that there are no exceptions to the requirements in Section 26806, it would stand to reason that all of those unsuspecting, non-consenting people would be recorded on the permanently placed/24-hour recording devices that would have to become an integral part of those facilities that host gun shows. If the venue refuses to install the expensive equipment, it will lead to yet another swipe by Senator Min and Governor Newson at venues hosting gun shows, in an effort to end those shows.  *See B&L Prods.*, Inc, 2023 WL 7132054.

55.     The state of California has, hands down, the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That regulatory regime applies to the operation of gun show events throughout California. The laws related to the acquisition and sale of firearms is arguably stricter at a gun show than at brick-and-mortar stores or internet sales.

56.     Only state-approved, licensed gun show "producers" may operate gun shows in California.

57.     All gun show producers must have an individual (the "promoter") who holds a valid "Certificate of Eligibility" issued by the California Department of Justice.

58.     Gun show producers must, among other things:

    a.  Certify that they are familiar with all California laws regarding gun shows, Cal. Penal Code § 27200;

    b.  Possess a minimum of $1,000,000 liability insurance, *id.*;

    c.  Provide an annual list of shows or events to be held to the California Department of Justice, *id.*; and

    d.  Notify the California Department of Justice no later than 30 days prior to the gun show or event of any changes to the above, *id.*

    e.  Make available to law enforcement a complete and accurate list of all vendors that will participate in the show to sell, lease, or transfer firearms.

Cal. Penal Code § 27205.

59.     Gun show promoters must submit an annual event and security plan and schedule to the California Department of Justice and any local law enforcement agency. The plan must include:

    a.  Type of show or event;

    b.  Estimated number of vendors offering for sale or display firearms;

    c.  Estimated number of attendees;

    d.  Number of entrances and exits at the event;

    e.  Location, dates, and times of the event

20

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

f.  Contact person and telephone number for both promoter and facility;

g.  Number of sworn peace officers employed by the producer or facility who will be present at the event;

h.  Number of non-sworn security personnel employed by the producer or the facility who will be present at the event; and

i.  Promoters must inform all prospective vendors of all California laws regarding gun shows.

Cal. Penal Code §§ 27210, 27215.

60.     Promoters must also provide a list of all prospective vendors and designated firearm transfer agents who are licensed firearm dealers to the California Department of Justice no later than seven days prior to the event for the purpose of determining whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

61.     If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California laws, they cannot participate. Cal. Penal Code § 27220.

62.     Except in very limited exceptions applicable only to law enforcement, actual firearm transfers are prohibited from taking place at any gun show in California. *See* Cal. Penal Code § 26805.

63.     The firearm sale can be started through an on-site licensed "transfer dealer," but it cannot be completed on-site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location--after a 10-day waiting period and background check. There is no exception for transfers to occur at gun shows operated in accordance with California Law.

64.     Just because someone starts the process to purchase a firearm, does not mean that they will pass the background check and be able to actually take possession of a firearm. Section 26806 will collect information on everyone regardless of whether they actually complete the transaction and take possession of a firearm or not.

21

65.     The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

a. Vendors not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

b. Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

c. Vendors will not engage in activities that incite or encourage hate crimes;

d. Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

e. Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

f. Vendors provide all required information under Penal Code §27320;

g. Vendors will not display or possess black powder or offer it for sale;

h. Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. .On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply;

i. No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian;

j. No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

66.     Vendors at gun shows, like Plaintiffs Adam Richards and Jesse Harris are some of the same licensed vendors that have brick-and-mortar stores in the community

or operate legally over the Internet and are registered with the state as lawful businesses.

**[Gun Shops and Gun Shows Are a Cultural Experience]**

67.     Gun shows are a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state and local governments for all manner of commerce. This convention-like setting is of incalculable benefit to the gun-buying consumer and promotes public safety.

68.     Gun Shops mirror this same connection amongst like-minded individuals who come to the shop – in addition to acquire Second Amendment protected "arms" – to discuss their rights and their needs for protection, the current laws of California, and political issues that may limit what they are able to acquire.

69.     Gun shows and gun shops, in general, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution.

70.     Gun shows and gun shops are places where parents can learn to protect their families and their homes, and how to stay in compliance with California's ever-changing gun laws.

71.     Gun shows, in particular, are held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the constitutional principles that gun show participants hold dear.

72.     Gun show venues are used by many different public groups and constitute major event venues for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows. Affixing permanent cameras that record 24 hours per day would be a violation of not just gun owners' rights to not have the government spy on personal conversations but would broadly affect any other groups using the venues.

73.     The government spying on people, especially in a place where expressive activity occurs so frequently, is wholly inconsistent with our country's founding

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  principles.

2  **[California's Senate Bill 1384(Min)]**

3  **[Impacts of SB 1384 on FFLs in California and the Ineffectiveness on Crime]**

4  *Impacts of SB 1384 Implementation on FFL Businesses*

5  74.    The California Legislature, and particularly SB 1384 sponsor Senator Min,

6  have made a big business of anti-gun legislation that they say will stop gun violence in

7  California, sponsoring and passing multiple gun control laws each legislative session

8  that are repeatedly challenged and overturned in the courts.

9  75.    SB 1384, which added Section 26806 to the California Penal Code would

10  require "a licensed firearm dealer to have a digital video surveillance system on their

11  business premises."

12  "(a) Commencing January 1, 2024, a licensee shall ensure that its business

13  premises are monitored by a digital video surveillance system that meets all of

14  the following requirements:

15  (1) The system shall clearly record images and, for systems located inside the

16  premises, audio, of the area under surveillance.

17  (2) Each camera shall be permanently mounted in a fixed location. Cameras

18  shall be placed in locations that allow the camera to clearly record

19  activity occurring in all areas described in paragraph (3) and reasonably

20  produce recordings that allow for the clear identification of any person.

21  (3) The areas recorded shall include, without limitation, all of the following:

22  (A) Interior views of all entries or exits to the premises.

23  (B) All areas where firearms are displayed.

24  (C) All points of sale, sufficient to identify the parties involved in the

25  transaction.

26  (4) The system shall continuously record 24 hours per day at a frame rate no

27  less than 15 frames per second.

28

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

(5) The media or device on which recordings are stored shall be secured in a manner to protect the recording from tampering, unauthorized access or use, or theft.

(6) Recordings shall be maintained for a minimum of one year.

(7) Recorded images shall clearly and accurately display the date and time.

(8) The system shall be equipped with a failure notification system that provides notification to the licensee of any interruption or failure of the system or storage device.

Cal. Penal Code § 26806(a).

76.     The information collected by the FFL shall not be used, shared, or accessed except as specified as follows:

(1) A licensee shall allow access to the system to an agent of the department or a licensing authority conducting an inspection of the licensee's premises, for the purpose of inspecting the system for compliance with this section, and only if a warrant or court order would not generally be required for that access.

(2) A licensee shall allow access to the system or release recordings to any person pursuant to search warrant or other court order.

(3) A licensee may allow access to the system or release recordings to any person in response to an insurance claim or as part of the civil discovery process, including, but not limited to, in response to subpoenas, request for production or inspection, or other court order.

Cal. Penal Code § 26806(b).

77.     The FFL "shall post a sign in a conspicuous place at each entrance to the premises that states in block letters not less than one inch in height" the following: "THESE PREMISES ARE UNDER VIDEO AND AUDIO SURVEILLANCE. YOUR IMAGE AND CONVERSATIONS MAY BE RECORDED."

Cal. Penal Code § 26806(c).

78.     A licensee shall, on an annual basis, provide certification to the department, in a manner prescribed by the department, that its video surveillance system is in proper working order. Cal. Penal Code § 26806(d).

79.     Recently, the Bureau of Alcohol, Tobacco, Firearms, and Explosives promulgated a Notice of Proposed Rulemaking designed to vastly increase the number of federally licensed gun dealers, who are also regulated by California, including under Section 26806.  *See* Definition 8, 2023) (to be codified at 27 C.F.R. pt. 478).  ATF estimates that the net effect of its proposed rule will be that a minimum of *hundreds of thousands* of Americans must become licensed dealers, even if only to sell a few personally owned firearms.  *Id.* at 62009.  ATF further estimates that most of these new "dealers" will operate out of their homes.  *See id.*  Thus, the sum total of Section 26806 and this proposed federal rulemaking will be that many thousands more gun-owning households will be under 24/7 audiovisual surveillance by California.

*Section 26806 has no impact on Preventing Crime*

80.     One of the purpose of Section 26806 was to stop criminal activity that supposedly takes place in gun stores such as stolen firearms and straw purchases.

81.     Admittedly, many gun shops already have some form of security camera to help deal with break ins and the like that may occur in stores. Just like every other retail store in California, the incidence of retail theft is real. And just like every other type of retail store in California that has video security, crime is not deterred by these security systems or by even having security personnel in the stores. Most security cameras are there for loss and insurance purposes, not to catch criminals.

82.     The authors of SB 1386 note that "the rate of gun store thefts seems to have tapered slightly in recent years"[4] while retail theft across the board has increased in

---

[4] Senate Committee on Public Safety, April 19, 2021 hearing on SB 1384, p.7 file:///C:/Users/tcheuvront/Downloads/20210220SB1384_Senate%20Public%20Safety.pdf (last visited Dec. 18, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

California.[5],[6]

83.     Yet, with all of the retail crime on the rise in California, FFLs are the only ones being forced to set up costly government surveillance systems while simultaneously being the industry experiencing less crime in recent years according to SB 1384's author.

### [The First Amendment Right to Free Speech, Association, Anonymity & Assembly]

84.     The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  The Fourteenth Amendment incorporates these protections against the states through its Due Process Clause.

*Section 26806 violates virtually every one of these enumerated rights.*

85.     First, Section 26806 mounts a malicious attack on the freedom of association and second, violates the right to remain anonymous. *Antonyuk v. Chiumento*, 2023 WL 8518003, at *37 (2d Cir. Dec. 8, 2023) ("It is uncontroversial that the First Amendment protects the right to speak anonymously.").

86.     When engaging in protected speech—imposing a dystopian surveillance mandate that chills not just speech that is favorable of the Second Amendment but also quintessential political speech that is critical of California's draconian gun control regime, arguably the most severe outlier of any state in the nation.

---

[5] Retail Theft and Robbery Rates Have Risen across California, Public Policy Institute of California, https://www.ppic.org/blog/retail-theft-and-robbery-rates-have-risen-across-california/#:~:text=In%20sum%2C%20the%202022%20data,where%20it%20was%20in%202017. (Last visited Dec. 18, 2023).
[6] Why Shoplifting is Now De Facto Legal in California, Hoover Institution, Aug. 3, 2021 https://www.hoover.org/research/why-shoplifting-now-de-facto-legal-california (Last visited Dec. 19, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

87.     Third, Section 26806 impermissibly compels speech by requiring business owners, and many homeowners with an at-home business, to display a government-mandated message that will discourage customers, and non-customer visitors, from even entering the premises.

88.     Fourth, in something of a pièce de résistance, residential FFLs who lawfully sell firearms out of their homes face an Orwellian-level "telescreen" invasion of their privacy and *elimination of virtually all First Amendment freedoms in their own homes* with the "all knowing eye" of the government peering in.

89.     Fifth and finally, Section 26806 also is not content-neutral, but rather constitutes a blatant viewpoint discrimination as only those supporters of the Second Amendment (i.e., gun owners and gun dealers) are subjected to Section 26806's onerous restrictions. No other industry in California is mandated to record video and audio of all activities, for all people coming and going, and all conversations 24 hours a day.

90.     Section 26806 is patently violative of the First Amendment for any one of these reasons.  But taken together, these compounded issues expose a grotesquely unconstitutional law that warrants the swiftest and most emphatic corrective action.

*Section 26806 Decimates the Freedom of Association.*

91.     Contrary to Section 26806's unprecedented surveillance mandate, the Supreme Court has long held that "the right of individuals to associate for the advancement of political beliefs" ranks "among our most precious freedoms" and "is protected by the First Amendment." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

92.     Attacks on constitutional rights are, unfortunately, nothing new in this country.  But the Second Amendment right to keep and bear arms has been subject to an assault perhaps unparalleled in scope and duration.

/ / /

/ / /

93.     As then-Arkansas Attorney General Leslie Rutledge noted in 2020, the Second Amendment is constantly "under assault."[7] Others have observed that "[t]he Second Amendment is the most attacked right,"[8] so much so that the Supreme Court has had to warn openly hostile lower courts that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2156 (2022).  And yet, retired Supreme Court Justice John Paul Stevens has even called for a total repeal of the Second Amendment[9].

94.    The volume and duration of the attacks on this right have, of course, also engendered the creation of Second Amendment associations, such as Plaintiff Gun Owners of America which, in addition to providing educational materials to the public and litigating to preserve constitutional rights, also engages in lobbying, advocacy, and even endorsement of candidates for political office who support the Second Amendment.

95.     But attacks on the constitutional right to keep and bear arms inevitably involve attacks on other constitutional rights as well.  For example, Plaintiff GOA has filed briefs in numerous Fourth Amendment cases,[10] because the freedom from unreasonable searches and seizures often results in confluence with Second Amendment-protected keeping and bearing of arms.  Similarly, firearms-related activities have long engendered First Amendment-protected free associations of citizens for related (and unrelated) purposes, such as during hunting, target shooting, self-defense training, and gun collecting.

---

[7] Leslie Rutledge, *Guns, the NRA and the Second Amendment Are Under Assault from the Left,* NBC News (Aug. 21, 2020), https://tinyurl.com/2kx6bt26.

[8] Heather Smith, *Second Amendment: What Are the Facts?,* Jews for the Pres. of Firearms Ownership (Oct. 19, 2020), https://tinyurl.com/2wbs22hf.

[9] Ellis Kim, *How Difficult Would It Be to Repeal the Second Amendment?,* PBS (Mar. 27, 2018), https://tinyurl.com/mr4a2v2h.

[10] *See, e.g.,* https://www.lawandfreedom.com/wordpress/wp-content/uploads/2022/07/Torcivia-Amicus-Brief.pdf.

96.     Inextricably linked to the right to keep and bear arms is the First Amendment's protection of the freedom of association, which Section 26806 chills severely.

97.     California has made no secret of its open declaration of war on the Second Amendment and the right to keep and bear arms.  In an echo of former Justice Stevens, Governor Gavin Newsom has issued a press release calling for a "28th Amendment" to ban millions of commonly owned semiautomatic rifles.[11]  Joining this initiative, State Senator Aisha Wahab called support of the Second Amendment a "gun fetish culture." *Id.*  And if California's hostility to the Bill of Rights was not yet clear, the Governor has even proposed to double taxes on firearms and ammunition, comparing such a measure to a "sin tax."[12]

98.     In California's political climate, given the outward animus towards gun owners, it is probable (if not certain) that, in stores where customers gather to purchase firearms and ammunition, one will hear statements and conversations among like-minded individuals criticizing the Governor and the Attorney General or other powerful California politicians who openly oppose the right to keep and bear arms.

99.     Yet should Section 26806 be permitted to take effect, those conversations will now be recorded and accessible to government investigators (by the same department that makes determinations as to who may carry a firearm).  Such intrusive surveillance into the realm of political discourse invariably will have a chilling effect on the associational rights of those who wish to gather and discuss the Second Amendment or criticize the politicians who oppose it.

---

[11] *Governor Newsom Proposes Historic 28th Amendment to the United States Constitution to End America's Gun Violence Crisis*, Off. of Governor Gavin Newsom (June 8, 2023), https://tinyurl.com/4y82tmve.

[12] Emma Colton, *NRA Slams Newsom's 'Sin Tax' Comments on Gun Law amid Spiraling Crime: 'Ignoring Criminals,'* Fox News (Sept. 27, 2023), https://tinyurl.com/4x4k5fsx.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

100.    Unfortunately, this chilling effect on association is not speculative.  Eight years ago, High Bridge Arms, the last gun store in San Francisco, closed its doors, strong-armed out of business by city ordinances nearly identical to Section 26806: "The store announced on Facebook that it would close for 'a variety of reasons' – among them, gun regulations in San Francisco.  Specifically, new measures the city is currently considering would require the store to videotape gun purchases and report ammunition sales to the police … regulations[] which have already upset customers. 'We're getting phone calls: So, if I buy a box of bullets from you, are you going to report us to the police department?'"[13]

101.    It is no coincidence that the Supreme Court recently has had to remind California that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2382 (2021).  That "[p]rotected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (emphasis added).

102.    Moreover, the "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462 (1958).

103.    For example, as discussed in the declaration of Sam Paredes and Richard Minnich, Plaintiffs GOC and CRPA distribute the organization's literature, including fliers, newsletters, and membership applications, to hundreds of gun stores across California.  The dealers typically are thankful to receive the material, because patrons frequently visit their stores not only to purchase firearms, but also to discuss firearms-

---

[13] Sam Harnett, *San Francisco's Last Gun Shop Calls It Quits*, NPR (Oct. 27, 2015), https://tinyurl.com/79pc2kf8 (cleaned up).

related issues.  The GOC and CRPA materials thus provide a convenient way for gun stores to provide relevant literature to inquiring customers.  Oftentimes, this distribution leads to discussion about Second Amendment issues and to new GOC and CRPA members joining at their local gun store.  Many GOC and CRPA members report having initially obtained information about GOC and CRPA from their local gun store. Plaintiffs Clark and Harris often times leave this literature and talk to the FFLs in the stores about the politics of gun control in the state.

104.    Similarly, as discussed in the declaration of Erich Pratt, Plaintiff GOA maintains a "Caliber Club," a "partnership program" comprised of more than five thousand gun stores and shooting ranges across the country, many of which are in California.  GOA distributes various literature, brochures, patches, stickers, newsletters, and other items to its Caliber Club members, who make those items available for interested customers.  This distribution leads to literature about events of concern to GOA and its members being disseminated widely, and also leads to the acquisition of new members and supporters. CRPA and SAF have similar programs working closely with FFLs across the state.

105.    Section 26806 would surveil, monitor, and record all of this quintessential First Amendment speech about Second Amendment rights, which is generally politically unpopular in California.  Knowing they are under constant government surveillance, gun store patrons will be less likely to speak their minds and to seek out information about pro-gun groups like Plaintiffs GOA, GOC, CRPA, and SAF.  This will harm Plaintiffs' ability to disseminate their message and communicate with gun owners.

106.    Also, as Section 26806 will inevitably result in less political speech involving the organizational Plaintiffs, this will result in fewer members signing up and fewer donations received, directly harming GOA, GOC, CRPA, and SAF as organizations and impeding their ability to perform their nonprofit mission to secure and preserve the right to keep and bear arms in California.

107.     Finally, Section 26806 quite literally will result in California's creation of a partial list of members of GOA, GOC, CRPA and SAF as everyone who signs up as a member of either organization will be monitored and surveilled by the state, clearly violating the First Amendment's prohibition against such government activity.  *See NAACP*, 357 U.S. at 462; *see also Shelton v. Tucker*, 364 U.S. 479 (1960) (prohibiting forcing schoolteachers to list their political affiliations); *Bates v. City of Little Rock*, 361 U.S. 516 (1960) (prohibiting forced disclosure of membership list through regulatory scheme).

108.     Of course, "disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public,'" as is the case here, where FFLs must record at the government's behest—but generally not publish—identities and interactions of gun owners.  *Ams. for Prosperity Found.*, 141 S. Ct. at 2388.

109.     In other words, Section 26806 goes far beyond requiring the constitutionally repugnant disclosure of mere names on lists, requiring instead the images, likenesses, and utterances of all who may seek to purchase a firearm or even just explore the options of firearms within the state.

110.     To illustrate just how seriously federal courts have treated the freedom of association, even otherwise proper civil discovery obligations to the government risk running afoul of the First Amendment: "In cases pitting the government against a private association, the Supreme Court has required that the government's interest be demonstrated to be 'compelling' and bear a 'substantial relation' to the disclosure sought.  Additionally, the government must show that the sought-after disclosure represents the 'least restrictive means' for accomplishing its objectives and will not unnecessarily sweep constitutional rights aside.  Finally, the Court charges us to weigh against the government's interest in disclosure the likelihood of injury to an association, or its members, if the desired information is released."  *Adolph Coors Co. v. Wallace,* 570 F. Supp. 202, 208 (N.D. Cal. 1983).

111.     California can meet none of these requirements.  In particular, the state

could never show that the 24/7 audiovisual recording of a business engaged in constitutionally protected conduct and commerce is the *least restrictive* means of accomplishing Section 26806's alleged goal of "public safety and education."

112.    Section 26806 offends the "vital relationship between freedom to associate and privacy in one's associations." *Ams. for Prosperity Found.*, 141 S. Ct. at 2382.  It is an attack not only on the Second Amendment but on the First Amendment freedom of association as well.

113.    Because Section 26806 abridges the freedom of association, it is unconstitutional as violative of the First Amendment.

*Section 26806 Abridges the Right to Speak Anonymously, Including to Criticize the Government*

114.    As noted, Section 26806 requires ubiquitous audio and video surveillance and recording of every bit of speech that occurs within California's thousands of gun stores.  In other words, there is no possibility that a customer or visitor can speak anonymously with others in such locations, on any topic.  Rather, all private conversations will be swept up and monitored by the government.

115.    In stark contrast to Section 26806's provisions, this nation's Founders placed great value on the *anonymous* exercise of constitutional rights.  In accordance with this rich historical tradition, the Supreme Court has explained that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 343 (1995).

116.    Indeed, "[a]nonymity is a shield from … tyranny [which] exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *Id.* at 357 (citation omitted).  Naturally, "[t]he decision in favor of anonymity may be motivated by fear of … official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as

possible.  Whatever the motivation may be … the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry." *Id.* at 341-42.

117.    Other federal courts have elaborated on the importance of this constitutional protection for anonymous speech: "The right to speak anonymously was of fundamental importance to the establishment of our Constitution.  Throughout the revolutionary and early federal period in American history, anonymous speech and the use of pseudonyms were powerful tools of political debate.  The Federalist Papers (authored by Madison, Hamilton, and Jay) were written anonymously under the name 'Publius.' … Anonymous speech is a great tradition that is woven into the fabric of this nation's history." *Doe v. 2themart.com Inc.,* 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001).

118.    Foreshadowing the Panopticon-like risks Section 26806's attack on anonymity would bring, the Supreme Court has cautioned that "the fear of public disclosure of private conversations might well have a chilling effect on private speech. In a democratic society, the privacy of communication is essential if citizens are to think and act creatively and constructively.  Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas." *Bartnicki v. Vopper,* 532 U.S. 514, 533 (2001).

119.    Section 26806, however, replaces the "stranger" intentionally monitoring the conversation with the State's executive branch, controlled by the powerful Governor of California, a sworn political enemy of the very constitutional right a gun store customer is attempting to exercise.  The First Amendment chilling effect thus is at its zenith.  Section 26806's effect on speech related to Second Amendment rights is equivalent to a law mandating audio and video recording of services and parishioner prayers in every California church, mosque, and synagogue.

120.    Unsurprisingly, customers at gun stores (gun owners) likely are motivated to engage in speech which is critical of Governor Newsom and other California politicians who advocate for, enact, and enforce laws, regulations, and policies that target gun owners.  Indeed, the Executive Branch contains the very officials enforcing the very laws that gun store customers engage in protected political speech to criticize. If such speakers know their comments will be heard only by a sympathetic gun store owner and other like-minded patrons, they are likely to feel free to speak their minds. Conversely, if the government wishes to squelch "political debate" and enable "official retaliation" against critics, what better way than requiring 24/7 facial and voice recording at locations where citizens, exercising a disfavored but enumerated constitutional right, are likely to assemble?

121.    For example, Plaintiffs Harris, Vandermeulen, Smokin' Barrel Firearms, and On Target declarations explain that local gun stores provide a vital First Amendment platform in their communities, in addition to being a place where Californians can exercise their Second Amendment right to acquire firearms.  On a typical weekend morning, there are numerous customers and visitors in these stores at any given time, representing people from all walks of life and from all over the area, but who are generally united in their enjoyment of firearms, their desire to provide for their own self-defense, and their motivation to protect and preserve their Second Amendment rights. (See Declaration of Jesse Harris ("Harris Decl.") ¶¶ 4-7; Declaration of Jeffrey Vandermeulen ("Vandermeulen Decl.") ¶ 6; Declaration of Robert Gaalswyk ("Gaalswyk Decl.") ¶¶ 7, 9; and Declaration of Gregg Bouslog ("Bouslog Decl.") ¶¶ 5-8, filed concurrently herewith.)

122.    Such persons, like Plaintiffs Harris, Richards, GOC, GOA, CRPA, SAF, and Gerald Clark use these local gun stores and gun shows to engage in First Amendment speech about Second Amendment rights including, for example, potential government legislation, executive actions related to firearms, current events, firearms

activities such as firearms training and target shooting, and other firearms-related news and issues (not to mention topics dealing with the firearms themselves).

123.   In other words, today, gun stores serve the same purpose as once served by 19th- and early 20th-century General Stores, where Americans gathered to discuss local and national issues.[14] (See Harris Decl. ¶¶ 4-7; Vandermeulen Decl. ¶ 6; Gaalswyk Decl. ¶¶ 7, 9; Bouslog Decl. ¶¶ 5-8.)

124.    Section 26806 puts a torch to this important channel for Plaintiffs to meet others and exercise First Amendment speech and association rights on Second Amendment issues.

125.    Section 26806 is California's latest effort to target, marginalize, and drive from the market dissenters wishing to exercise the right to keep and bear arms. Stripping gun owners (and those seeking to become gun owners) of their rights to anonymous discourse about political matters, Section 26806 permits the very government officials being criticized to monitor the speech and identify the individuals speaking critically of them.  It would be hard to conceive of a more tyrannical system than Section 26806 imposes.  Section 26806 clearly violates the First Amendment right to engage in anonymous speech and must be enjoined.

*Section 26806 Violates the First Amendment's Prohibition of Compelled Speech*

126.    The First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714 (1977).

127.    While penalizing speech is odious to our Constitution, so is penalizing silence.  Accordingly, the Supreme Court's "leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006).

---

[14] *See, e.g.*, Ronald Taylor, *The Old-Time General Store Was a Symbol of American Enterprise*, <u>Allegany Cnty. Hist. Soc'y</u>, https://tinyurl.com/muvp2te8 (last visited Dec. 8, 2023).

128.    Yet this is precisely what Section 26806(c) does. This provision goes well beyond compelling conduct (government-mandated 24/7 recording of customers and visitors) by also compelling government-approved speech: "The licensee shall post a sign in a conspicuous place at each entrance to the premises that states in block letters not less than one inch in height: 'THESE PREMISES ARE UNDER VIDEO AND AUDIO SURVEILLANCE. YOUR IMAGE AND CONVERSATIONS MAY BE RECORDED.'"

129.    Thus, dealers not only are commanded as to what they must do in recording all patrons, whether they wish to do so or not, but also they are required to convey the government's chosen message about that surveillance to all visitors.

130.    Interestingly enough, nowhere in this government-mandated statement is any indication provided that it is *the government* that is the entity mandating the surveillance, making it appear as if the dealer, not the government, is responsible for the eavesdropping and monitoring.

131.    On the contrary, the Supreme Court has rejected soundly the notion that the First Amendment permits the government to compel its favored speech.  In a decades-old decision, the Court declared that "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to … free speech … and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638 (1943).

132.    The Court continued, "[a]s governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be....  Ultimate futility of such attempts to compel coherence is the lesson of … the fast-failing efforts of our present totalitarian enemies.  Those who begin coercive elimination of dissent soon find themselves exterminating dissenters.  Compulsory unification of opinion achieves only the unanimity of the graveyard." *Id.* at 641.

133.    The *Barnette* Court's reference to our "totalitarian enemies" was no invitation to become one ourselves.  Compelled speech has no place in a state bound by the First Amendment's protections.

134.    In 2018, the Court recognized the continuing vitality of the compelled speech doctrine.  In striking down a California state law requiring pro-life pregnancy centers to inform all clients that California also offers abortion services, the Court warned that "California cannot co-opt the licensed [crisis pregnancy centers] to deliver its message for it."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 138 S. Ct. 2361, 2376 (2018).

135.    Nor does it matter that California's compelled message may not be opinion, as the Supreme Court held, "compelled statements of fact … like compelled statements of opinion, are subject to First Amendment scrutiny." *Rumsfeld*, 547 U.S. at 62.

136.    The Second Circuit has held that "compelled speech presents a unique affront to personal dignity.  The decision to withhold speech depends on views and calculations known only to the individual" and, "between compelled silence and compelled speech, compelled speech is the more serious incursion on the First Amendment...."  *Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018).

137.    Likewise, "[b]ecause the statute at issue requires [plaintiffs] to make an involuntary statement" at their place of business, "the statute causes [them] irreparable harm." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996). "The wrong done" by a statute to the "constitutional right not to speak is a serious one," and it must be "given proper weight by [a] district court." *Id.*

138.    Striking down New York's similar mandate that pro-gun property owners post conspicuous signage containing a government-required message when firearms are allowed on the property, a federal court explained that, "[s]ince *Barnette*, the Supreme Court has consistently 'prohibit[ed] the government from telling people what they must say.'  This prohibition is not limited to ideological messages; it extends equally to compelled statements of fact." *Antonyuk v. Hochul*, 639 F. Supp. 3d 232,

344 (N.D.N.Y. 2022) (citation omitted).  As that Court put it, New York's law "compel[s] Plaintiffs' speech … by *coercing* them, as busy store owners, to conspicuously speak the state's controversial message (visible to neighbors and passersby on the sidewalk or street) if … they want to welcome [gun owners] onto their property." *Id.* at 345.

139.    California may believe that 24/7 Orwellian monitoring of citizens in the act of exercising Second Amendment rights is laudable public policy.  But California cannot require firearm sellers to publish the state's preferred statements to inform their customers that the state is violating everyone's constitutional rights.  Such a requirement compels speech in violation of the First Amendment.

**[Section 26806 Imposes a Pervasive and Dystopian Surveillance Regime on Home-Based Licensees.]**

140.    In his dystopian work "1984," George Orwell described an unthinkable world dominated by constant government surveillance of the most private affairs of its citizens: "The telescreen received and transmitted simultaneously.  Any sound that Winston made, above the level of a very low whisper, would be picked up by it, moreover, so long as he remained within the field of vision … he could be seen as well as heard.  There was of course no way of knowing whether you were being watched at any given moment....  It was even conceivable that they watched everybody all the time.  You had to live … in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized."[15]

141.    Beginning in 2024, Section 26806 brings this dystopian fiction to life.

142.    Section 26806 requires 24/7 audiovisual recording, sufficient to "identify [all] parties" and "activit[ies]," at all "[i]nterior views of all entries or exits to the premises, [a]ll areas where firearms are displayed, [and a]ll points of sale, sufficient to identify the parties involved in the transaction."

---

[15] George Orwell, <u>1984</u>, at 3-4 (1949).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

143.     Yet even as tyrannical as these requirements are when applied to traditional brick-and-mortar gun stores, the stark reality is that more than 60 percent of gun dealers use their home as their business premises.[16]

144.     Section 26806's requirements will destroy the entire spectrum of First Amendment rights exercised by home-based sellers.  For numerous such dealers, being home-based makes their business affordable: "Selling firearms is a fairly low-margin business.  Depending on the model you're selling, you can expect to charge 12-20 percent more than your wholesale cost on a new gun.  These low margins make it difficult to run a retail gun store profitably.  However, a home-based FFL business has much lower maintenance and labor costs...." *Id.*

145.     Section 26806 would consign home-based FFLs to the unenviable Hobson's choice of either losing their business or giving up their most basic First Amendment rights in the (former) privacy of their own homes.  To require 24/7 surveillance of the interior of one's home is Orwellian, to say the least.

146.     The pervasiveness of this surveillance cannot be understated.  Many American homes contain multiple "entries or exits," including a front door, rear door, garage door, basement door, etc.  Under Section 26806, "the "interior view[]" of each would require constant surveillance, regardless of whether the dealer is currently using his home for business purposes.  Section 26806 also requires surveillance in "all areas where firearms are displayed," without limitation to only business firearms inventory.  Thus, even personally owned firearms housed in a glass display case in a living room, or hunting rifles secured in a rack hung on an office wall, would require additional cameras and audio recording.  Finally, Section 26806 requires surveillance at "all points of sale."  For home-based dealers, colloquially known as "kitchen table FFLs," this would mean 24-hour surveillance of, for example, a person's kitchen table, as well.

---

[16] Katherine Anderson, *Home-Based FFL Requirements*, Zenti, https://tinyurl.com/2s3fm75f (Apr. 11, 2023).

147.     Section 26806 would impose great harm to at-home FFL dealers such as Adam Richards who not only operates as an FFL out of his home, but also works as an attorney and has multiple confidential conversation per day that would be fully recorded and break his duty of confidentiality with clients. Section 26806 also impacts Plaintiff Richards' personal life by placing every small detail of his family into the lens a camera like being on a reality show that they did not sign up for. (See Declaration of Adam Richards ("Richards Decl.") ¶¶ 3-5, 9, 10.)

148.     It thus is hardly inconceivable to estimate that a home-based dealer will be required to install government surveillance systems in virtually every corner of the home, perhaps aside from a bedroom or bathroom (the only private places left to escape California's prying eye).

149.     Sweeping up virtually all activity that takes place within the home (on a 24-hour basis), Section 26806's surveillance mandate thus strikes at the heart of several important First Amendment protections.

150.     For example, the Supreme Court has long recognized the importance of confidential marital communications, to the point that disclosure of such speech cannot be compelled by the government, even in criminal cases: "the protection of marital confidences [is] regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." *Wolfle v. United States,* 291 U.S. 7, 14 (1934).  Section 26806 eviscerates that privilege, even in one's own home, mandating the recording of conversations between spouses, on the most private of topics, including health, sex, religion, political beliefs, personal finances, the rearing of children, and the list goes on.

151.     Section 26806's application to home-based business also strikes at the free exercise of religion.  The chilling effect of 24/7 government monitoring inside the homes of spiritual citizens should be too obvious for argument.  For example, Plaintiffs who regularly pray in thanks before meals at the kitchen table may be captured because

it is done at the same place he conducts firearms transfers.  People may feel that they lack privacy in their own homes and be forced to change rooms, change their habits, alter their religious practices, etc. because of the constant surveillance by the government.

152.     Plaintiffs' concerns about Section 26806's violation of religious freedom are more than theoretical.  In 2014, Houston, Texas mayor Annise Parker, the city's first lesbian mayor, issued subpoenas to a group of pastors opposed to her "equal rights ordinance," demanding that they turn over copies of any sermons or communications with parishioners dealing with homosexuality, gender identity, or Parker herself, for review by city attorneys.[17]  The move sparked a massive national outcry, and resulted in a motion to quash filed by Alliance Defending Freedom on behalf of the pastors.  As ADF noted, "[t]hese requests, if allowed, will have a chilling effect on future citizens."[18]  Eventually, and unsurprisingly, Parker and the city backed down.[19]

153.     Yet Section 26806 will accomplish the same ends, and through more nefarious means.  Personal religious conversations between spouses, parents and children, and homeowners and houseguests will be subject to monitoring by the state. Free exercise of religion in Californians' own homes doubtlessly will be chilled by such monitoring, as will political comments in opposition to politicians such as Governor Newsom, and state policies attacking the right to bear arms.

154.     Indeed, the more one thinks about Section 26806, the worse it gets. Besides the obvious chilling effects its surveillance will have on political speech and the rights to anonymity and free association, Section 26806 will eviscerate free expression almost entirely.

---

[17] Todd Starnes, *City of Houston Demands Pastors Turn Over Sermons*, <u>Fox News</u>, https://tinyurl.com/y9h72yt8 (May 7, 2015).
[18] Memorandum in Support of Nonparty Pastors' Amended Motion to Quash Subpoenas at 5, *Woodfill v. Parker*, No. 2014-44974 (Tex. Dist. Ct. Harris Cnty. Oct. 9, 2014), https://tinyurl.com/ms9sasu9.
[19] Todd Starnes, *Houston Mayor Drops Bid to Subpoena Pastors' Sermons*, <u>Fox News</u>, https://tinyurl.com/34w5hhbj (May 7, 2015).

155.    Section 26806(a)(1) requires surveillance equipment to "clearly record images and … audio."  The phrase "clearly record" modifies a conjunctive requirement; therefore, such equipment must also "clearly record … audio."  Moreover, under Section 26806(a)(2), cameras providing such "clear[] record[ing]" of audio must "reasonably produce recordings that allow for the clear identification of any person."  A person's voice is just one way they may be clearly identified.

156.    Taken together, these provisions require a practically sterile audio environment in order for surveillance recordings to comply with the law.  Were it otherwise, gun dealers could simply install "white noise" machines next to all audio surveillance devices, which would still capture a "clear[] record[ing]" of "audio" within the store, just not anything helpful to the government.  What is more realistic is that a fan in the shop or other noises in the course of business would make it difficult for the recording to pick up anything useful and therefore Section 26806 is asking FFLs to record their lives which may be completely unusable.

157.    Indeed, if cameras must clearly record audio such that persons are clearly identifiable, then Section 26806 effectively prohibits ambient audio interference.  That means a store clerk cannot listen to a TV show, for fear of its audio garbling the surveillance recording.  Christmas music—or any music, for that matter—is similarly verboten.  But for home-based FFLs, the implications get worse and worse.  Section 26806 does not lift its "clear[] record[ing]" mandate outside of business hours; indeed, household occupants will find themselves actors on the set of a 24/7 reality TV show, ensuring the microphones "clearly record" the contents of conversations such that everyone remains identifiable at all times.  Of course, the political debate broadcast on the radio will be off-limits, as will be the televised religious sermon, because Section 26806 requires ambient sterility.

158.    As discussed above, Section 26806 *compels speech*, telling gun stores what they must say.  But in requiring a quiet environment so that conversations with customers can be recorded, Section 26806 also *compels silence*.

44

159.    California no doubt will demur that the surveillance recordings under Section 26806 are for limited purposes and promise that they will be used only for firearms-related purposes, such as providing evidence of criminal transfers, or tracking down thieves who rob gun stores.  But that misses the whole point about a "chilling effect" on protected speech – the government's ultimate actions are not the only concern, but rather the effect the restrictions have on persons' willingness and freedom to speak their minds in the first place.  As Winston quipped, "[t]here was of course no way of knowing whether you were being watched. … You had to live … in the assumption that … every movement [was] scrutinized."

160.    As applied to home-based FFLs, Section 26806 imposes a dystopian panopticon that will eviscerate constitutional rights and destroy small business, because no home-based FFL could possibly be expected to comply with such tyrannical demands by the government.  To prevent these irreparable harms, Section 26806 must be enjoined.

**[Section 26806 Is Presumptively Unconstitutional Because It Subjects Disfavored Viewpoints to Discriminatory Treatment.]**

161.    Section 26806 constitutes nefarious viewpoint discrimination in violation of the First Amendment.   It targets only stores engaged in the exercise of Second Amendment rights to possess and transfer firearms.  And it punishes only those individuals exercising the right—those with a favorable view of the Second Amendment—with 24/7 surveillance, and not those who disagree with, criticize, or decline to exercise the right themselves.

162.    Section 26806's discriminatory nature is clear on its face: "The test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam,* 582 U.S. 218, 248 (2017) (Kennedy, J., concurring).

163.    Although this Court need not proceed beyond Section 26806's plain text and real-world effects, the government's discriminatory intent bears emphasis.  Indeed,

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

the hostility of Governor Newsom and the California legislature to the right to keep and bear arms is well-documented.  Governor Newsom "has for years crusaded against the gun industry and reaped the political benefits."[20]  From the Governor on down, California has made crystal-clear its opposition to the Second Amendment and its intention to burden, and where possible shut down, those who attempt to exercise the right.

164.    Of course, a law that "reflects the Government's disapproval of a subset of messages it finds offensive … is the essence of viewpoint discrimination." *Tam*, 582 U.S. at 249 (Kennedy, J., concurring).

165.    Accordingly, the Supreme Court has emphasized that, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant....  The government **must** abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added).

166.    Consequently, "viewpoint discrimination is an 'egregious form of content discrimination' and is 'presumptively unconstitutional,'" subject to strict scrutiny. *Iancu v. Brunetti,* 139 S. Ct. 2294, 2299 (2019).  The commercial context of Section 26806's discrimination is inapposite.  *See Tam*, 582 U.S. at 251 (Kennedy, J., concurring) ("[D]iscrimination based on viewpoint, including a regulation that targets speech for its offensiveness, remains of serious concern in the commercial context.").

167.    Defendants bear the burden of justifying their novel surveillance scheme, and they cannot.  Section 26806 therefore violates the First Amendment's prohibition of viewpoint discrimination as well.

---

[20] Christopher Cadelago & Jeremy B. White, *Gavin Newsom Wants 28th Amendment for Guns in U.S. Constitution*, <u>Politico</u> (June 8, 2023), <u>https://tinyurl.com/5n6krbkn</u>.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

**[The Fourteenth Amendment Right to Equal Protection Under the Law]**

168.    The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

169.    Singling out speakers because of the content of their speech also violates their fundamental rights under the Equal Protection Clause. U.S. Const. amend. XIV.

170.    If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*, 517 U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 666 (1990), *rev'd on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010).

171.    No other industry, known to Plaintiffs, in the state of California is required to audio and video record their locations, comings and goings, conversations, business practices, and the like 24 hours a day and keep those recordings for one year.

172.    On its face and as applied, Section 26806 is an unconstitutional abridgement of Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth Amendment because it is a viewpoint-discriminatory and/or animus-based restriction on Plaintiffs' protected political and ideological speech that serves no compelling governmental interest.

173.    On its face, Section 26806 does not apply to similar or opposing speech made by businesses, organizations, or people who are not considered FFLs.

174.    Defendants have no compelling (or even legitimate) governmental interest in recording Plaintiffs' pure speech (regardless of whether dealing with a firearm transaction or something entirely outside that area). Indeed, the State's purported

interests in "ensuring gun owners are more educated" and stopping criminals are betrayed by the fact that no other retail stores can say that having surveillance educates their customers on their products or stops criminals from conducting retail theft.

175.    Nor is there any legitimate interest in singling out politically disfavored firearm industry members, gun owners, and FFLs under Section 26806 while leaving members of other industries free to engage in protected speech without government intrusion. Rather, Section 26806 is steeped in and motivated by animus for "gun culture" and those who participate in it.

176.    Further, Section 26806 is not narrowly tailored to achieving the state's dubious interests.

**[Right to Keep and Bear Arms Under U.S. Const. amend. II]**

177.    The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

178.    The Fourteenth Amendment incorporates the Second Amendment's protections against the states.  *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

179.    The Second Amendment's absolutist language contains no qualification or limitation constraining which members of "the people" enjoy the pre-existing individual right, which "Arms" are protected, or the purposes for which individuals may use such arms.  Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," and presumptively covers all "lawful purposes."  *District of Columbia v. Heller*, 554 U.S. 570, 581, 582, 624 (2008).

180.    As the Supreme Court explained last year in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), consistent with the Second Amendment's unyielding text, any government regulation implicating the right to keep and bear arms must comport with the original public understanding of the text adopted by its Framers, as evidenced by our "Nation's historical tradition of firearm regulation."  *Id.* at 2126.

181.    In other words, the government must conclusively demonstrate that the Framers never considered certain persons, arms, or activities to be within the protections of the Second Amendment in the first place.  Otherwise, that which the Second Amendment protects, it protects absolutely.

182.    Consistent with its textual focus on original meaning, *Bruen* categorically rejected the "'two-step' framework for analyzing Second Amendment challenges," around which "the Courts of Appeals ha[d] coalesced," a framework which improperly employed "means-end scrutiny."  142 S. Ct. at 2125.

183.    Of course, even before *Bruen*, the Supreme Court had consistently and "expressly rejected the application of any 'judge-empowering "interest-balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests"'" for Second Amendment challenges.  *Bruen*, 142 S. Ct. at 2129; *see also McDonald*, 561 U.S. 742; *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam).

184.    The Court's categorical rejection of judicial interest balancing reflects the Framers' understanding that the pre-existing right to keep and bear arms "'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense."  *Bruen*, 142 S. Ct. at 2131.  Indeed, "[t]he very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.  A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."  *Heller*, 554 U.S. at 634.

185.    Accordingly, when the Constitution's "plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the

49

1  individual's conduct falls outside the Second Amendment's 'unqualified
2  command.'" *Bruen*, 142 S. Ct. at 2129-30.

3                                      *Bruen's Methodology*

4       186.    Several analytical considerations from *Bruen* bear emphasis in analyzing
5  SB 1384.  First, the relevant time period for historical inquiry is a narrow one.  Only
6  historical evidence contemporaneous with the Founding can shed light on the Second
7  Amendment's original public understanding because "[c]onstitutional rights are
8  enshrined with the scope they were understood to have *when the people adopted*
9  *them*." *Bruen*, 142 S. Ct. at 2136.

10      187.    To the extent governments seek to justify infringements by proffering
11  historical evidence from beyond the Founding era, such evidence may be used, if at all,
12  only to confirm a tradition that already existed at the Founding.  Even prior to *Bruen*,
13  the Court made clear that post-Founding history cannot fabricate a tradition, piecemeal,
14  that was unknown to the Founding generation.  *See Bruen*, 142 S. Ct. at 2136 ("[W]e
15  must … guard against giving post enactment history more weight than it can rightly
16  bear."); *id.* at 2137 ("[T]o the extent later history contradicts what the text says, the
17  text controls."); *id.* ("[P]ostratification adoption or acceptance of laws that are
18  *inconsistent* with the original meaning of the constitutional text obviously cannot
19  overcome or alter that text."); *id.* ("[B]ecause post-Civil War discussions of the right to
20  keep and bear arms 'took place 75 years after the ratification of the Second
21  Amendment, they do not provide as much insight into its original meaning as earlier
22  sources.'"); *id.* (treating 19th-century evidence "as mere confirmation of what the
23  Court thought had already been established"); *id.* ("[W]e have generally assumed that
24  the scope of the protection applicable to the Federal Government and States is pegged
25  to the public understanding of the right when the Bill of Rights was adopted in 1791.");
26  *id.* at 2154 n.28 ("We will not address any of the 20th-century historical evidence
27  brought to bear.... As with … late-19th-century evidence, the 20th-century evidence …
28  does not provide insight into the meaning of the Second Amendment when it

contradicts earlier evidence."); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (rejecting examples of 19th century-era laws from "more than 30 States" as failing to "establish an early American tradition"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (emphasis added) ("Influential, postadoption treatises *confirm* this understanding.").

188.    Second, it is Defendants' burden—and theirs alone—to affirmatively prove that Section 26806's modern regulation comports with the original public understanding of the Second Amendment. *Bruen*, 142 S. Ct. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain [the] statute. That is respondents' burden.").  If Defendants fail to do so, Plaintiffs are entitled to injunctive relief. *See id.* at 2130 (emphasis added) (announcing that "*only*" when the government carries its burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'").

189.    Third, in proffering historical evidence, Defendants must establish a broad and enduring Founding-era tradition. *Bruen*, 142 S. Ct. at 2130 (emphasis added) (contemplating a "historical *tradition* of firearm regulation"); *id.* at 2153 (rejecting historical evidence from even several states as "outliers").  While the *Bruen* Court did not articulate just how much historical evidence constitutes a "tradition," this Court need not address that question because, as discussed below, there is *no* relevant evidence to support Section 26806.

190.    And fourth, the widespread Founding-era firearm regulations Defendants must proffer must be analogous to Section 26806's surveillance requirement in mechanisms and motivations. *Bruen*, 142 S. Ct. at 2133 (identifying "how and why the regulations burden a law-abiding citizen's right to armed self-defense" as "'*central*' considerations" in analogical reasoning).

191.    Under this framework, Section 26806 cannot possibly be justified as consistent with the Second Amendment's guarantee.

*The Second Amendment Right to Acquire "Arms"*

192.     Although it seems to go without saying, inherent in the Second Amendment's protection of the right to "keep and bear" firearms is the right to acquire them.  As numerous courts across the country have observed, the Second Amendment protects the manufacture, purchase, and sale of firearms, ammunition, and related items. *See, e.g.*, *Luis v United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) (constitutional rights "implicitly protect those closely related acts necessary to their exercise."); *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Duncan v. Bonta*, 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023) ("[n]either magazines, nor rounds of ammunition, nor triggers, nor barrels are specifically mentioned in the Second Amendment … But without a right to keep and bear triggers, or barrels, or ammunition and the magazines that hold ammunition, the Second Amendment right would be meaningless."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire...."); *United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023) ("The clear answer is that 'keep and bear arms' includes receipt."); *Bezet v. United States*, 276 F. Supp. 3d 576, 605 (E.D. La. 2017) (emphasis added) ("the rights of law-abiding, responsible citizens … *to acquire*" firearms), *aff'd*, 714 F. App'x 336 (5th Cir. 2017); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them … and to purchase and provide ammunition suitable for such arms....").

193.     A contrary finding – *i.e.*, that there is a right to possess arms but not to manufacture or sell them – is akin to a finding that there is a right to *have* the assistance of criminal defense counsel but no right to retain or obligation to appoint an attorney.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

194.     As noted, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.  In other words, any regulation that "covers" an individual's "proposed course of conduct" must comport with our early "historical tradition of firearm regulation," whose burden of proof the government must bear. *Id.* at 2126, 2134.  Here, Section 26806 regulates the acquisition of "arms" by members of "the people," conditioning the exercise of their right to acquire on giving up numerous First, Fourth, and Fifth Amendment rights and requiring a detailed audiovisual record of every Second Amendment-related transaction.

*Second Amendment Right to Engage in Firearm Commerce*

195.     On the flip side of the clear Second Amendment right to acquire a firearm, the Second Amendment also protects the right to engage in the commerce and/or the business of being a gun dealer, gun manufacturer, and/or operating a gun range.

196.     In order to ensure that "the people" actually have the "right to keep and bear Arms," the Second Amendment must protect the methods and mechanisms by which firearms come into existence and are distributed.  Indeed, the right to "keep and bear" arms becomes meaningless if there is no right to acquire them in the first place, and the right to acquire arms becomes meaningless if California is able to control, manipulate, and discourage its citizens' access to firearms by imposing the onerous surveillance that Section 26806 mandates.

197.     To suggest the contrary would eviscerate the Second Amendment entirely: "the Government argues[] receiving a firearm falls outside the Second Amendment right to 'keep and bear arms.' … [W]hat the Government is suggesting is absurd in practice.  If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right.  And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one.  So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

buying and selling of firearms.  What a marvelous, Second Amendment loophole!" *United States v. Hicks*, 649 F. Supp. 3d 357, 359-60 (W.D. Tex. 2023); *see also Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 162 (Lynchburg 2020) (alteration in original) (observing that "the right to keep and bear arms 'includ[es] the otherwise lawful … sale[] or transfer of firearms'"); *Kole v. Village of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27, 2017) (quoting Thomas Jefferson) ("Our citizens have always been free to make, vend, and export arms.").[21]

198.    Early Founding traditions presuppose and confirm this broad right to firearm commerce: "in order '[t]o sustain themselves against a large and well-supplied British military throughout the [Revolutionary] war, the Americans relied on gunsmiths, individuals with knowhow from working on their *own arms*, and Americans who were willing to *learn the art of arms manufacturing*.'"  *Mock v. Garland*, 2023 U.S. Dist. LEXIS 178809, at *31 (N.D. Tex. Oct. 2, 2023) (alterations in original).  Were it not the case that the Second Amendment protects the manufacturing and distributing of firearms, the only constitutionally guaranteed way to acquire a firearm would be to make one for oneself—a high bar, to say the least, considering the equipment required, the tolerances involved, and the machining knowledge necessary.

199.    Under federal and state law, there can be no commercial manufacture of firearms without licensure.  And for those firearms that are manufactured commercially (*i.e.*, probably 99.9% of them), they cannot be distributed to the

---

[21] *But see United States v. Kazmende*, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (plain text of Second Amendment does not cover commercial sales); *United States v. Flores*, 2023 WL 361868, at *2-6 (S.D. Tex. Jan. 23, 2023) (the Second Amendment does not protect the right to commercially deal firearms).  But these unpersuasive opinions are flat wrong.  If there is no right to sell a firearm, and/or no right to buy one, then there can be no right to keep and bear arms (since there can be no arms to keep and bear in the first place).  In other words, the government cannot demur that a person has a right to post a Tweet, but Twitter can be prohibited from providing the forum in which to do so.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

California public but through licensed dealers.  Thus, through Section 26806, California almost entirely controls Californians' access to firearms[22] through a surveillance scheme deliberately and intentionally designed to discourage and penalize the constitutionally protected and guaranteed Second Amendment pipeline.

200.     A plaintiff business is able to bring claims on behalf of its customers.  *Craig v. Boren*, 429 U.S. 190, 195 (1976).  But even so, at least one prospective customer of a Plaintiffs On Target,  Smokin' Barrel Firearms, and Jesse Harris would purchase firearms from a plaintiff business but for Section 26806's requirement that Plaintiffs constantly monitor customers and transactions via audiovisual surveillance.  Because of this surveillance mandate and the violations to constitutional rights it imposes, Plaintiffs Customers will refrain from purchasing firearms at licensed California gun dealers. (See Vandermeulen Decl. ¶ 7; Gaalswyk Decl. ¶ 13.)

201.     Expectedly, California will latch on to the dicta in *Heller* about "laws imposing conditions and qualifications on the commercial sale of arms" being "presumptively lawful."  554 U.S. at 626-27, 627 n.26.  But this is not the magic incantation that California expectedly will represent it to be.

202.     First, any nebulous class of restrictions that purportedly constitute commercial regulations suffers from total ambiguity.  Rather, not every law that involves the transfer of a firearm is a "regulation on the commercial sale of arms."  And, "[o]f course, not every regulation on the commercial sale of arms is presumptively lawful." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022).

203.     Without any limiting principle, a federal law imposing a 100,000% tax on each commercial firearm sale would be a "condition" on firearm sales and remain "presumptively constitutional"—thereby avoiding the *Bruen* framework entirely, despite its obvious unconstitutionality.  Similarly, a requirement that a person be seven

---

[22] This is especially true because California's AB 1621 criminalizes the self-manufacture of firearms from common commercial "unfinished" kits.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  feet tall in order to buy a gun could be deemed a "qualification" on the commercial

2  sale of arms, and thus exempt from *Bruen*.

3  204.    Without any further exposition as to which sorts of laws the Supreme Court

4  presumed would have historical support when challenged, no court can label a given

5  restriction definitively "commercial" in nature and thus definitively exempt from the

6  *Bruen* framework.

7  205.    But even if the opposite were true, simply being labeled as a "condition[]

8  [or] qualification[] on the commercial sale of arms" does not exempt governmental

9  regulation from a historical analysis under *Bruen*.  The Supreme Court has explicitly

10  said as much.  As the Court observed, "there will be time enough to expound upon the

11  historical justifications for the exceptions we have mentioned if and when those

12  exceptions come before us."  *Heller,* 554 U.S. at 635 (inviting future challenges to

13  firearm regulations whose historical traditions the Court merely assumed, arguendo,

14  without deciding).

15  206.    The *Bruen* Court was similarly explicit that, in *every* case where the Second

16  Amendment presumptively protects conduct, the "government must … justify its

17  regulation by demonstrating that it is consistent with the Nation's historical tradition of

18  firearm regulation.  ***Only then*** may a court conclude that the individual's conduct falls

19  outside the Second Amendment's 'unqualified command.'"  *Bruen,* 142 S. Ct. at 2130

20  (emphasis added).  This absolutist language left no room for reliance on ambiguous

21  dicta as a way around *Bruen*'s historical framework.  Rather, "[o]nly" after the

22  government carries its burden and proves a relevant historical tradition may a court

23  rule the regulation does not violate the Second Amendment.

24  207.    Other federal courts have held as much.  See *United States v. Marzzarella*,

25  614 F.3d 85, 92 n.8 (3d Cir. 2010) ("Commercial regulations on the sale of firearms do

26  not fall outside the scope of the Second Amendment....  In order to uphold the

27  constitutionality of a law imposing a condition on the commercial sale of firearms, a

28  court necessarily must examine the nature and extent of the imposed condition.  If

56

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1    there were somehow a categorical exception for these restrictions, it would follow that

2    there would be no constitutional defect in prohibiting the commercial sale of firearms.

3    Such a result would be untenable under *Heller*."); *United States v. Price,* 635 F. Supp.

4    3d 455, 459 (S.D. W. Va. 2022) (rejecting the government's call for an expansive

5    reading of *Heller*'s "commercial sale" dicta).

**[Section 26806 Violates the Second Amendment]**

7    208.    Section 26806's invasive surveillance of prospective firearm purchasers

8    discourages protected firearm purchases from ever occurring.

9    209.    To be sure, the exercise of Second Amendment rights may be

10   controversial.  *See McDonald*, 561 U.S. at 783 ("The right to keep and bear arms … is

11   not the only constitutional right that has controversial public safety implications.").

12   210.    This is especially true in California, where politicians express an open

13   hostility to the enumerated right[23] and government officials display a shocking

14   carelessness with gun owners' personal information.[24]

15   211.    Unsurprisingly, existing and prospective California gun owners value their

16   privacy in a state where controversial viewpoints and arms risk social ostracism and

17   reprisal.  *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("It

18   is hardly a novel perception that compelled disclosure of affiliation with groups

19   engaged in advocacy may constitute as effective a restraint on freedom of association

20   as [other] forms of governmental action...."); *Ams. for Prosperity Found. v. Bonta*, 141

---

[23] California Governor Gavin Newsom, *Governor Newsom Speaks on SCOTUS Conceal Carry Decision*, YouTube, at 0:44 (June 23, 2022), https://youtu.be/iK1xKGMrPlE (calling *Bruen* "a radical decision").  At a press conference on February 1, 2023, Governor Newsom used air quotes when discussing the "right" to carry firearms outside the home, making his contempt for the Constitution clear. https://twitter.com/i/broadcasts/1vAxRAXgXRVJl (at 41 minutes, 23 seconds in) (last accessed December 15, 2023).

[24] Dani Anguiano, *Leak of California Gun Owners' Private Data Far Wider than Originally Reported*, Guardian (June 30, 2022), https://tinyurl.com/4nw2w9r8 ("The California department of justice admitted it had exposed the personal information of as many as hundreds of thousands of gun owners in the state....  The data breach temporarily made public the names, birthdates, gender, race, driver's license numbers, addresses and criminal histories of people who were granted or denied permits to carry concealed weapons between 2011 and 2021.").

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

S. Ct. 2373, 2382 (2021) (observing that "NAACP members faced a risk of reprisals if their affiliation with the organization became known").

212.    The prospect of having one's face, name, and conversations captured and stored "for a minimum of one year," Cal. Penal Code § 26806(a)(6), subject to government exposure, will chill the purchase of firearms in California in much the same way that the compelled disclosure of association members or charity donors would chill First Amendment rights.  *See NAACP*, 357 U.S. at 462; *Ams. for Prosperity Found.*, 141 S. Ct. at 2389.

213.    But in addition to Section 26806 intimidating and discouraging law-abiding Americans from exercising their enumerated right to keep and bear arms, Section 26806 regulates "conduct" that is clearly "presumptively protected" by the Second Amendment.  Thus, California must show a broad and enduring historical tradition of similar regulation.  California cannot hope to do so.

**[There Is No Historical Tradition of Electronically Surveilling Gun Sales]**

214.    Of course, photography did not exist at the Founding—let alone video cameras.[25]  Yet the Founders knew how to record the likenesses of individuals and the contents of conversations when they wanted to – through the use of sketches, drawings, written descriptions, and transcriptions.[26]  Certainly, if the Founders understood invasive surveillance of prospective firearm purchasers to comport with the original meaning of the Second Amendment, then one would expect to find widespread Founding-era regulations requiring every gunsmith to employ a sketch artist to reproduce or otherwise describe each patron's appearance, and a reporter to write down the conversations that took place during those transactions.

215.    Obviously, no such tradition of regulation ever existed.

---

[25] Jacob Livesay, *When Was the Camera Invented? Here's Who Created the First Camera in 1816.*, USA Today, https://tinyurl.com/46pepc3a (Aug. 23, 2023) (tracing the advent of photography to the early 19th century).
[26] *See, e.g.*, *Life Portraits of George Washington*, Mount Vernon, https://tinyurl.com/2krve9fm (last visited Dec. 8, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

216.     Nor did the Founders ever sanction government employees being stationed at gunsmiths to achieve the same results as Section 26806.  Indeed, the Third Amendment categorically rejects such intrusions into the private affairs of the former subjects.

217.     Quite to the contrary, the historical tradition demonstrates that the Founders were concerned with *anonymity*, a principle that the Supreme Court has found to be quite squarely embodied within the First Amendment, freedom from oppression and surveillance, concerns addressed by the Third Amendment, and security of property and personal privacy, protected by the Fourth Amendment.  It is hardly a stretch to conclude that the Founding generation would not have countenanced a regime where officers of the Crown (or officials of the newly minted American government) were watching Americans' every move and breathing down their necks whenever they attempted to acquire constitutionally protected arms.

218.     Without any semblance of a Founding-era historical tradition in support, Section 26806's compelled surveillance of firearm purchasers is patently violative of the Second Amendment.

**[Right to Be Free of Uncompensated Government Takings Under U.S. Const. amend. V.]**

219.     Section 26806 imposes upon licensee Plaintiffs a legal obligation to purchase government approved video surveillance systems, and to operate, maintain, and store the resulting video and audio recordings, all at the expense of the licensee.

220.     Section 26806 imposes on licensee Plaintiffs a legal obligation to undertake continuous digital video surveillance of their own private property, and to permit government agents to freely enter upon their property to perpetually access and view, at-will, that digital video surveillance.

221.     Mandating that lawful possessors or owners of private property may not interfere with governmental agents who freely enter their property at-will, to perpetually access and view all on-site surveillance video and audio recordings, is a

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

physical appropriation of that property, and a governmental surveillance easement of the private property.

222.    Such surveillance itself, in addition to at-will entry onto Plaintiffs' property, constitutes a permanent physical occupation of their property.

223.    Such at-will surveillance, entry, and viewing are neither intermittent nor of a temporary nature.

224.    Such at-will surveillance, entry, and viewing impair Plaintiffs' right to exclude other persons from their property.

225.    Such at-will surveillance, entry, and viewing impair Plaintiffs' right to freely use their property, free from the prying eyes of the government.

226.    Such at-will surveillance, entry, and viewing impair Plaintiffs' right to transact business.

227.    Such at-will surveillance, entry, and viewing authorize the government to possess and use Plaintiffs' own property as it pleases, and impair Plaintiffs' right to possess, use, and dispose of their own property as they please, in violation of the Fifth and the Fourteenth Amendments.

228.    Defendants have failed to compensate Plaintiffs for the permanent physical taking or the permanent easement imposed upon Plaintiffs' property.

229.    Section 26806 commandeers private property owners and lessees to implement and then accommodate a sweeping and perpetual government surveillance scheme without any form of compensation for the significant costs incurred or the severe limitations on property rights suffered.  What is more, once California has its Section 26806 recording regime in place (with private industry having done all the legwork), California reserves the right to insert itself into gun dealers' stores and homes for compliance inspections as often as it pleases – at the dealers' cost.[27]

---

[27] California has granted itself the right to inspect gun dealers "at least once every three years," language that contains no upper limit to inspection frequency.  Cal. Penal Code § 26720(a)(1).  Indeed, weekly inspections occur "at least once every three years."  Moreover, California compels gun dealers to cover the costs of their own

230.     In other words, Section 26806 represents a 21st-century digital "quartering" of troops in Plaintiff licensee's private homes and businesses.[28]

231.     California's message to businesses engaged in constitutionally protected conduct and commerce is clear: "First, you will spy on your patrons' lawful conduct for us.  Second, you are to bear the costs of our surveillance.  Third, you will give us access, on demand, to what you have recorded.  Fourth, *you* will pay *us* for *your* trouble."

232.     Designed to curtail such egregious abuses of power, the Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation."  The protections of the Takings Clause are incorporated against the states via the Fourteenth Amendment Due Process Clause.  *Chi., Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226 (1897).

233.     After *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), Plaintiffs need not exhaust state-court remedies prior to filing a Takings claim in federal court, because such a requirement would have preclusive effect on any subsequent federal claims under *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005).  Accordingly, "[a] property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation...."  *Knick*, 139 S. Ct. at 2179.

---

regulatory oversight.  Cal. Penal Code § 26720(b) ("The department may assess an annual fee … including the cost of inspections.").

[28] Although Plaintiffs do not bring a Third Amendment claim on behalf of home-based gun dealers, one of the Founders' motivations in proscribing the quartering of soldiers in homes was ending the practice of surveilling citizens and stifling local dissent through shows of force.  *See Engblom v. Carey*, 677 F.2d 957, 966-67 (2d Cir. 1982) (Kaufman, J., dissenting) ("the Third Amendment of the United States Constitution embodies a fundamental value the Founders of our Republic sought to insure after casting off the yoke of colonial rule: the sanctity of the home from oppressive governmental intrusion.").  Of course, technology has progressed since the 1770s, and the government need not quarter soldiers in homes to achieve the same degree of odious supervision and suppression.  A "telescreen" will suffice, à la 1984.

234.   As the Founders recognized uniformly, "the protection of private property is indispensable to the promotion of individual freedom."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

235.   Among the most vital rights of property ownership is the right to exclude others, from private individuals to the government itself.  *Cedar Point*, 141 S. Ct. at 2072.  Indeed, without the right to decide who may enter upon your property and what they may do while there, the right to property does not exist.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("the power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle...."); *id.* ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'  To the extent that the government permanently occupies physical property, it effectively destroys each of these rights.").

236.   Accordingly, several types of governmental interference with property rise to the level of "takings" within the meaning of the Fifth Amendment, for which the government must pay "just compensation."

237.    While the formal condemnation or physical possession of property by government clearly suffice as "takings," so too do physical intrusions and use restrictions.  Indeed, "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation," *Cedar Point*, 141 S. Ct. at 2072, and the "essential question is not … whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)," but rather "whether the government has physically taken property for itself or someone else—*by whatever means*—or has instead restricted a property owner's ability to use his own property."  *Id.* (emphasis added).

238.   In 2020, a minority of eight dissenting Ninth Circuit judges wrote that "[t]he right to enter onto the land of another to take some action is the epitome of an easement in gross. … The Access Regulation gives multiple union organizers the right to enter onto employers' private property to 'meet[ ] and talk[ ] with employees and

solicit[ ] their support' for three hours a day, 120 days a year. … Accordingly, we have the 'classic taking' … Because California has 'appropriate[d] private property for its own use,' there has been 'a per se taking that requires compensation.'" *Cedar Point Nursery v. Shiroma*, 956 F.3d 1162, 1171-72 (9th Cir. 2020) (Ikuta, J., dissenting). Of course, their minority view was vindicated by the Supreme Court the following year.

239.    Worse even than California's "Access Regulation," Section 26806 makes the Plaintiff licensees Adam Richards, Jesse Harris, Jeffrey Vandermeulen, On Target, and Smokin' Barrel Firearms set aside their property for the state's exclusive use, purchase the state's electronic equipment on their own dime (in essence install their own wiretap in their private space), and then stand aside while state officials enter upon said property to access the system at their pleasure. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355 (Fed. Cir. 2002) (permanent physical taking when the government "sunk concrete wells on … property to monitor groundwater pollution from a nearby superfund site," and thereafter government "workers … entered to … maintain[] and monitor them.... The permanency of the wells and the quasi-permanent right of entry provided to the government workers who monitored and maintained them led us to apply the *per se* takings theory of *Loretto*.").

*Section 26806 Constitutes an Uncompensated Per Se Physical Intrusion.*

240.    Applying the above principles, the Supreme Court time and again has made clear that, "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred" and just compensation must be paid. *Cedar Point*, 141 S. Ct. at 2072.

241.    A finding of a *per se* physical taking is dispositive; "a permanent physical occupation constitutes a *per se* taking regardless whether it results in only a trivial economic loss" and "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Cedar Point*, 141 S. Ct. at 2073 (quoting *Loretto*, 458 U.S. at 434-35).

242.     In other words, when a *per se* physical taking has occurred, the only question is *how much* compensation must be paid, not *whether* it should be paid.  *See, e.g.*, *Cedar Point*, 141 S. Ct. at 2074 (citation omitted) ("The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation."); *id.* at 2075 (recognizing that "physical invasions constitute takings even if they are intermittent as opposed to continuous"); *id.* ("What matters is not that [a taking] notionally ran round the clock, but that the government had taken a right to physically invade...."); *id.* ("The fact that a right to take access is exercised only from time to time does not make it any less a physical taking.").

243.     The regulatory imposition of a right to invade property will constitute a *per se* physical taking, *Cedar Point*, 141 S. Ct. at 2074, as will the regulatory imposition of a permanent physical occupation, however minor.  *Loretto*, 458 U.S. at 426.

244.     Section 26806's provisions meet this standard and thus constitute a *per se* physical taking because Section 26806 compels the installation of government surveillance equipment (video cameras, audio recording devices, etc.) at various locations throughout commercial businesses and private homes across California.  *See Otay Mesa Prop. L.P. v. United States*, 86 Fed. Cl. 774, 790-91 (2009), *aff'd*, 670 F.3d 1358 (Fed. Cir. 2012) (Border Patrol installation of "seismic sensors … to detect illegal aliens on the subject property" constituted "the physical taking of an easement.").  Video and audio surveillance are many standard deviations more invasive than mere "seismic sensors."

245.     Section 26806 is fairly specific about where such government monitoring devices must be placed – so as to capture "interior views of all entries or exits," at "all places where firearms are displayed," and at "all points of sale."

246.     Section 26806 removes any discretion from  Plaintiff licensees Jesse Harris, Adam Richards, Jeffrey Vandermeulen, On Target, and Smokin' Barrel Firearms how or where to install the government's surveillance devices and, under Section 26806, such devices may not be removed ("[e]ach camera shall be permanently mounted in a

fixed location"). *See Loretto*, 458 U.S. at 440 n.19 (explaining that "the statute might present a different question" if "the landlord [had] rights to the placement, manner, use, and possibly the disposition of the installation"). Under Section 26806, gun dealers have control over none of those factors.

247. The fact that modern surveillance equipment often is relatively small does not change the analysis. *See Loretto*, 458 U.S. at 437 ("constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied."); *id.* at 438 n.16 (rejecting the notion that a taking of "about one-eighth of a cubic foot of spaces is not of constitutional significance.").

248. In a typical business, Section 26806's mandates likely would mean cameras near the front and rear doors, along with at the gun counter, capturing all handguns in display cases, all long guns on wall racks, and at the cash register and/or computer where background checks are performed. It also means a "sign in a conspicuous place at each entrance to the premises" providing government-mandated warnings that government-mandated surveillance is in progress.

249. Section 26806's mandates take priority over a shop owner's other uses for the real estate of his walls, ceilings, etc. For example, if there is a clock on the wall above the front door, the clock must move. If there are gun racks and long guns hanging on walls where a video camera must be placed, the guns must be moved. If there is no adequate spot in which to install certain monitoring devices to "identify the parties" and "clearly record … audio," then infrastructure must be constructed. If shelves or racks block the view of a camera, the inventory must be removed. And finally, as noted above with respect to Section 26806's First Amendment violations, a gun store owner cannot play the radio, TV, or Christmas music, because he must make sure California's surveillance system is able to capture not only "images" but also "audio" of transactions – unless, of Course, California would like to stipulate that gun stores many install "white noise" generators next to all cameras in their stores. *See United States v. Causby*, 328 U.S. 256, 266-67 (1946) (taking where the noise of

65

"frequent, low-level flights" of aircraft … direct and immediate interference with the enjoyment and use of the land").

250.    Section 26806 thus constitutes a permanent,[29] physical, government occupation of numerous portions of (and uses of) Plaintiffs' property where government surveillance equipment must be installed, and additionally for all space upon the property where cameras and audio equipment are pointed and recording.

251.    For gun shops, the effect that this law will have on their business is almost indescribable. Tens of thousands of dollars spent on purchasing recording and storage equipment so the government can track them and their customers. Losses in revenue because customers refuse to give up their bundle of other rights in order to exercise a few. Limits to the conversations that would normally happen around dun safety, security needs of the individual and constitutional rights of the gun owner quashed because people are too afraid to have these conversations while under the microscope of a government lens.

252.    For home-based gun dealers, the physical intrusion is even greater, as surveillance equipment must be installed within one's own home.  Mom's ornamental plates on the wall of the dining room must give way to a sterile-looking video camera with a flashing light.  Dad's deer antlers on the living room wall must be moved so that more government eavesdropping devices can be affixed to the studs. The most intimate of situations may be recorded and even used against the homeowners in civil or criminal litigation.

253.    All of the surveillance equipment mandated by Section 26806 is permanent ("shall be permanently mounted").  It must record 24 hours a day, 7 days a week.  It cannot be removed for special occasions (Christmas dinner), and it may not be turned off or covered while the premises are not open to the public for business.  *See Loretto*,

---

[29]   Even if Section 26806 did not blatantly use the word "permanent," a taking does not become "temporary" merely because "the government can always change its mind at a later time...." *Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991).

458 U.S. at 426 ("a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve."); *id.* at 427 ("[w]hen faced with a … permanent physical occupation of real property, this Court has invariably found a taking.").

254.    Indeed, Section 26806 is on all fours with the facts of *Loretto*, where the owner of an apartment building objected to installation of electronic devices (cable TV antennas and boxes) on the *exterior* roof of her building.  Here, Section 26806 mandates installation of electronic devices (cameras, microphones, computers) on the *interior* of Plaintiffs' businesses, and "literally adds insult to injury" because it makes Plaintiffs pay to be surveilled.  *See Loretto*, 458 U.S. at 436.

255.    Nor is Section 26806 permissible under "the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building," with no "physical occupation of a portion of his building by a third party."  *Loretto*, 458 U.S. at 440.  The government surveillance equipment required by Section 26806 in no way relates to devices the government requires be installed for the benefit of those within the property.[30]  Rather, Section 26806's mandated surveillance equipment is *for the benefit of the government alone*.  *See Cedar Point*, 141 S. Ct. at 2072 ("Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place.").

256.    Indeed, Section 26806 explicitly provides that the gun store "shall not use … recordings" but "shall allow access" to the government at any time.  **Under the plain language of Section 26806, a gun store could not even examine video and audio recordings after a burglary to attempt to identify the perpetrators.**  In other

---

[30]    But even if California's surveillance system somehow benefited the gun store, that does not mean that Section 26806 does not constitute a taking.  *See Loretto*, 458 U.S. at 422, 438 (concluding, with respect to the installation of "a 'noncrossover' line—*i.e.*, one that provided CATV service to appellant's own tenants," that there is "no constitutional difference between a crossover and a noncrossover installation").

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

words, Section 26806 clearly mandates an "occupation" by the government, forcing gun stores to purchase and install government property, for the sole use and benefit of the government.  *See Loretto*, 458 U.S. at 440.  And Section 26806 permits government agents to come a-knocking at any time, to inspect the system or download its surveillance recordings.[31]

257.    Section 26806 thus could be compared to a law requiring Plaintiff licensees to appropriate physical space behind the counter for a government agent to sit in every day and monitor the goings on.[32]  No reasonable argument could be made that such a law did not effect a taking.

258.    Nor does it matter that Section 26806 does not provide for government or utility installation of its devices, but instead requires licensees to purchase and install the system by which the government will then tyrannize them.  If it were otherwise, any Takings claim could be avoided by simply making the violation worse, and requiring the property owner to harm himself (for example, in *Loretto*, requiring the apartment building owner install the utility's cable lines on its behalf).

259.    Rather, what matters is that Section 26806 mandates installation of surveillance equipment for the government's use and benefit alone, subject to the government's inspection and review at any time, depriving the property owner not only of a certain amount of physical space, but also of use and enjoyment of the entire premises.

---

[31] Similarly, a requirement that property owners allow non-governmental private parties a right of access on their land is a physical taking under the Fifth Amendment. *Cedar Point*, 141 S. Ct. at 2080.

[32] Section 26806 is completely unlike federal law, which requires firearms dealers to keep certain records in a certain form (18 U.S.C. § 923(g)(1)(A)), but does not say where they must be kept—indeed, ATF allows for paper or electronic storage of records (27 C.F.R. § 478.129(b)).  Nor is Section 26806 like an ATF administrative inspection of a dealer, which is temporary in nature and occurs infrequently (at *most* once per year).  *Compare* 18 U.S.C. § 923(g)(1)(B)(ii)(I) ("not more than once during any 12-month period"), *with* Cal. Penal Code § 26720(a)(1) ("at least once every three years").

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

260.    Although the *Cedar Point* Court noted that "[l]imitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public," 141 S. Ct. at 2077, the issue here is that California's physical occupation extends indefinitely, on a 24/7 basis, and even at times when businesses are in fact closed to the public.

261.    Compounded by the sheer costs of complying with Section 26806's novel surveillance scheme, this intrusive digital dragnet plainly constitutes a physical taking for which just compensation must be paid.

*Section 26806 Constitutes an Uncompensated Regulatory Taking.*

262.    In the alternative, Section 26806 is a restriction on the use of property that goes "too far" and therefore amounts to a "regulatory taking." *Cedar Point*, 141 S. Ct. at 2072.

263.    Whether a use restriction rises to the level of compensable "regulatory taking" requires analysis of the factors identified in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978).

264.    This factual inquiry entails "'[t]he economic impact of the regulation on the [property owner],' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'" *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021) (alterations in original) (quoting *Penn Central*, 438 U.S. at 124).  Elaborating on the "character" factor, the *Penn Central* Court observed that a regulatory "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government." *Penn Central*, 438 U.S. at 124.

265.    Of course, the case at bar is nothing like *Penn Central*, which simply maintained the status quo by denying Penn Central's ability to construct an office building above Grand Central Terminal, a historic landmark.  *Penn Central*, 438 U.S.

at 136 (noting that "the New York City law does not interfere in any way with the present uses of the Terminal").

266.     In stark contrast, Section 26806 upends the status quo entirely, imposing onerous new surveillance requirements at a significant (and for some, altogether prohibitive) cost.  Businessowners and affected homeowners alike will have to change how they use their own properties, as the installation of a Bentham's Panopticon invariably alters how people under observation behave: "'The fact that you *won't* do things, that you will self-censor, are the worst effects of pervasive surveillance,' reiterates security expert Bruce Schneier, a fellow at the Berkman and in the cybersecurity program of the Kennedy School's Belfer Center for Government and International Affairs.  'Governments, of course, know this.  China bases its surveillance on this fact.  It *wants* people to self-censor....'"[33]  Thus, the "character of the governmental action" here is as tyrannical as it gets.

267.     Egregious as these effects are, the *Penn Central* factors make all the more clear that Section 26806 effectuates a regulatory taking.  Indeed, Section 26806 entirely upends dealers' "investment-backed expectations," especially those who are homeowners.  In its surveillance-state zeal, Section 26806 imposes prohibitively expensive regulatory burdens that will price countless small-scale gun dealers out of existence.  These unprecedented costs naturally interfere with Plaintiffs' expectations as to the uses of their property and the profit (and indeed livelihood) potential of operating a gun store in California.

268.     In the context of a home-based dealer, such regulatory limitation amounts to a complete taking because no meaningful domestic use remains if occupants are to be surveilled within their own homes.  Indeed, Plaintiffs Richardson and Vandermeulen would rather move out of their homes or quit their businesses than star in Section 26806's version of "The Truman Show."  In addition to the weighty cost of

---

[33] Jonathan Shaw, *The Watchers: Assaults on Privacy in America*, Harv. Mag. (Jan.-Feb. 2017), https://tinyurl.com/4jfrmcbk.

purchasing, installing, and maintaining Section 26806's surveillance system, the economic impacts caused by loss of use of a property (especially a home) are crippling.

269.     Thus, even if the Court finds that Section 26806 is not a *per se* physical taking of property for government use, it still constitutes an overbearing regulatory taking for which compensation is due.

*Unconstitutionally Compelled Waiver of Fifth Amendment-Protected Privileges*

270.     By mandating both visual and audio recording 24/7 inside Plaintiffs' premises, including the homes of home-based dealers, Section 26806 forcibly intrudes into areas where many privileged communications occur.

271.     First, with respect to home-based gun dealers, the recording mandate treads into an area which the courts have recognized is essential to protect—spousal communications.

272.     The Supreme Court has articulated this protection by explaining that "the basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." *Wolfle v. United States*, 291 U.S. 7, 14 (1934).

273.     While case law supports the concept that spousal communications made in public, or where the spouses know that the communication is not in confidence, fall outside the protection, it appears implicit in these decisions that courts differentiate such communications *because* they occur outside the home.  *See, e.g.*, *United States v. Tartaglione*, 228 F. Supp. 3d 402 (E.D. Pa. 2017) (holding that phone communications between spouses, where one of them is incarcerated, is not protected due to the "well-known need for correctional institutions to monitor inmate conversations"); *Pursley v. City of Rockford*, 2020 U.S. Dist. LEXIS 50513, at *8 (N.D. Ill. Mar. 24, 2020) (explaining that inmates' "privacy interests were less than a private citizen making calls at home because they knew that their calls were recorded").

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

274.    Indeed, various courts have recognized that the home is different, as the very "purpose of the spousal privilege is to protect the sanctity of the *marriage and home*." *In re Marriage of Sarsfield*, 671 P.2d 595, 600 (Mont. 1983) (emphasis added).  The entire concept of waiver of privilege is that one who gives up the privilege could have retreated to a safe space, such as the home, in order to make the communication.  Here, the government effectively removes the ability to retreat by requiring recording *within* the sanctity of the home.

275.    Especially for home-based dealers, Section 26806 pays no concern as to other privileges which it might obliterate, such as the doctor/patient privilege.

276.    The doctor/patient privilege "reflects 'the imperative need for confidence and trust' inherent in the doctor-patient relationship and recognizes that 'a physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment.'" *Conant v. Walters*, 309 F.3d. 629, 636 (9th Cir. 2002) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

277.    And while modern medicine has progressed to allow treatment inside the home via offerings such as telehealth, these offerings for Plaintiffs require a Hobson's choice of either refusing such modern treatment options or, alternatively, being forced to disclose their otherwise privileged medical issues to California's ever-present big brother recording device.

278.    Plaintiffs Richards and Harris express concerns over legal conversations that happen in their home office or shop to which Defendants would be made a party should Section 26806 be implemented. (See Richards Decl. ¶ 4, 7, 8; Harris Decl. 5, 9.) These conversations are confidential. Should the owner of a shop or owners of a home business have to go outside to find a private place to have a conversation?

279.    Likewise, the priest-penitent or clergy privilege may also be implicated for individuals who choose to, for example, receive counseling or therapy, or otherwise contact a pastor or priest for guidance on spiritual issues while under government

surveillance at home. *See, e.g.*, *Stevens v. Brigham Young University-Idaho*, 2018 U.S. Dist. LEXIS 100491, at *19 (D. Idaho June 11, 2018) ("'[t]he privilege applies to protect communications made (1) to a clergyperson, (2) in his or her spiritual professional capacity (3) with a reasonable expectation of confidentiality.'").

280.    Finally, Section 26806 egregiously invades the attorney-client privilege. For example, due to the complex regulatory nature of the firearms business, many gun stores frequently communicate with counsel to receive guidance on complex compliance needs. However, given the nonstop nature of the recording under Section 26806, and the demand for audio recording in particular, proprietors looking for counsel must *leave* their licensed premises to ensure that their communications with their lawyer are not captured and recorded, which would waive their privilege.

281.    Of course, leaving the premises (which is now recorded) to call counsel is not feasible in many cases, as gun stores may require guidance *about their records*, which they are statutorily forbidden from removing from the licensed premises. *See* 27 C.F.R. § 478.129.

282.    Indeed, many gun stores have retained counsel via programs to conduct mock audits and provide them advice at the licensed premises.[34]

283.    These privileged interactions would now be recorded under Section 26806.

284.    Section 26806 thus invades and violates all of the most fundamental privileges against disclosure of conversations. By mandating that every gun store owner and home-based dealer record all of their conversations for review by the State, Section 26806 invades the Fifth Amendment's privileges against disclosure of many conversations.

**[Right to Privacy Under U.S. Const. amend. IV.]**

285.    The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[34] *See, e.g.*, *FFL DealerShield*, U.S. LawShield, https://tinyurl.com/4r6mdpnx (last visited Dec. 8, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

286.    The Fourth Amendment's protections have been incorporated against the states via the Due Process Clause of the Fourteenth Amendment.  *See Mapp v. Ohio*, 367 U.S. 643 (1961); *Ker v. California*, 374 U.S. 23 (1963); *Aguilar v. Texas*, 378 U.S. 108 (1964).

287.    The Fourth Amendment was a direct repudiation of the oppressive writs of assistance and general search warrants that colonial merchants suffered under British rule.  These writs operated without expiration and granted officials wide latitude in searches because they did not enumerate specific items, places, persons, or timeframes for governmental intrusion.  *Payton v. New York*, 445 U.S. 573, 583-84 (1980).

288.    Indeed, one of the Fourth Amendment's primary purposes was to protect the people's *businesses*, which had been subject to open-ended rummaging at the hands of British customs officials.  *See Boyd v. United States*, 116 U.S. 616, 625 (1886) ("The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods....").

289.    These writs of assistance famously saw use in oppressing Boston merchants, whose plight inspired James Otis, the Advocate-General tasked with defending the British regime in court, to desert his post and proclaim in the merchants' defense: "It appears to me the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law-book."[35]

290.    As the colonists knew and Plaintiffs are painfully aware, such extensive intrusions into the people's private affairs are no hallmarks of a free society.   Rather,

---

[35] *James Otis: Against Writs of Assistance*, Nat'l Humans. Inst. (Feb. 1761), https://tinyurl.com/39t2h9ra.

"[a]mong deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart.  Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.  And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates, and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police." *Brinegar v. United States*, 338 U.S. 160, 180-81 (1949) (Jackson, J., dissenting).

291.    Rejecting these open-ended, perpetual searches, the Founders sought to protect the people from unreasonable governmental intrusions.  Consequently, "the principles reflected in the Amendment 'reached farther than the concrete form' of the specific cases that gave it birth, and 'apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life.'" *Payton*, 445 U.S. at 585 (quoting *Boyd*, 116 U.S. at 630).

292.    Based on the Fourth Amendment's historical underpinnings in commercial activity, the protection against unreasonable searches and seizures naturally "extends to commercial premises." *De La O v. Arnold-Williams*, 2006 U.S. Dist. LEXIS 91919, at *15 (E.D. Wash. Dec. 20, 2006).

293.    Accordingly, the Fourth Amendment applies with equal force in civil and criminal contexts, because unreasonable governmental intrusions are odious no matter the form they take or the penalty they impose. *Safaie v. City of Los Angeles*, 2020 U.S. Dist. LEXIS 87227, at *6 (C.D. Cal. Mar. 23, 2020) ("Whether the search is conducted pursuant to a civil or criminal investigation, *i.e.*, whether the potential penalty is an arrest or citation, is irrelevant for Fourth Amendment purposes.").

294.    In order "[t]o state a Fourth Amendment claim based upon an unreasonable search, [a] plaintiff must allege (1) government conduct that constitutes a search within the meaning of the Fourth Amendment; and (2) that the search was

unreasonable.  *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) ('To determine whether a Fourth Amendment violation has occurred, we ask two primary questions: first, whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment and second, whether the search was reasonable.').''  *Safaie*, 2020 U.S. Dist. LEXIS 87227, at *4.

295.    As the Supreme Court has observed, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment has 'undoubtedly occurred.'''  *Florida v. Jardines*, 569 U.S. 1, 5 (2013); *see also id.* at 6 ("entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner").

296.    Departing from the Fourth Amendment's property-rights foundation in the 20th century, the Supreme Court alternatively has found "official intrusion[s] into th[e] private sphere" to qualify as "searches" when an individual has a "reasonable expectation of privacy."  *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (explaining doctrinal history); *see also United States v. Jones*, 565 U.S. 400, 406-07 (2012) ("'reasonable expectation of privacy' … did not repudiate" the property focus).

297.    Under either conception (property or privacy), Section 26806 mandates an unreasonable Fourth Amendment "search."

298.    The compelled installation of audiovisual surveillance on private property undoubtedly is a Fourth Amendment search because such surveillance is a physical intrusion on and occupation of private property for the purpose of collecting information.

299.    Section 26806 mandates the installation of surveillance equipment in private homes and businesses for the collection and long-term retention of information to which California will then have the right to access.  In other words, California will physically intrude upon these locations and permanently install its "eyes" and "ears" to observe all that goes on.

300.     Yet Plaintiffs expect their private homes and businesses to remain private, free from perpetual government surveillance.

301.     Moreover, society undoubtedly recognizes this expectation as reasonable; never before has California law imposed such a surveillance requirement on the constitutionally protected firearms industry or private homes, for that matter.

302.     However, at the outset, the Fourth Amendment forecloses Section 26806 without resort to property or privacy analysis because the law operates as a general warrant, contrary to the Fourth Amendment's "precise and clear" command that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

*Section 26806 Operates as a Forbidden General Warrant*

303.     Section 26806 installs the "eyes" and "ears" of government directly into the homes and businesses of some of California's most disfavored subjects (gun owners).  Unlike the eyes and ears of the Redcoats who quartered among the colonists, these new eyes never close and these new ears never stop listening.  Such pervasive, unparticularized surveillance constitutes a general warrant that is repugnant to the Fourth Amendment.

304.     A general warrant allows government officials to "rummage … in an unrestrained search for evidence of criminal activity," *Riley v. California*, 573 U.S. 373, 403 (2014), and therefore is *per se* unreasonable without further analysis.  *Weeks v. United States*, 232 U.S. 383, 390 (1914) (describing "unreasonable searches and seizures, such as were permitted under the general warrants" of British rule).

305.     Among the most oppressive historical general warrants were writs of assistance.  These "hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford*, 379 U.S. at 481.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

306.    Denouncing these writs before the Superior Court of Massachusetts in 1761, James Otis described the writ as "perpetual; there is no return.  A man is accountable to no person for his doings.  Every man may reign secure in his petty tyranny....  [A] person with this writ, in the daytime, may enter all houses, shops, etc., at will...."[36]

307.    The similarities between these flatly banned general warrants and Section 26806 are too clear.  In a flagrant display of "petty tyranny," California has granted itself a general warrant that would have left the King's customs officials green with envy.

308.    Indeed, California's general warrant reaches far beyond wooden barrels in colonial shipyards, instead authorizing a "permanent[]" and "continuous[]" examination of all homes and all private properties engaging in firearm commerce.  Cal. Penal Code § 26806(a)(2), (4).

309.    Like the repudiated general warrant, Section 26806 grants enforcement officials blanket authority to examine **all locations** identified in the statute without any particularized suspicion of criminal activity.  *Cf. Stanford*, 379 U.S. at 481 ("blanket authority to search where they pleased").

310.    Like the general warrant, Section 26806 operates without expiration, remaining in effect on a permanent basis.  *Cf. James Otis: Against Writs of Assistance*, *supra* note 32 ("perpetual; there is no return").

311.    Like the general warrant, Section 26806 fails to interpose between the property owner and the executive officer a neutral judicial officer who first must be satisfied that the places and people to be searched have been described with particularity.  *Cf. James Otis: Against Writs of Assistance*, *supra* note 32 ("A man is accountable to no person for his doings."); *Weeks*, 232 U.S. at 390 ("there had been invasions of the home and privacy of the citizens and the seizure of their private papers

---

[36] *James Otis: Against Writs of Assistance*, *supra* note 32.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

in support of charges, real or imaginary, made against them"); *see also California v. Acevedo*, 500 U.S. 565, 586 (1991) (Stevens, J., dissenting) (describing the Fourth Amendment "as a bulwark against police practices that prevail in totalitarian regimes").

312.    And like the general warrant, Section 26806 authorizes intrusions into *homes* and *businesses* engaged in California's disfavored sort of commerce.  *Cf. James Otis: Against Writs of Assistance*, *supra* note 32 ("a person with this writ, in the daytime, may enter all houses, shops, etc., at will").

313.    And as mentioned, while the King's eyes and ears needed to rest and could not be in all places of general interest at once, California's eyes and ears are much more pervasive.  Indeed, while "a person with th[e] writ, in the daytime, may enter all houses, shops, etc.,"[37] California's watchful gaze continues throughout the night, indefinitely, observing all activity captured under this mass-surveillance regime.

314.    Case law makes clear that a governmental action's similarity to the general warrants of old is a dispositive inquiry.  In *Weeks v. United States*, the Supreme Court analyzed the government's search of "all of [the defendant's] books, letters, money, papers, notes, … and other property in said home," paying careful attention to the *generality* of the search, before concluding that the search violated "the fundamental law … that a man's house was his castle and not to be invaded by any *general authority* to search."  *Weeks*, 232 U.S. at 387, 390 (emphasis added); *see also Rush v. Obledo*, 756 F.2d 713, 721, 723 (9th Cir. 1985) (striking down a California statute authorizing "general searches of any home … at any time of the day or night" as "invalid under the Fourth Amendment as general searches").

315.    Moreover, a marginal specificity as to only *certain* types of homes and *certain* types of businesses (here, firearm dealers) cannot save Section 26806.  Indeed, "[o]ne of the most important types of general searches banned by the fourth

---

[37] *James Otis: Against Writs of Assistance*, *supra* note 32.

amendment is general paper searches.  Typically, such searches are 'specific' as to the person and/or place to be searched, but they are 'general' because the quest for incriminating papers requires examination of the contents of *innocent papers containing private expressions and communications*."[38]

316.    Unsurprisingly, then, the Supreme Court has described those British warrants "authoriz[ing] the arrest and *search of the premises of all persons connected with* the publication of a particular libel" as a "kind[] of general warrant[]."  *Stanford*, 379 U.S. at 482, 483 (emphasis added); *cf.* Cal. Penal Code § 26806 (authorizing the *search of the premises of all persons connected with* the conduct of firearm dealing).

317.    Section 26806's pervasive surveillance scheme undoubtedly operates as a forbidden general warrant.  After all, while a constitutional warrant "particularly describing the place to be searched, and the persons or things to be seized" sets subject-matter, locational, and temporal boundaries, no such protections exist under Section 26806.  Instead, Section 26806's surveillance mandate casts a dragnet, indiscriminately sweeping up all manner of persons, conversations, and conduct, recording all that occurs for future parsing by the state.

318.    Accordingly, Section 26806 violates the Fourth Amendment's prohibition of general warrants and is *per se* unconstitutional.

*Section 26806's Surveillance Scheme Invades Plaintiffs' Property Without License or Warrant and Is Therefore "Unreasonable."*

319.    Although this Court may resolve its Fourth Amendment question based on the flat historical prohibition of general warrants, Section 26806's constitutional defects do not end there.  Indeed, Section 26806 compels intrusions into individuals' private property without individual permission, judicial warrant, or any claim of superior property interest in Californians' shops and homes.  Under the Fourth

---

[38] Russell W. Galloway, Jr., *The Intruding Eye: A Status Report on the Constitutional Ban Against Paper Searches*, 25 How. L.J. 367, 396 (1982) (emphasis added).

Amendment's traditional protection of property rights, such intrusions cannot stand.

320.     The original public understanding of the Fourth Amendment's protections emphasized "property rights in search-and-seizure analysis" such that "Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century." *Jones*, 565 U.S. at 405.

321.     Marking a modern resurgence in analyzing the Fourth Amendment's property underpinnings in *United States v. Jones*, and reaffirming this approach in *Florida v. Jardines*, the Supreme Court has observed that "[t]he text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous." *Jones*, 565 U.S. at 405.

322.     This property-rights approach stands apart from the 20th-century "reasonable-expectations test," which merely "'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment." *Jardines*, 569 U.S. at 11.

323.     As the *Jardines* Court observed, "[o]ne virtue of the Fourth Amendments property-rights baseline is that it keeps easy cases easy." 569 U.S. at 11.  The case at bar is one such "easy case[]."

324.     Under *Jones* and *Jardines*, an unconsented and unwarranted physical intrusion onto an individual's property to gather information for the government constitutes an unreasonable search without regard to any privacy expectations. *Jones*, 565 U.S. at 404-05 ("The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."); *see also id.* at 413 (Sotomayor, J., concurring) ("I join the Court's opinion because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum, '[w]here, as here, the Government obtains

information by physically intruding on a constitutionally protected area.'"); *Jardines*, 569 U.S. at 7 (examining whether a search "was accomplished through an unlicensed physical intrusion").

325.    In other words, in order to commit a trespass against an individual's property for a search, the government must prove a superior property interest in the "person[], house[], paper[], [or] effect[]," U.S. Const. amend. IV, such as through a warrant based upon probable cause, a seizure of stolen property (in which the individual has no property interest), or a seizure of contraband (in which no individual can claim lawful interest).

326.    Section 26806, without any warrant, oath or affirmation, or probable cause of any wrongdoing, "physically occupie[s] private property for the purpose of obtaining information" by requiring the installation of government recording equipment against the will of businessowner and homeowner alike. *Jones*, 565 U.S. at 404.  Accordingly, there is "no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404-05.

327.    While an intrusion (and indeed occupation) of Plaintiffs' private property is dispositive on the unreasonable-search question, Section 26806's edicts are especially intolerable for home-based dealers.

328.    Indeed, invasive household surveillance implicates *all* of the property interests identified in the Fourth Amendment's text.  Not only will Plaintiffs' "houses" be searched while on camera, but so will their "persons" be, as will their relatives and guests be, should they find themselves within view of one of the likely multiple permanently mounted cameras required by Section 26806.  What previously may have been an underwear-clad, late-night traipse to the bathroom is now, under Section 26806, essentially a public outing.  Similarly, all personal property (papers and effects) within view will be unable to escape California's prying eyes.  As a result, California has managed to violate the entirety of an amendment's text in one fell swoop.

329.    Because Section 26806 mandates physical intrusions of Plaintiffs' property for the purpose of gathering information, such a mandate violates the Fourth Amendment's protection against unreasonable searches of "persons, houses, papers, and effects," which must be "secure."

*Section 26806 Violates Plaintiffs' Reasonable Expectations of Privacy.*

330.    The Supreme Court's "privacy" doctrine provides a distinct basis for relief under the Fourth Amendment.  *See Katz v. United States*, 389 U.S. 347 (1967).  According to this principle, "a person must show he had a 'legitimate expectation of privacy.'  To establish a 'legitimate' expectation of privacy, he must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was 'one that society is prepared to recognize as reasonable.'"  *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).

331.    Using this "reasonable expectation of privacy" formulation, the Supreme Court has "found a [Fourth Amendment] violation in attachment of an eavesdropping device to a public telephone booth."  *Jones*, 565 U.S. at 406 (citing *Katz*, 389 U.S. at 351).

332.    Section 26806 violates this test multiple times over by installing eavesdropping devices on all *private* properties where firearm dealing occurs—including the home.

333.    Section 26806's eavesdropping devices collect much more than just audio, which the Court already has found to be intolerably intrusive.  *See Kyllo v. United States*, 533 U.S. 27, 35 (2001) (discussing "*Katz*, where the eavesdropping device picked up only sound waves that reached the exterior of the phone booth"); *cf.* Cal. Penal Code § 26806(a) (requiring audio *and* video *inside* the proverbial phone booth).

334.    In rejecting the mechanical distinction of "off-the-wall" and "through-the-wall" surveillance first in *Katz* and later in *Kyllo*, the Court observed that "just as a thermal imager captures only heat emanating from a house, so also a powerful

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

directional microphone picks up only sound emanating from a house." *Kyllo*, 533 U.S. at 35.

335.    Now, imagine a microphone (and camera) *inside the walls* of a house, capturing the sights and sounds within the home, and you have Section 26806.

336.    Indeed, "[w]hat the ancients knew as 'eavesdropping,' we now call 'electronic surveillance'.... *Electronic surveillance is the greatest leveler of human privacy ever known*." *United States v. White*, 401 U.S. 745, 756 (1971) (Douglas, J., dissenting) (emphasis added).

337.    Courts are loathe to sanction the electronic surveillance of individuals generally and within private properties especially.  Holding even a transient, anti-cheating "room scan" at the start of a remotely held college exam to violate the Fourth Amendment, a district court in Ohio noted that, "[a]lthough the intrusion at issue might not strike a person as especially problematic, particularly in the nascent Zoom era, the core protection afforded to the home, the limited options, inconsistency in application of the policy, and short notice of the scan weigh in Plaintiff's favor." *Ogletree v. Cleveland State Univ.*, 647 F. Supp. 3d 602, 616 (N.D. Ohio 2022).

338.    Accordingly, "[b]ased on consideration of the[] factors, individually and collectively, the Court conclude[d] that [the student's] privacy interest in his home outweighs Cleveland State's interests in scanning his room." *Ogletree*, 647 F. Supp. 3d at 617.

339.    Notably, these video-based anti-cheating exam measures "lasted less than a minute, and as little as ten to twenty seconds." *Ogletree*, 647 F. Supp. 3d at 609.  Such brief invasions of privacy pale in comparison to the *perpetual* video surveillance Plaintiffs face.

340.    Other courts already have dispensed with the perpetual video surveillance of private property as plainly unconstitutional under the "reasonable expectation of privacy" analysis.  For example, the Fifth Circuit has held that even the video surveillance of one's backyard, outside one's house, is a bridge too far.  *United States*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

*v. Cuevas-Sanchez*, 821 F.2d 248, 250 (5th Cir. 1987) (reasonable expectation of privacy against installation of a "video camera atop a power pole overlooking the appellant's 10-foot-high fence bordering the back of the yard").

341.    At the prospect of "a camera monitoring all of a person's backyard activities," the Fifth Circuit was unequivocal: "This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." *Cuevas-Sanchez*, 821 F.2d at 251; *see also Nerber*, 222 F.3d at 602 (emphasis added) (Ninth Circuit citing *Cuevas-Sanchez* with approval and noting the "*legitimate expectation to be free from constant video surveillance*").

342.    Section 26806 captures where gun owners and prospective purchasers go, what they say, and indeed what firearms they purchase.

343.    Yet "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 138 S. Ct. at 2217.[39]  The Fourth Amendment also protects the contents of conversations from unreasonable governmental intrusion.  *Alderman v. United States*, 394 U.S. 165, 178 (1969) (noting "the Court has now decided that the Fourth Amendment protects a person's private conversations as well as his private premises").

344.    Taken together, it is clear that Section 26806 captures all manner of information, locations, and conduct to which individuals maintain a reasonable expectation of privacy.

---

[39] *See also Jones*, 565 U.S. at 415 (Sotomayor, J., concurring) ("Disclosed … will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on." (quoting *People v. Weaver*, 909 N.E.2d 1195, 1199 (N.Y. 2009))).  Permitting the perpetual surveillance of gun dealers disfavored by California may encourage other states to enact the same sort of surveillance laws in places, like abortion clinics, that are disfavored by those states.  And while the right to keep and bear arms is enumerated in the bill of rights, abortion is not.  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

345.    For instance, Plaintiffs Richardson and Vandermeulen legitimately expect their homes to be private and free from constant governmental surveillance of his family, visitors, conversations, and all aspects of his private daily life.  This expectation is plainly "reasonable" under the Fourth Amendment because "'at the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home'" and "there be free from unreasonable governmental intrusion."  *Soldal v. Cook County*, 506 U.S. 56, 61 (1992); *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Nerber*, 222 F.3d at 602.

346.    Similarly, Plaintiffs Jesse Harris, On Target and Smokin' Barrels Firearms legitimately expect their businesses to be private to the extent that it is free from constant governmental audiovisual surveillance of all employees, patrons, conversations, and transactions.  This expectation is "reasonable" under the Fourth Amendment because society does not expect constitutionally protected commerce to be subject to such intrusive surveillance.  Indeed, it never has been in the past.

347.    Section 26806 undoubtedly sanctions "searches" under the Court's "privacy" test.  *See Katz*, 389 U.S. at 353 (noting that "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure"); *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring) (emphasis added) (citation omitted) ("Nonetheless, as Justice Alito notes, physical intrusion is now unnecessary to many forms of surveillance.  With increasing regularity, the government will be capable of duplicating the monitoring undertaken in this case by enlisting factory- ***or owner-installed*** … devices....").

348.    California has absolutely no legitimate interest in recording the identities and interactions of people exercising their constitutional rights, which will serve only to chill the exercise of those rights.  No state can claim an interest in chilling the exercise of constitutional rights, the very negative rights that the state is tasked with *not* violating.  *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms. And the

86

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse.").

349. In contrast, individuals' privacy interests in the exercise of constitutional rights reach their zenith in hostile jurisdictions like California.

350. Section 26806 represents just the latest of California's insidious attempts to nullify another disfavored portion of the Bill of Rights. In words that ring as true today as they did during Reconstruction, "illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed." *Boyd*, 116 U.S. at 635; *Silverman*, 365 U.S. at 512 (reiterating the same in 1961).

351. Section 26806 is no slight deviation, and this Court should defend against it with even greater protective vigor still.

*The "Highly Regulated Industry" Exception to the Warrant Requirement Cannot Save Section 26806.*

352. To be sure, courts have recognized an exception to the warrant requirement for administrative searches in so-called "highly regulated industries," to which firearm dealers have been found to belong. *See, e.g.*, *United States v. Hamad*, 809 F.3d 898, 905 (7th Cir. 2016) ("sellers of alcohol and firearms are highly regulated and licensed and therefore subject to the administrative search exception").

353. Of course, unlike the "right to keep and bear arms," there is no constitutionally enumerated right to imbibe. Thus, Plaintiffs question the continuing validity of these sorts of holdings when applied to dealers in constitutionally protected products, as it would seem that the right to Fourth Amendment property and privacy rights is at its zenith when other constitutional rights (here, Second Amendment rights) are involved.

354.   Indeed, the "highly regulated industry" exception is premised on the notion that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (citation omitted). *But see United States v. Biswell*, 406 U.S. 311, 315 (1972) (emphasis added) (admitting that "[f]ederal regulation of the interstate traffic in firearms is *not as deeply rooted in history* as is governmental control of the liquor industry" but citing the governmental interests in such regulation); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2136 (2022) (focusing constitutional analysis on early, Founding-era historical traditions and rejecting governmental interest balancing entirely).

355.   It would appear, then, that *Biswell*'s holding, which upheld the Gun Control Act's warrantless administrative searches of gun dealers, has been undermined significantly by the Court's recent return to original-meaning analysis, which focuses on the public understanding during the Founding era. There is no early American tradition of warrantless inspections of gunsmiths to justify a "highly regulated industry" Fourth Amendment exception today. Indeed, the Founding generation had every expectation that the government would *not* rummage through gunsmiths' "records" to verify "compliance," having just cast off the yoke of the British regulators who had done so in most commercial affairs.

356.   Nevertheless, merely belonging to a highly regulated industry is no magic talisman to ward off Fourth Amendment challenges. Instead, to be "reasonable," a warrantless administrative search of a highly regulated industry "must be specifically authorized by statute, and the parameters of any exception to the search warrant requirement must be found in the statute." *Taylor v. Va. Alcoholic Beverage Control Auth.*, 827 S.E.2d 15, 25 (Va. Ct. App. 2019) (citing *Biswell*, 406 U.S. at 315 (1972)).

357.   While statutes may authorize warrantless administrative searches, these searches remain susceptible to overbreadth challenges if they sweep too far. *See Rush*, 756 F.2d at 719.

358.     To illustrate, in striking down a California statute authorizing warrantless inspections of home-based daycares, the Ninth Circuit found the "statutes authorizing such searches [we]re overbroad – permitting general searches of any home providing care and supervision ***at any time of the day or night*** – and thus invalid unless sufficiently limited by the current regulations so as to preclude general searches."  *Rush*, 756 F.2d at 721 (emphasis added).

359.     Moreover, the Ninth Circuit observed that a "family day care home is a business ***only when*** children cared for from other families for compensation are present ***and at all other times is a private residence***."  *Rush*, 756 F.2d at 721 (emphasis added).

360.     Violating that principle, Section 26806 subjects home-based dealers to searches "at any time of the day or night" – in fact, *at all times* – because surveillance must be continuous and uninterrupted.  *Rush*, 756 F.2d at 721.

361.     Section 26806 does not lift its surveillance mandate during non-business hours, despite the fact that a home-based dealer "at all other times is a private residence."  *Rush*, 756 F.2d at 721.  Indeed, Section 26806 contains no limiting principle whatsoever.

362.     Accordingly, Section 26806 is "thus invalid under the Fourth Amendment as [a] general search[]."  *Rush*, 756 F.2d at 723.

*California Constitution, Article I, Section 1, Specifically Institutes a Right to Privacy*

363.     California is the first state in the nation to include an explicit right to privacy in its state constitution.

364.     Article I, Section 1 of the California Constitution applies to both government and private entities and is specifically designed "to preserve our private lives and fundamental rights in the face of technological advances."[40]

---

[40] *California Constitutional Right to Privacy*, ACLU NorCal, https://tinyurl.com/mrxptude (last visited Dec. 5, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

365.    For fifty years, California's right to privacy has been a north star for work on cutting-edge laws—from consumer protections that require businesses to provide people with privacy policies, data-breach notifications, and the right to know about and delete the information being collected on them—to anti-surveillance laws that require the government get a warrant to access personal information and that protect against face surveillance and other dangerous technology.

366.    An example of this protection in action is found in *White v. Davis*, 533 P.2d 222 (Cal. 1975), where the California Supreme Court ruled that the Los Angeles Police Department violated Article I, Section 1 of the Californian Constitution when they infiltrated UCLA courses and organizations to create dossiers on students and professors, without any suspicion of illegal activity. The Court wrote that the LAPD's spying program "epitomizes the kind of governmental conduct which the new constitutional amendment [Article I, Section 1] condemns." *Id.* at 234.

367.    Section 26806 clearly violates California's own constitutional privacy protection, by recording legally protected private moments, recording those areas and events where people have a reasonable expectation of privacy, and recording these events and areas constitutes a serious invasion of privacy that even Defendants cannot overcome.

### *California Dual Consent Law for Recording Others*

368.    California Penal Code § 632.7 requires dual consent of all parties included in a recording and issues criminal penalties for knowingly recording someone without their consent.

369.    Section 632 states that *"anyone who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record it, or to use a telegraph, telephone, or another device, will be punished by a fine up to $2,500 per violation, or up to one year in county jail, or both. If the person has a previous conviction, the penalty increased to $10,000 or both jail and a fine."*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

**[Section 26806 Will Financially Cripple Many FFLs]**

370.    Section 26806 contains numerous and often unclear technical requirements. However, even assuming a best-case scenario, the statute is cost-prohibitive to implement for many dealers.

371.    Erring on the side of caution, even a conservative estimate would produce substantial financial outlays for gun dealers of nearly $20,000.

372.    For starters, Section 26806(a)[41] requires cameras to "clearly record images and … audio" that will allow for the "clear identification" of persons, but the law provides no minimum standard, such as video resolution of 720p or 1080p.  The only minimum standard provided refers to frame rate of the video being recorded—"15 frames per second."

373.    Likewise, although the statute provides no details, in order to record audio sufficient to capture conversations at distances, especially in order to clearly identify speakers, unidirectional microphones may be necessary in locations where cameras are pointed and would increase the cost.

*Hypothetical Costs*

374.    To demonstrate the costs, take a hypothetical gun store with a simple 20' x 20' floorplan, with gun racks lining one full 20' wall and an 18' glass display counter in front of it, with 4' of space between the counter and the racks for employees to work.

375.    Further, this hypothetical store will have one point-of-sale ("POS") system where transactions occur, which is located on the display counter in the corner where the counter meets the wall.  The National Instant Criminal Background Check

---

[41] Notwithstanding the already outrageous requirements of the statute, Section 26806(e) invites additional local requirements: "This section does not preclude any local authority or local governing body from adopting or enforcing local laws or policies regarding video surveillance that do not contradict or conflict with the requirements of this section."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

("NICS") station is located immediately next to the computer, between the POS and the wall.

376.    There is only one door that leads to the outside of the store.  It is used as the sole entrance and exit for clients, employees, and inventory deliveries (unlikely in most gun stores).  On the wall opposite the firearm display, there is a bathroom and an office that doubles as a stockroom.

377.    Finally, there are no other displays or obstructions in the middle of the showroom. The gun store has a drop ceiling and sheetrock walls with wood studs, and there is neither a basement nor an attic. *See* Fig. 1.1:



378.    **Cameras.**  Section 26806 requires that cameras must be "digital," "permanently mounted in a fixed location," that the system record "audio," and that it capture images capable of "clear identification of any person."

379.    The cameras must be of sufficient quantity to record all interior views of "entries and exits," "all areas where firearms are displayed," and all POS stations

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1   "sufficient to identify the parties involved in the transaction."  Cal. Penal Code

2   § 26806.

3   380.     Based on those statutory requirements, in the above hypothetical gun store,

4   a minimum of eight cameras would be required: one camera capturing customers

5   entering the store, one capturing people leaving the store, one capturing the doors to

6   the bathroom and office/storeroom, one focused on the POS from mid-store, one on the

7   same wall as the POS capturing a portion of the display counter and gun rack, one on

8   the wall opposite the POS capturing the display counter and part of the gun rack, one

9   mid-store aiming towards the counter and gun rack, and finally one aiming from the

10  gun rack towards the opening for the display counter.

11  381.     Even then, it would be difficult to capture everything that the statute

12  demands. *See* Fig. 1.2:



Legend

| | | | |
|---|---|---|---|
| Display Counter | ▮ | Velvet Rope | ••••• |
| Gun Racks | ▮ | Camera Pattern | ◁ |
| POS | ● | | |
| NICS | ● | | |

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

382.    Because the statute fails to specify what resolution cameras are acceptable, a middle-of-the-road camera system was chosen: Luma Surveillance 420 Series 4MP Dome IP cameras with built-in microphones and motorized varifocal lenses that allow the cameras to be customized to the shot.  These cameras have an MRSP of $518.00 each.  Eight cameras would cost approximately $4,144.00.

383.    **Recording.**  The statute requires the ability to record high-quality audio and video continuously, 24 hours a day, at a minimum of 15 frames per second, and to store that information for a minimum of one year.  Cal. Penal Code § 26806.

384.    Recording video alone and omitting the audio, would require roughly 105 terabytes ("TB") of storage using H.265 compression.[42]

385.    Additionally, in order to comply with Section 26806's requirements, the network video recorder ("NVR") necessary for recording would need to be secure, send notifications when it goes down, and accurately display the date and time.  Cal. Penal Code § 26806.

386.    For example, a Luma Surveillance 820 Series 32-Channel Network Video Recorder would accommodate the needed storage.  The NVR itself has an MSRP of $3,238.00 and can handle a maximum of eight 18TB hard drives for a total capacity of 144TB, greater than the 105TB estimated requirement for video recordings.  The extra space should be sufficient to accommodate the audio recording but, of course, is insufficient to provide a redundant backup.

387.    Installed within that NVR could be, for example, Western Digital WD Purple Pro Smart Video 18TB Hard Drives, at $369.99 each, for a total of $2,959.92. Together, the NVR and hard drives come to $6,197.92.

388.    Of course, a redundant backup system could double this cost.

---

[42] *See Seagate Required Storage Space Calculator*, SEAGATE, https://tinyurl.com/mjpw4p54 ("8" cameras; "15" frames per second; "24" hours per day; "365" days stored; "high" video quality; double "1080P" results = 105.4TB; compare to "3MP" + half the difference between "5MP" = 104.3TB).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

389.    **Power.**  Power to the cameras likely would be provided by the NVR through power-over-ethernet ("POE") connection.  The NVR would require an uninterruptible power supply ("UPS") of sufficient size to ensure that audio and video continued to record, even during utility maintenance or power outages.

390.    A Wattbox IP UPS Kit, which offers 12 controllable outlets, surge protection, power conditioning, and a 2000VA battery backup has an MSRP of $2,476.95.

391.    **Accessories**.  To house and secure the system and to prevent tampering, unauthorized access or use, or theft—as required by statute—it would require a lockable rack system (at a minimum).  A Strong FS Series 21U Rack System Package with DC cooling fans would cost approximately $1,039.45.

392.    **Installation**.  Obviously, installation costs can vary, but an estimate of $250.00 per camera to mount each camera and run its respective wiring through walls, ceiling, under carpet or flooring, etc., is reasonable.  Accordingly, eight cameras might cost $2,000.00 to mount and wire.

393.    Installing and configuring the hard drives likely would cost $50.00 per hard drive, or $400.00 in total.

394.    Installing and configuring the components into the rack system would easily cost another $200.00.

395.    Setting up and fine-tuning the entire system, configuring settings, remote access, and alerts so that everything operates smoothly, and providing store employees with instruction on proper use of the system, would be an additional $600.00.

396.    Total installation costs for this small system thus could be expected to be approximately $3,200.00.

397.    **Total**.  Estimating $4,144.00 for cameras, $6,197.92 for the NVR and hard drives, $2,476.95 for surge protection and UPS, $1,039.45 for a rack system to protect and house the components, and $3,200.00 in labor totals approximately $17,058.32 prior to sales tax, shipping, or other costs not specifically identified herein.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

398.    The Senate Committee on Public Safety also recognized this burden, stating, "[t]hough few would disagree with the critical importance of high security at gun shops, the intensive and detailed nature of the requirements in this bill may represent a challenge for licensees, both economically and logistically."  The Committee also suggested that the author try to take steps to "ease the potential burden of compliance."[43]

399.    The above estimate assumes that the system identified is 1) sufficient to meet the requirements of the statute and 2) available for installation.

400.    This estimate also does not take into account ongoing system maintenance, to include replacing cameras that malfunction, hard drives that eventually wear out, or additional redundant recording systems, should the original system go down or otherwise not function properly.

401.    Of course, depending on the type of store, this figure can vary wildly to the upside, as not all retail stores are simple squares with easily determined mounting locations to capture all of the places, images, and audio the statute requires.

402.    For example, Plaintiff GOC has heard from at least one large retailer who reportedly already has spent in excess of $250,000 in order to comply with Section 26806.  Of course, many California dealers have not yet complied with Section 26806.

403.    Needless to say, the costs imposed on California gun stores and dealers (including home dealers) are astronomical.

404.    For many gun stores, such as Plaintiffs On Target, Smokin' Barrels Firearms, and Harris, this cost is prohibitive.

405.    For home-based dealers, such as Plaintiffs Richards and Vandermeulen, this cost is prohibitive and will drive them out of business entirely.

**[Section 26806's Recordings are Unlawful Under Federal and State Law]**

---

[43] Senate Committee on Public Safety Hearing on SB 1384, Apr. 19, 2022, p. 9 https://spsf.senate.ca.gov/sites/spsf.senate.ca.gov/files/sb_1384_analysis.pdf (last visited Dec. 4, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

406.     California has shown a willingness to legislatively protect privacy against surreptitious recording, such as by enactment of Cal. Penal Code § 632, which criminalizes "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio."

407.     In other words, California is a "two party consent state."

408.     Yet under California's new and contradictory Section 26806, dealers now are mandated to keep surveillance rolling irrespective of the risk of accidently recording a communication by someone who expects privacy.

409.     Interestingly enough, Section 26806 partially (but not entirely) anticipates this problem, mandating that dealers must post conspicuous signage warning visitors *to the property* that they are under surveillance.

410.     But Section 26806 does not provide for a situation where a conversation is *not* in-person.

411.     For example, Plaintiffs routinely speak with customers over the phone, in order to take orders, schedule pickups, receive payments, arrange appointments, etc. Oftentimes, Plaintiffs uses the phone's "speaker phone" in order to work the computer, review paperwork, or otherwise multitask when talking with customers by phone. Section 26806 thus would result not only in Plaintiffs' side of the conversation being recorded, but also that of his customers, suppliers, other dealers, and more.

412.     Naturally, Plaintiffs' customers who call in by phone will be unable to see the "conspicuous" signage posted on the exterior of the store, warning them that their conversation is being recorded.

413.     Thus, Section 26806 mandates that Plaintiffs Richards, Vandermeulen, Smokin' Barrel Firearms, Harris, and On Target violate Cal. Penal Code § 632,

recording  customers, on behalf of the state and without their knowledge. Especially if the calls occur on speaker phone.

414.    What is more, Plaintiffs do not consent to Section 26806's recording even of their end of a  conversation with customers.  In other words, neither party to these private conversations has consented to the recordings under Section 26806.

415.    Unfortunately, California firearms dealers will now be at risk of violating California's wiretap law should they put a caller on speaker phone, or even have their phone volume turned up loudly enough to capture a conversation in a location subject to Section 26806 recording.

416.    This risk is not limited merely to visitors at traditional gun stores, but also to those who call home-based dealers about a personal matter, totally unaware that they are under surveillance and that recording equipment is capturing their conversation.

417.    Arguably, Section 26806's dystopian defects do not end there.  Should a gun store accept a phone call from a customer and place it on speaker in an area under Section 26806 surveillance, California's resulting recording may additionally violate the federal Wiretap Act, 18 U.S.C. § 2511(1)(a), which prohibits "any person who … intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication...."  Section (c) and (d) of that Section provide additional penalties for "disclosure" and "use" of that wiretapped conversation.  Here, there is no exception if "one of the parties to the communication has given prior consent to such interception," because it is California (a third party) that has imposed the surveillance requirement on gun dealers.  Again, Plaintiffs do not consent to California recording their conversations.  Section 26806 thus appears to legislate a violation of federal law or, alternatively, should be found to be preempted by federal law.

**[Section 26806 Opens FFLs Up to Criminal and Civil Liability]**

418.    Additionally, Section 26806 places FFLs in danger of legal action against them for recording customers and patrons who have not given their consent to be

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

recorded. Even with the mandatory sign placement, California is a mutual consent state and requires the consent of all parties being recorded. If an individual does not consent to be recorded carrying out a constitutional right to purchase a firearm, they will not be able to purchase a firearm at all in the state. It is either forced compliance to the government listening to private conversations or not purchasing a firearm or ammunition at all.

419.    Many FFLs operate their small businesses out of their homes. Many do the firearm transfer paperwork with a client at the kitchen table. Imagine the shocking intrusion that a fixed camera, recording all conversations 24 hours per day, would have on the entire household or anyone visiting the home, even when no firearms transactions are taking place. Every dinner guest, handyman, child's playdate, or potentially the client of a spouse who works from home would have to give consent to be recorded. Every telephone conversation or intimate family issue, recorded. It is unfathomable the reach that Section 26806 has in the intrusion upon the private lives and private conversations of people simply because they are visiting the premises of an FFL.

420.    The bill comments by Senator Min note that the need for this bill is "[t]o ensure gun owners are educated about the dangers of firearm usage."[44] **It is unclear how forcing recorded conversations (video and audio) will help gun owners to be more educated about the "dangers of firearm usage."** Defendants offer no evidence to support that Section 26806 will accomplish these governmental goals.

*SB 1384 Will Not Stop Gun Violence and Crime.*

421.    A recent article stated that "we find evidence that some retailers contribute disproportionately to the supply of crime guns, though much less dramatically than statistics often cited would suggest. The data indicate that there may be somewhat

---

[44] Senate Committee on Public Safety Hearing on SB 1384, April 19, 2022, p. 5. https://spsf.senate.ca.gov/sites/spsf.senate.ca.gov/files/sb_1384_analysis.pdf (last visited Dec. 4, 2023).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

fewer problematic dealers now than there were a decade ago." This directly from conversations with DOJ and the impact they have already had in shutting down dealers who do not comply under current laws.[45]

422.    A statewide dealer regulation was also passed in 2013, requiring all persons engaged in the business of selling firearms to possess a state Certificate of Eligibility and be named on the state's Centralized List of firearms retailers. Cal. Pen. Code § 28450.

423.    The California Senate Public Safety Committee's April 19, 2022, analysis of AB 1384 relied on studies on retail gun theft that are either older (2016 or earlier) or that deal with nationwide issues and not specifically any issues with gun shops in California. (See Exhibit 1 at 9.) Much has changed in California over the past decade, and relying on factual data that is that far out of touch with our current reality makes little sense to those truly searching for the science behind the issues of our time.

424.    The sponsors of SB 1384 were hopeful that somehow adding costly surveillance and audio requirements would stop theft of gun shops,[46] but as retail crime rises in California,[47] the use of video surveillance does not seem to be any kind of deterrent to criminals willing to break the law.

425.    The video footage only fills the media with the images of thefts in action. Criminals simply do not care if there are cameras in a retail business. In fact, many of them hope for cameras that will capture their antics and give them their 10 seconds of fame. Meanwhile, Section 26806's audio and video recording of lawful citizens

---

[45] Trends and Sources of Crime Guns in California: 2010-2021, September 11, 2023. https://link.springer.com/article/10.1007/s11524-023-00741-y (last visited Dec. 3, 2023).

[46] As noted, Senate Committee on Public Safety Hearing on SC 1384, Apr. 19, 2022, p. 7, "the rate of gun store thefts seems to have tapered slightly in recent years since peaking in 2016 (690), with 208 reported thefts in 2021."

[47] *Retail Theft and Robbery Rates Have Risen Across California*, Pub. Pol'y Inst. of Cal. (Sept. 7, 2023), https://www.ppic.org/blog/retail-theft-and-robbery-rates-have-risen-across-california/; *What We Know (and Don't) About the Rise in Retail Theft*, L.A. Times (Oct. 18, 2023), https://www.latimes.com/california/newsletter/2023-10-18/what-we-know-and-dont-about-the-rise-in-retail-theft-essential-california; https://www.youtube.com/watch?v=1Mnwgh5XGhk.

1  directly infringes on the rights of those attempting to exercise their constitutional

2  rights.

3  **[Section 26806 Conditions the Exercise of One Enumerated Right on the**

4  **Forfeiture of Others]**

5  426.    Under Section 26806, Californians seeking to exercise their Second

6  Amendment rights to acquire firearms must leave many other constitutional rights at

7  the gun shop door.

8  427.    Indeed, Section 26806 imposes an intolerable Hobson's choice on

9  Californians "insisting upon"[48] exercising their Second Amendment rights.  If they do

10  so, then they relinquish their First, Fourth, and Fifth Amendment rights, as discussed

11  *supra*/*infra*.  But if they choose to retain those rights, then they necessarily must forgo

12  their Second Amendment right to acquire constitutionally protected arms.

13  428.    Desirable to California politicians as such a scheme may be, the compelled

14  choice between or among constitutional rights—where the exercise of one turns on the

15  relinquishment of others—necessarily violates them all.

16  429.    The Supreme Court has found it "intolerable that one constitutional right

17  should have to be surrendered in order to assert another."  *Simmons v. United States*,

18  390 U.S. 377, 394 (1968) (recognizing an "undeniable tension" between the exercise of

19  Fourth and Fifth Amendment rights when the government uses testimony in support of

20  a suppression motion at a later trial to prove guilt); *see also United States v. Jackson*,

21  390 U.S. 570, 581 (1968) (holding unconstitutional a federal statute that created a

22  tension between "the Fifth Amendment right not to plead guilty" and "the Sixth

23  Amendment right to demand a jury trial" by allowing the death penalty upon a jury

24  conviction).

25  430.    This principle applies with equal force to other Bill of Rights guarantees,

26  the Second Amendment included.  Indeed, the Second Amendment often results in a

27

28  [48] *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

confluence with other rights. *See, e.g.*, *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 349 (W.D.N.Y. 2022) (granting a TRO enjoining enforcement of a prohibition on firearms in places of worship because "[l]aw-abiding citizens are forced to forgo their Second Amendment rights to exercise their First Amendment rights to free exercise of religion, or vice versa"); *Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

431.    For example, the intersection of First and Second Amendment rights is no foreign concept within this Circuit, as "[g]un possession can be speech where there is 'an intent to convey a particularized message, and the likelihood [is] great that the message would be understood by those who viewed it.'" *Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003) (second alteration in original).  Just as how "[f]lag waving and flag burning are both protected expressive conduct," so too is "a gun supporter waving a gun at an anti-gun control rally." *Id.*

432.    Similarly, the First Amendment undoubtedly protects speech about firearms, including speech concerning their purchase and sale. *See Nordyke v. Santa Clara County*, 110 F.3d 707, 711 (9th Cir. 1997) (citation omitted) ("Since the sale of guns at a gun show at the Fairgrounds is 'lawful activity,' a proposal to engage in such a transaction is protected as commercial speech under the First Amendment.").

433.    Additionally, Californians seeking to purchase firearms should not be forced, even temporarily, to surrender their First Amendment rights to criticize California policies and politicians in order to exercise their Second Amendment rights. But that will be the direct result of Section 26806's chilling effect when persons visit California gun stores.

434.    Of course, "[t]he loss of First Amendment freedoms, for even minimal periods of time (like while in a gun store), unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

435.     Likewise, courts have had no trouble concluding that recording one's personal biometric information without consent is equivalent to an "act of trespass." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020). "Consent" to be recorded for the "privilege" of exercising a constitutional right cannot be mandated by governmental edict, nor the refusal to give "consent" criminalized. Indeed, "[government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which [it] could not command directly. Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (internal quotation omitted). *See also Miller v. United States*, 230 F.2d 486, 490 (5th Cir. 1956) ("[t]he claim and exercise of a constitutional right cannot thus be converted into a crime.").

436.     Distilled to its essence, Section 26806 creates a *de facto* registry of gun owners, complete with facial and vocal data cataloguing every exercise of their Second Amendment right to acquire firearms. This information is then turned over to gun owners' political opponents in the executive branch, opening this information to use in politicians further attacking constitutional rights in California. Once in effect, the only "opting out" of this registry is the relinquishment of the Second Amendment right to acquire firearms altogether.

437.     Such privacy concerns are not speculative. In November 2023, the California Court of Appeals ruled that the state can turn over personal identifying

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

information of California gun owners to so-called "researchers" who purportedly "study gun violence."[49]

438.    Of course, these euphemistically titled "researchers" are the California Firearm Violence Research Center at the University of California-Davis.  The Center is headed by Dr. Garen Wintemute, a longtime belligerent in battles against the Second Amendment.  Wintemute has a long history of surreptitiously recording customers at gun shows,[50] a "self-described 'guerilla scientist' masquerading as a firearms dealer."[51] Wintemute's tactics, described by some as "sleazy," have led to Second Amendment advocates calling him "more a biased campaigner than a researcher."  *Id.*  He has referred to "Stand your ground" laws as legalizing "murder."[52]

439.    Wintemute's Center, founded in 2017 at the behest of the California legislature,[53] is essentially a state-funded organ dedicated to producing "research" to aid the state in further restricting Second Amendment rights.  Under the guise of "research," the Court of Appeals essentially has turned the most intimate personal data of California gun owners over to a state-funded agency dedicated to further restrictions on their Second Amendment rights.

440.    Wintemute has "worked with California lawmakers on crafting gun policy and helped to drive a group of gun-making companies out of business."[54]  It is little wonder, then, that California gun owners would not wish Wintemute to have possession of their personal information—or to have any confidence that he would not share the information with their political opponents for political purposes.

---

[49] Tran Nguyen, *California Can Share Gun Owners' Personal Information with Researchers, Appeals Court Rules*, Associated Press (Nov. 21, 2023), https://tinyurl.com/44utzay8.

[50] Meredith Wadman, *Firearms Research: The Gun Fighter*, Nature, https://tinyurl.com/2vuh6wjy (June 12, 2013).

[51] Cynthia H. Craft, *For This Man, Reducing Gun Violence Is a Life's Mission*, KFF Health News (July 5, 2016), https://tinyurl.com/yc33k7yw.

[52] Garen J. Wintemute, *Tragedy's Legacy*, New Eng. J. Med. (Jan. 31, 2013), https://tinyurl.com/ycy85s7w.

[53] *About the California Firearm Violence Research Center (CA FVRC)*, U.C. Davis Health, https://tinyurl.com/43c6rxae (last visited Nov. 28, 2023).

[54] Wadman, *supra* note 47.

441.     Where, as under Section 26806, the nonconsensual recording is mandated by government as a condition to exercise an enumerated constitutional right (the right to keep and bear arms), California's apparent "constructive consent" argument (that citizens give "consent" by entering a facility marked "conspicuously" with a "recording" notice) collapses.

442.     Nor can Section 26806 require a citizen to subject his political, religious, or intimate personal speech, including in the safe haven of his own home, to government surveillance in exchange for the exercise of Second Amendment rights.

443.     Nor can Section 26806 require a person to waive Fifth Amendment privileges as a condition of holding a dealer's license or doing business with a dealer to acquire constitutionally protected arms.

444.     Likewise, Section 26806 cannot chill the ability of California gun owners to receive information from and engage with Plaintiff organizations who rely on California gun stores as a source of new members.

445.     The Ninth Circuit has held that there can be "no sanction or penalty imposed upon one because of [the] exercise of constitutional rights." *Sherar v. Cullen*, 481 F.2d 945, 947 (9th Cir. 1973).  Section 26806 imposes just such a sanction.

446.     Thus, California's attempt to condition the exercise of the Second Amendment right to acquire firearms on the forfeiture of numerous other constitutional rights is an "intolerable" situation.

## FIRST CAUSE OF ACTON

### Violation of the Right to Free Speech Under U.S. Const. amend. I

### 42 U.S.C. § 1983

447.     Plaintiffs incorporate by reference paragraphs 1 through 446 of this Complaint as though fully set forth herein in their entirety.

448.     Defendants, acting under color of state law, are enforcing AB 2571, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

449.     On its face and as applied, Section 26806 is an unconstitutional abridgement of Plaintiffs' right to free speech under the First Amendment because it casts such a wide net that it directly prohibits Plaintiffs' pure speech related to the lawful possession and use of lawful firearms without any compelling governmental interest.

450.     Section 26806 Violates Virtually Every Right Protected by the First Amendment. The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  The Fourteenth Amendment incorporates these protections against the states through its Due Process Clause.

451.     Defendants have no compelling (or even legitimate) governmental interest in recording video and audio of lawful gun owners constantly for the mere hope of catching a criminal somewhere in the thousands of hours of tape. But in reviewing that tape, would have to review private and confidential matters that the government has no right to.

452.     Further, Section 26806 is neither narrowly tailored to nor the least restrictive means of achieving the state's dubious interests. Indeed, it sweeps up all communications—even communications concerning lawful (and constitutionally protected) products and communications that are private and confidential and have nothing to do with the process of transactions for the purchase of a firearm.

453.     Section 26806 is unconstitutionally overbroad because, in an effort to "catch a criminal," the law seriously and deliberately burdens a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment.

454.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

speech, right to assembly, and right to remain anonymous entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## SECOND CAUSE OF ACTION

**Violation of the Right to Equal Protection Under U.S. Const. amend. XIV**

**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

455.    Plaintiffs incorporate by reference paragraphs 1 through 454 of this Complaint as if fully set forth herein in their entirety.

456.    Defendants, acting under color of state law, are enforcing SB 1384, which deprives Plaintiffs of the right to equal protection under the law secured by the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

457.    On its face and as applied, SB 1384 is an unconstitutional abridgment of Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth Amendment because it is a viewpoint-discriminatory and/or animus-based restriction on Plaintiffs' protected speech that serves no compelling governmental interest.

458.    On its face, it is clear that the law's purpose and intention is to make a "symbolic" gesture and a "value statement" about the otherwise lawful sale of firearms and related products and of the proliferation of the "gun culture" in California and elsewhere. This is clear because there is no evidence that adding costly surveillance of 24 hours of business activity will deter any gun violence or make gun owners safer. Stores all over California are experiencing growing amounts of retail theft and they already decided (they were not mandated) to install cameras that are not a deterrent.

459.    Defendants have no compelling (or even legitimate) governmental interest in recording Plaintiffs' speech. Indeed, any purported interest in "public safety" is betrayed by the fact that SB 1384 does nothing to stop the criminal element of gun

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

theft and gun violence, but instead only targets law abiding gun owners through outrageous government overreach.

460. Further, SB 1384 is not narrowly tailored to achieving the state's dubious interests.

461. As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### THIRD CAUSE OF ACTION

### Violation of the Right to Keep and Bear Arms Under U.S. Const. amend. II
### 42 U.S.C. § 1983

(By All Plaintiffs Against All Defendants)

462. Plaintiffs incorporate by reference paragraphs 1 through 461 of this Complaint as if fully set forth herein in their entirety.

463. The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This absolutist language contains no qualification or limitation constraining which members of "the people" enjoy the pre-existing individual right, which "Arms" are protected, or the purposes for which individuals may use such arms. Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," and presumptively covers all "lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581, 582, 624 (2008).

464. In violation of the Second Amendment, Section 26806 chills a lawful person's desire to exercise their constitutional right to bear arms out of fear of being constantly observed and recorded by an administration hostile towards gun ownership while doing so.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

465.     Section 26806 also extends into the sanctuary of a person's home, where Second Amendment protections are at their zenith, just because they are a licensed a firearm dealer that already undergoes strict oversight by the state and federal government and now must submit to having the government record all activities inside that home 24 hours per day just because they sell a lawful product.

466.     Defendants cannot justify Section 26806's intrusions upon the people, including Plaintiffs, to be free of overbearing government control that sinks to the very heart of our constitutional rights. The entire purpose of the Second Amendment is to protect and defend and that includes from the tyranny of government.

467.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**FOURTH CAUSE OF ACTION**

**Violation of Government Taking Without Just Compensation Under U.S. Const. amend. V**

**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

468.     Plaintiffs incorporate by reference paragraphs 1 through 467 of this Complaint as if fully set forth herein in their entirety.

469.     The Fifth Amendment to the U.S. Constitution states no private property shall be taken for public use without just compensation.

470.     "A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation...." *Knick*, 139 S. Ct. at 2179.

471.     As the Founders recognized uniformly, "the protection of private property is indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

472.     Among the most vital rights of property ownership is the right to exclude others, from private individuals to the government itself.  *Cedar Point*, 141 S. Ct. at 2072.  Indeed, without the right to decide who may enter upon your property and what they may do while there, the right to property does not exist.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("the power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle...."); *id.*

473.     Section 26806 imposes upon licensee Plaintiffs a legal obligation to purchase government approved video surveillance systems, and to operate, maintain and store the resulting video and audio recordings, all at the expense of the licensee.

474.     Section 26806 imposes on licensee plaintiffs a legal obligation to undertake continuous digital video surveillance of their own private property, and to permit government agents to freely enter upon their property to perpetually access and view, at-will, that digital video surveillance.

Such surveillance, mandated to be located on the private property of a business owner, or their home where they conduct business, constitutes a permanent physical occupation of their property by the government.

475.     Such at-will surveillance and viewing impair Plaintiffs' right to exclude other persons from their property.

476.     Such at-will surveillance and viewing impair Plaintiffs' right to freely use their property, free from the prying eyes of the government.

477.     Such at-will surveillance and viewing authorize the government to possess and use Plaintiffs' property as it pleases, and impairs Plaintiffs' right to possess, use, and dispose of their own property as they please, in violation of the 5th and the 14th Amendments.

478.     Defendants have failed to compensate Plaintiffs for the permanent physical taking or the permanent easement imposed upon Plaintiffs' property.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

479. Section 26806 commandeers private property owners and lessees to implement and then accommodate a sweeping and perpetual government surveillance scheme without any form of compensation for the significant costs incurred or the severe limitations on property rights suffered.

480. What is more, once California has its Section 26806 recording regime in place (with private industry having done all the legwork), California reserves the right to insert itself into gun dealers' stores and homes for compliance inspections as often as it pleases – at the dealers' cost.

481. Section 26806 thus constitutes a permanent,[3] physical, government occupation of numerous portions of (and uses of) Plaintiffs' property where government surveillance equipment must be installed, and additionally for all space upon the property where cameras and audio equipment are pointed and recording.

482. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of a government taking under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

483. In the alternative, to the extent that Section 26806 does not constitute a physical taking, it is an unconstitutional regulatory taking.

**FIFTH CAUSE OF ACTION**

**Violation of the Right to Privacy Under U.S. Const. amend. IV**

**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

484. Plaintiffs incorporate by reference paragraphs 1 through 483 of this Complaint as if fully set forth herein in their entirety.

485. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized."
U.S. Const. amend. IV.

486.     The Fourth Amendment prohibits unreasonable searches and seizures without a warrant—generally, law enforcement must obtain a warrant when a search would violate a person's "reasonable expectation of privacy."

487.     The Fourth Amendment also requires that warrants be supported by probable cause and describe with particularity the places to be searched and persons to be seized.

488.     Particularly for at home FFL dealers, the business space is more than just where they conduct transactions; it is where they sleep, eat, go to school, have family gatherings, host holidays, and participate in everyday private activities just like those not running a business in their home.

489.     Round-the-clock video surveillance of the inside of a person's home can reveal our daily routine, who we associate with, what we purchase, and many other intimate details, especially as camera and video analytical technology advances to allow for automated pan, tilt, and zoom, the ability to read and identify small text from long distances, face recognition, and more.

490.     Imagine not being able to walk around your home unless fully dressed, having every conversation with your spouse recorded, or even having private indiscretions recorded. All of which under Section 26806 can be subpoenaed by a court for civil legal matters.

491.     In *Katz v. United States*, the Court held that the Fourth Amendment protects people, not places: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection, but what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. 347 (1967).

492.     Section 26806 violates the privacy of the people by intrusion into places and conversations that are meant to remain private from the prying eyes of the government.

493.     The Fourth Amendment protects not only property interests but certain expectations of privacy as well. *Katz v. United States,* 389 U. S. 347, 351. Thus, when an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," official intrusion into that sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith v. Maryland,* 442 U. S. 735, 740 (internal quotation marks and alterations omitted).

494.     While communicating private information always risks betrayal of confidence by the other party, from a privacy perspective, repeating private information secondhand is quite different from recording the information for potential dissemination to countless recipients. *Smith v. LoanMe, Inc.,* 11 Cal. 5th 183, 200 (2021).

495.     Additionally, Section 62806 violates California Penal Code § 632.7 which requires dual consent of all parties included in a recording and issues criminals penalties for knowingly recording someone without their consent and the California Constitution, Article I, Section 1 right to privacy.

496.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

/ / /

/ / /

/ / /

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1.      A declaration that SB 1384, codified at California Penal Code section 26806, violates Plaintiffs' free speech, anonymity, free association, and assembly rights under the First Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

2.      A declaration that SB 1384, codified at California Penal Code section 26806, violates Plaintiffs' rights to equal protection under the law per the Fourteenth Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

3.      A declaration that SB 1384, codified at California Penal Code section 26806, violates Plaintiffs' right to keep and bear arms under the Second Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

4.      A declaration that SB 1384, codified at California Penal Code section 26806, violates Plaintiffs' right to be free from governmental taking without just compensation under the Fifth Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

5.      A declaration that SB 1384, codified at California Penal Code section 26806, violates the Plaintiffs' right to privacy under the Fourth Amendment to the United States Constitution, on its face and as applied to the Plaintiffs;

6.      A preliminary and permanent injunction prohibiting all Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing SB 1384, codified at Penal Code section 26806;

7.      Damages pursuant to government taking which would reimburse FFLs for costly systems mandated by the government, payments for technical expertise and installation, and damages for the physical intrusion of permanent structures by the government upon private property;

8.      Nominal damages;

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

9.      An award of costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 or other applicable state or federal law; and

10.      Any such other relief the Court deems just and equitable.

Dated:  December 19, 2023          **MICHEL & ASSOCIATES, P.C.**

*s/ C.D. Michel*
C.D. Michel
Attorneys for Plaintiffs Adam Richards,
Jeffrey Vandermeulen, Gerald Clark, Jesse
Harris, On Target Indoor Shooting Range,
LLC, Gaalswyk Enterprises, Inc. (D/B/A/
Smokin' Barrel Firearms), Gun Owners of
California, Inc., Gun Owners of America, Inc.,
Gun Owners Foundation, and California Rifle
& Pistol Association, Incorporated

Dated:  December 19, 2023          **LAW OFFICES OF DONALD KILMER, APC**

*s/ Donald Kilmer*
Donald Kilmer
Attorney for Plaintiff Second Amendment
Foundation

## ATTESTATION OF E-FILED SIGNATURES

I, C.D. Michel, am the ECF User whose ID and password are being used to file this COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: December 19, 2023                    *s/ C.D. Michel*
C.D. Michel