ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
CHRISTINA R.B. LÓPEZ
Deputy Attorney General
CAROLYN DOWNS
Deputy Attorney General
TODD GRABARSKY
Deputy Attorney General
State Bar No. 286999
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6044
  Fax:  (916) 731-2124
  E-mail:  Todd.Grabarsky@doj.ca.gov
*Attorneys for Attorney General Rob Bonta in his official capacity*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ADAM RICHARDS, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No.: 8:23-cv-02413 JVS (KESx)<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:       October 7, 2024<br>Time:       1:30 p.m.<br>Courtroom:  10C<br>Judge:      The Honorable James V. Selna<br>Action Filed: 12/19/2023 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, as per the Court's Order dated June 24, 2024 (ECF No. 38), on October 7, 2024, at 1:30 p.m. at the United States District Court, Central District of California, Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, CA 92701-4516, in Courtroom

10C, or as soon thereafter as the matter may be heard at the Court's convenience, Defendant Attorney General Rob Bonta, in his official capacity, will and does hereby move to dismiss this action in its entirety under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs fail to state a claim upon which relief can be granted.

The motion is based upon this Notice of Motion and Motion, as well as the concurrently filed Memorandum of Points and Authorities, Declaration of Deputy Attorney General Todd Grabarsky, and Request for Judicial Notice. This motion is also based on the pleadings and record already on file and on any further matters this Court deems appropriate. As per the Court's Initial Order Following Filing of Complaint § J (ECF 16) a copy of the Amended Complaint is attached hereto, following the Memorandum of Points and Authorities.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on July 8, 2024.

Dated: August 2, 2024                    Respectfully submitted,

ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
CHRISTINA R.B. LOPEZ
Deputy Attorney General
CAROLYN DOWNS
Deputy Attorney General


*/s/ Todd Grabarsky*
TODD GRABARSKY
Deputy Attorney General
*Attorneys for Attorney General Rob Bonta in his official capacity*

1

**TABLE OF CONTENTS**

2

**Page**

Memorandum of Points and Authorities ................................................. 1

Introduction .......................................................................................... 1

Background ............................................................................................ 2

    I.     The Surveillance Requirement for Licensed Firearms Dealers ........... 2

    II.    Procedural History ....................................................................... 3

Legal Standard ...................................................................................... 3

Argument ............................................................................................... 4

    I.     Plaintiffs Fail to State a Cognizable First Amendment Claim ............. 4

        A.    Section 26806 Does Not Objectively Chill Speech or Association ..................................................................... 4

        B.    Section 26806 Does Not Implicate Any Right to Engage in First Amendment Conduct Anonymously ............................. 7

    II.    Plaintiffs Fail to State a Cognizable Fourth Amendment Claim ........... 7

    III.   Plaintiffs Fail to State a Cognizable Fifth Amendment Claim ........... 11

        A.    Section 26806 Does Not Constitute a Per Se Physical Taking ....................................................................... 11

        B.    Section 26806 Does Not Constitute a Regulatory Taking ....... 13

        C.    Plaintiffs Do Not—and Cannot—Bring a Claim for "Compelled Waiver of Fifth Amendment-Protected Privileges" ................................................................... 16

Conclusion ......................................................................................... 17

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

*Atlas Corp. v. United States*
   895 F.2d 745 (Fed. Cir. 1990) ................................................................. 15

*Bridge Aina Leʹa, LLC v. Land Use Comm'n*
   950 F.3d 610 (9th Cir. 2020) ................................................................. 15

*Cal. Hous. Sec., Inc. v. United States*
   959 F.2d 955 (Fed. Cir. 1992) ......................................................... 12, 15

*Carrico v. City & Cnty. of San Francisco*
   656 F.3d 1002 (9th Cir. 2011) ................................................................. 5

*CBS, Inc. v. Block*
   42 Cal. 3d 646 (1986) .............................................................................. 7

*CDK Global LLC v. Brnovich*
   16 F.4th 1266 (9th Cir. 2021) ......................................................... 13, 14

*Cedar Point Nursery v. Hassid*
   594 U.S. 139 (2021) .............................................................................. 13

*Colony Cove Props., LLC v. City of Carson*
   888 F.3d 445 (9th Cir. 2018) ............................................................... 14

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.
for S. Cal.*
   508 U.S. 602 (1993) .............................................................................. 15

*Doe v. Harris*
   772 F.3d 563 (9th Cir. 2014) ................................................................. 5

*Doe v. Regents of the Univ. of Cal.*
   891 F.3d 1147 (9th Cir. 2018) ............................................................. 11

*Donovan v. Dewey*
   452 U.S. 594 (1981) .............................................................................. 10

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES
### (continued)

Page

*Hamilton v. Brown*
    630 F.3d 889 (9th Cir. 2011) ................................................................... 4

*Humanitarian L. Project v. U.S. Treasury Dep't*
    578 F.3d 1133 (9th Cir. 2009) ................................................................. 5

*In re Gilead Scis. Sec. Litig.*
    536 F.3d 1049 (9th Cir. 2008) ................................................................. 4

*Laird v. Tatum*
    408 U.S. 1 (1972) ..................................................................................... 6

*Loretto v. Teleprompter Manhattan CATV Corp.*
    458 U.S. 419 (1982) .......................................................................... 12, 13

*Mendocino Envtl. Ctr. v. Mendocino County*
    192 F.3d 1283 (9th Cir. 1999) ................................................................. 4

*MHC Fin. Ltd. P'ship v. City of San Rafael*
    714 F.3d 1118 (9th Cir. 2013) ............................................................... 14

*Mitchell Arms, Inc. v. United States*
    7 F.3d 212 (Fed. Cir. 1993) ................................................................... 12

*Modern Sportsman, LLC v. United States*
    145 Fed. Cl. 575 (Fed. Cir. 2019) ......................................................... 12

*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984) ................................................................................. 11

*Rancho de Calistoga v. City of Calistoga*
    800 F.3d 1083 (9th Cir. 2015) ............................................................... 15

*Silveira v. Lockyer*
    312 F.3d 1052 (9th Cir. 2002) ................................................................. 7

*Speech First, Inc. v. Sands*
    69 F.4th 184 (4th Cir. 2023) ............................................................. 4, 14

*United States v. 4,432 Mastercases of Cigarettes*
    448 F.3d 1168 (9th Cir. 2006) ................................................................. 9

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Argent Chem. Labs., Inc.*
  93 F.3d 572 (9th Cir. 1996) .................................................................. 8, 9

*United States v. Biswell*
  406 U.S. 311 (1972) ...................................................................... 8, 9, 10

*United States v. Bright*
  596 F.3d 683 (9th Cir. 2010) .................................................................. 16

*Vega v. Tekoh*
  597 U.S. 134 (2022) ................................................................................ 16

*Verdun v. City of San Diego*
  51 F.4th 1033 (9th Cir. 2022) ..................................................... 8, 10, 13

*Whalen v. McMullen*
  907 F.3d 1139 (9th Cir. 2018) ................................................................. 9

*Zamani v. Carnes*
  491 F.3d 990 (9th Cir. 2007) ................................................................... 3

**STATUTES**

18 U.S.C.
  § 923 ..................................................................................................... 8, 9
  § 2511 ...................................................................................................... 11

Cal. Civ. Code § 1798.53 ............................................................................ 5

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

Cal. Penal Code

4      § 26700 ....................................................................................................... 8
       § 26705 ....................................................................................................... 8
5      § 26710 ....................................................................................................... 8
       § 26715 ....................................................................................................... 8
6      § 26720 ..................................................................................................... 13
7      § 26900 ..................................................................................................... 13
       § 26806 ............................................................................................... *passim*
8      § 26835 ....................................................................................................... 9
9      § 26850 ....................................................................................................... 9
       § 26853 ....................................................................................................... 9
10     § 26856 ....................................................................................................... 9
       § 26859 ....................................................................................................... 9
11     § 26860 ....................................................................................................... 9
12     § 26883 ....................................................................................................... 9
       § 26885 ....................................................................................................... 9
13     § 26892 ....................................................................................................... 9
       § 26910 ....................................................................................................... 9
14     § 28160 ....................................................................................................... 9
15     § 28175 ....................................................................................................... 9
       § 28180 ....................................................................................................... 9
16     § 28205 ....................................................................................................... 9
       § 28210 ....................................................................................................... 9
17     § 28215 ....................................................................................................... 9

18

19

**CONSTITUTIONAL PROVISIONS**

20

21     U.S. Constitution
       First Amendment ............................................................................... *passim*
22     Fourth Amendment ............................................................................ *passim*
23     Fifth Amendment ............................................................................... *passim*
       Eleventh Amendment ............................................................................ 11
24     Fourteenth Amendment ........................................................................... 3

25

**COURT RULES**

26

27     Federal Rule of Civil Procedure 12(b)(6) ............................................... 3

28

v

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

Cal. Code Regs. Title 4
  § 12372 ..................................................................................10
  § 12396 ..................................................................................10
  § 15000.3 ...............................................................................10
  § 15044 ..................................................................................10

Cal. Code Regs. Title 11
  § 4022 ......................................................................................9
  § 4032.5 ...................................................................................8
  § 4037 ......................................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

California Penal Code section 26806 requires licensed firearm dealers to maintain digital surveillance systems, which will assist law enforcement in combatting firearms trafficking, thefts, straw purchases, and other gun crimes. Far from creating an "Orwellian" regime as Plaintiffs contend, the law requires monitoring of only certain publicly accessible areas of firearm dealers' business premises, and it forbids the release or use of the recordings except under limited circumstances. The law is a reasonable regulation on the commercial sale of arms—similar to video monitoring requirements in other industries, such as banking, gambling, and cannabis—and just one of many in an industry that is already closely regulated.

More than a year after section 26806's enactment and on the eve of it taking effect, Plaintiffs sued to enjoin it under various constitutional provisions. But Plaintiffs have not raised a cognizable claim upon which relief could be granted, as the Court has already tacitly recognized when it denied Plaintiffs' motion for a preliminary injunction after finding no likelihood of success on the merits of their claims.

Indeed, none of the claims that remain in the operative Amended Complaint are cognizable. Section 26806 neither punishes nor restricts speech or association in any way, so Plaintiffs can allege no facts plausibly demonstrating that the law will objectively chill or suppress speech or assembly in violation of the First Amendment. Plaintiffs' Fourth Amendment claim fails because section 26806 operates in the historically highly regulated firearms industry in which there is little reasonable expectation of privacy, and the law's strict protections of the recordings mitigate any privacy or other related concerns. The law's application to a highly regulated industry also defeats Plaintiffs' claims of a physical or regulatory taking in violation of the Fifth Amendment.

1      The Court should grant Defendant's motion to dismiss and dismiss the

2  Amended Complaint without leave to amend.

3  **BACKGROUND**

4  **I.    THE SURVEILLANCE REQUIREMENT FOR LICENSED FIREARMS DEALERS**

5      Senate Bill No. 1384 was signed into law on September 30, 2022.  *See* 2021

6  Cal. Senate Bill No. 1384, Reg. Sess. 2021-2022.  Among other things, SB 1384

7  added section 26806 to the California Penal Code, which requires licensed firearm

8  dealers to maintain a digital video-audio surveillance system on their premises.

9  This requirement assists law enforcement in combatting and deterring firearms

10  trafficking, thefts, straw purchases, and other gun crimes, and provides key

11  evidence in prosecuting them.  *See* Decl. of Todd Grabarsky ISO Mot. Dismiss Am.

12  Compl. Exs. 1-3.

13      Section 26806 requires dealers to record "[i]nterior views of all entries or exits

14  to the premises," "[a]ll areas where firearms are displayed," and "[a]ll points of

15  sale, sufficient to identify the parties involved in the transaction."  Cal. Pen. Code

16  § 26806(a)(3).  The system must record continuously twenty-four hours a day, and

17  dealers must safely and securely store recordings for at least one year.  *Id.*

18  § 26806(a)(4)-(8).  The law forbids dealers from using, sharing, allowing access to,

19  or otherwise releasing the recordings except in limited circumstances: dealers must

20  allow access to the recordings pursuant to a search warrant or court order or as part

21  of an inspection by the California Department of Justice (DOJ) or licensing

22  authority for which no warrant is otherwise required; and dealers may allow access

23  in response to an insurance claim or as part of the civil discovery process.  *Id.*

24  § 26806(b)(1)-(3).  In addition, dealers must post a sign at each entrance notifying

25  patrons that the premises are under surveillance.  *Id.* § 26806(c).

26      Section 26806 went into effect on January 1, 2024.  *Id.* § 26806(a).

27

28

2

## II.   PROCEDURAL HISTORY

Nearly fifteen months after section 26806's enactment, Plaintiffs sued the Governor and Attorney General to enjoin it.  In their original Complaint, Plaintiffs brought claims under the First, Second, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Compl. (ECF No. 1).

Just a few days before the law's effective date, Plaintiffs filed an Ex Parte Application and Application for Temporary Restraining Order and Issuance of Preliminary Injunction seeking to enjoin section 26806.  The Court denied the TRO (ECF No. 15), and, after full briefing and oral argument from the parties, including supplemental briefing ordered by the Court, it also denied the preliminary injunction request ("PI Order," ECF No. 28).  In denying the requested injunction, the Court concluded that Plaintiffs have no likelihood of success on the merits of their claims and that they failed to meet the other preliminary injunction factors.  *Id.*

The Governor and Attorney General then filed a motion to dismiss.  (ECF No. 31.)  In their opposition, Plaintiffs stated that they did not oppose dismissal of their Second and Fourteenth Amendment claims or the Governor as a defendant, but opposed dismissal of the remaining claims.  (ECF No. 36.)  The parties then stipulated to dismissal of the Second and Fourteenth Amendment claims and the Governor as a defendant, as well as to Plaintiffs filing an amended complaint.  (ECF No. 37.)  The Court granted that stipulation (ECF No. 38), and Plaintiffs filed the operative Amended Complaint, which brings claims only under the First, Fourth, and Fifth Amendments and names the Attorney General as the sole defendant (Am. Compl., ECF No. 39).  The Attorney General presently moves to dismiss the Amended Complaint without leave to amend.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) for failure to state a claim is proper "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir.

2007) (citation omitted).  A court must accept as true a complaint's material factual allegations, *Hamilton v. Brown*, 630 F.3d 889, 893 (9th Cir. 2011), but not "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## ARGUMENT

### I.    PLAINTIFFS FAIL TO STATE A COGNIZABLE FIRST AMENDMENT CLAIM

Plaintiffs allege that section 26806 "chills the desire to exercise" First Amendment rights because it "mounts a malicious attack on the freedom of association" and "violates the right to remain anonymous."  Am. Compl. ¶¶ 2, 57. Both claims fail as a matter of law.

#### A.    Section 26806 Does Not Objectively Chill Speech or Association

Section 26806 does not proscribe any association or speech, nor does it objectively "chill or silence a person of ordinary firmness from future First Amendment activities."  *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted); *see also Speech First, Inc. v. Sands*, 69 F.4th 184, 192 (4th Cir. 2023) (requiring organizational plaintiff to show that "its members' asserted self-censorship" was "objectively reasonable").  As this Court has already found, "Plaintiffs have failed to show an objective chill on protected speech," PI Order at 8, and nothing in the Amended Complaint rectifies that deficiency.

Far from proscribing or even regulating speech, section 26806 merely requires firearms dealers to maintain surveillance recording systems for certain areas of their business premises.  The law says nothing about the content of the recordings themselves.  As the Court observed, "this audio/visual capture is essentially an alternate manifestation of the recording process that is already injected into firearm transactions by a host of other background check and purchase-tracking regulations."  PI Order at 8.  Contrary to Plaintiffs' claims (Am. Compl. ¶¶ 60,

123), nothing in section 26806 turns on the content or viewpoint expressed by or at firearm businesses. *See* PI Order at 8 (acknowledging that the law "does not impose any consequences for recorded speech"). It merely requires all businesses in a particular, highly regulated industry to take specific, uniform security measures—measures that, as Plaintiffs acknowledge, many firearm dealers already impose. Am. Compl. ¶ 53. Because the law does not target—let alone restrict or punish—any association or speech that appears on the recordings, Plaintiffs' allegations that section 26806 chills their First Amendment rights are not objectively reasonable and cannot support their pre-enforcement challenge. *See Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1005-06 (9th Cir. 2011); *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1138 (9th Cir. 2009).

That the law tightly limits the use or release of the recordings further demonstrates the unreasonableness of Plaintiffs' assertions that it has a "chilling" effect. *See* PI Order at 8 (recognizing that the law permits government access to the recordings only in "narrowly circumscribed instances"). Section 26806(b) forbids the use or disclosure of the surveillance recordings except in limited circumstances, such as pursuant to a warrant or other court order, or for licensure inspection purposes for which a warrant is not otherwise required. There are also remedies if the recordings are unlawfully used, shared, or made public. *E.g.*, Cal. Civ. Code § 1798.53. These protections show that Plaintiffs' conclusory allegations about pervasive governmental access to the content of the recordings (*e.g.*, Am. Compl. ¶¶ 70, 76, 90, 103) are objectively *un*reasonable. *See* PI Order at 8 ("Plaintiffs' 'fear of pervasive governmental monitoring' is unfounded, and any chill stemming from it is subjective."); *see also Doe v. Harris*, 772 F.3d 563, 580 & n.7 (9th Cir. 2014) (distinguishing between a statute that might chill speech because it lacked "any constraining principle" and a statute that "limited [the] purposes for which [information] could be shared" and so included "sufficient restrictions so as not to

1  unnecessarily chill [] speech" (citation omitted)); *Laird v. Tatum*, 408 U.S. 1, 13-14

2  (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a

3  claim of specific present objective harm or a threat of specific future harm.").

4      Even accepting as true Plaintiffs' allegation that "in stores where customers

5  gather to purchase firearms and ammunition, one will hear statements and

6  conversations among like-minded individuals criticizing the Governor and the

7  Attorney General," Am. Compl. ¶ 69; *see also id.* ¶ 41, section 26806 imposes no

8  consequences for making such statements.  PI Order at 8.  Nor does it compel

9  dealers and purchasers to have any conversation concerning any topic or viewpoint

10 in view of cameras.

11     Plaintiffs' allegations regarding at-home dealers (*see* Am. Compl. ¶¶ 97-116)

12 do not change the outcome because the objective effect of the law is the same

13 regardless of where a dealer chooses to operate his or her firearm business.  *See* PI

14 Order at 20-22.  Section 26806's stringent limitations on the release or use of the

15 recordings apply equally to storefronts and in-home dealers, as do the

16 aforementioned longstanding requirements for recording and tracking dealer and

17 purchaser identifying information for firearms transactions.  *See* PI Order at 8; *see*

18 *also infra* pp. 8-10 (setting forth the comprehensive regulatory scheme for firearms

19 dealers, including requirements to obtain personal information from potential

20 purchasers for recording and background-check purposes).  And, "[t]here are no

21 consequences for things said or done in the home in recordings so as to result in a

22 chill of First Amendment rights."  PI Order at 21.

23     Similarly, section 26806 does not "compel[] disclosure of affiliation with

24 groups engaged in advocacy."  Am. ¶ 73 (quoting *NAACP v. Alabama ex rel.*

25 *Patterson*, 357 U.S. 449, 462 (1958)); PI Order at 8.  Even if the fact that

26 organizational literature may be available at some gun stores could somehow

27 disclose the identity of members of those organizations, *see* Am. Compl. ¶¶ 74-75,

28 the State cannot use or disclose any information from the recordings, except in the

limited circumstances set forth in section 26806(b).  Even then, the information is only available because an individual chose to appear in person to conduct a commercial transaction—not based on the individual's association with any particular viewpoint or advocacy group.

**B.    Section 26806 Does Not Implicate Any Right to Engage in First Amendment Conduct Anonymously**

Plaintiffs also evoke a so-called right to "speak anonymously."  *See* Am. Compl. ¶¶ 85-96.  But as explained above, section 26806 forbids public disclosure of the recordings, so there is no merit to the allegation that an individual's identity or views will be widely disseminated.  And extending any right there might be to speak anonymously to the circumstances of this case makes no sense; there is nothing pseudonymous or anonymous about appearing in public and engaging in a face-to-face business interaction.  This is especially true for firearms purchases, which take place in a highly regulated industry in which there is little reasonable expectation of privacy.  *See infra* pp. 8-10.  Indeed, identity verification is a feature of firearm purchases, and "firearm transactions have long been conditioned on disclosing the identities of dealers and purchasers."  PI Order at 9; *see also Silveira v. Lockyer*, 312 F.3d 1052, 1092 (9th Cir. 2002), *as amended* (Jan. 27, 2003), *abrogated on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); *CBS, Inc. v. Block*, 42 Cal. 3d 646, 649 (1986).  Any assertions of an interest in anonymous commercial transactions involving firearms thus fail as a matter of law.[1]

**II.    PLAINTIFFS FAIL TO STATE A COGNIZABLE FOURTH AMENDMENT CLAIM**

Plaintiffs allege that section 26806 violates the Fourth Amendment by allowing the government to "permanently install its 'eyes' and 'ears' to observe all

---

[1] Plaintiffs appear to have abandoned their claim that section 26806's signage mandate impermissibly compels speech, Compl. ¶¶ 87, 128, which, in any event, was meritless.  *See* PI Order at 9-11; Defs.' Mot. Dismiss 7-8 (ECF No. 31).

7

that goes on" at firearm dealers.  Am. Compl. ¶ 187.  This claim fails as a matter of law.

Binding precedent makes clear that firearms dealers operate in a closely regulated industry subject to extensive federal, state, and local regulations and licensing schemes and in which there is a diminished expectation of privacy. *United States v. Biswell*, 406 U.S. 311, 316 (1972); *United States v. Argent Chem. Labs., Inc.*, 93 F.3d 572, 575 (9th Cir. 1996); *see also Verdun v. City of San Diego*, 51 F.4th 1033, 1039 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 73 (2023).  This Court followed that precedent when it found that the "significant regulatory framework surrounding the sales of firearms leads to the reasonable conclusion that such dealers are closely regulated businesses that have at least a diminished expectation of privacy under the Fourth Amendment."  PI Order at 19.

Indeed, prospective dealers must obtain numerous licenses—federal, state, and local—before becoming a licensed firearms dealer.  These include a valid federal firearms license from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Cal. Pen. Code § 26700(a); any regulatory or business license required by local government, § 26700(b); a valid seller's permit issued by the state Department of Tax and Fee Administration, § 26700(c); a Certificate of Eligibility from the state DOJ demonstrating the applicant is not prohibited from acquiring or possessing firearms, §§ 26700(d), 26710; and an annual license granted by local licensing authorities, §§ 26700(e), 26705.  The applicant must also be listed on DOJ's centralized list of persons licensed to sell firearms.  *Id.* §§ 26700(f), 26715.  The processes for obtaining a DOJ Certificate of Eligibility and an ATF license require the applicant to submit fingerprints.  11 C.C.R. § 4032.5; 18 U.S.C. § 923(a).  ATF also requires a photograph of the applicant.  18 U.S.C. § 923(a)*.*  If a license is granted, the dealer must regularly renew that license to remain active.  11 C.C.R. § 4037.

Furthermore, when in operation, licensed dealers must comply with a host of regulations governing nearly all aspects of firearms sales. *See, e.g.*, Cal. Pen. Code. § 26885 (reporting loss and theft); § 26892 (procedure and reporting requirements for temporary transfer and storage of firearm); § 26910 (report to DOJ if firearm not delivered within statutory time period); § 26835 (posting warnings and notices); §§ 26850, 26853, 26856, 26859, 26860 (safe handling demonstrations upon transfer); § 26883 (restriction on restocking or return-related fees). Licensed dealers must obtain personal information from potential purchasers for recording and background-check purposes. *E.g., id.* §§ 28160, 28175, 28180, 28205, 28210, 28215. They must also submit to inspections from federal and state authorities, 11 C.C.R § 4022(a); 18 U.S.C. § 923(c), the warrantless nature of which has been upheld as constitutional. *Biswell*, 406 U.S. at 316.

It is also well-established that administrative "warrantless searches and seizures on commercial property used in 'closely regulated' industries are constitutionally permissible." *Argent Chem. Labs., Inc.*, 93 F.3d at 575; *see also United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1176 (9th Cir. 2006). This Court followed that precedent by recognizing that the "Fourth Amendment's presumption that warrantless searches are unreasonable is subject to the administrative use or special needs exceptions, within which is the justification of warrantless searches of 'closely regulated businesses for specified purposes.'" PI Order at 19 (quoting *Verdun*, 51 F.4th at 1039).

Because section 26806 is a permissible regulation of a closely regulated industry in which there is little reasonable expectation of privacy, it does not effectuate an impermissible "search" within the meaning of the Fourth Amendment. The law does not allow government agents to "'obtain[] information by physically intruding on a constitutionally protected area,' or infringe[] upon a 'reasonable expectation of privacy.'" *Whalen v. McMullen*, 907 F.3d 1139, 1146 (9th Cir. 2018) (citing *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)). It is merely a

1  regulatory measure that those who choose to become licensed firearms dealers must

2  comply with.  *See Biswell*, 406 U.S. at 316 ("When a dealer chooses to engage in

3  this pervasively regulated business and to accept a federal license, he does so with

4  the knowledge that his business records, firearms, and ammunition will be subject

5  to effective inspection.").  And, in any event, section 26806 would fall under the

6  administrative use exception to warrantless searches, which is especially

7  permissible in the context of closely regulated industries like firearm sales.  *See*

8  *Verdun*, 51 F.4th at 1039 (discussing the "administrative use or special needs

9  exception," including in the firearm industry); *see also Biswell*, 406 U.S. at 316;

10 *Donovan v. Dewey*, 452 U.S. 594, 600 (1981).  In-home dealers are no exception:

11 as this Court recognized, the "close regulation of firearm transactions applies to

12 home-based dealers just as they do storefronts."  PI Order at 21.[2]

13    Plaintiffs' allegations that section 26806 is a general warrant, giving

14 government officials limitless access to their homes and businesses, Am. Compl.

15 ¶¶ 191, 194, or that it allows for overbroad sweeps, *id.* ¶¶ 212-214, also fail as a

16 matter of law.  By its plain terms, section 26806 does not grant "enforcement

17 officials blanket authority" to engage in "pervasive[]" surveillance, *id.* at ¶¶ 103,

18 191, nor does it allow an officer to conduct "an unrestrained search for evidence of

19 criminal activity" in violation of the Fourth Amendment, *id.* at ¶ 189 (quoting *Riley*

20 *v. California*, 573 U.S. 373, 403 (2014)).  The law requires monitoring only in

21 certain public spaces that are used to conduct the business of firearm sales—views

22 of entries and exits, areas where firearms are displayed, and points of sale.  Cal.

23 Penal Code § 26806(a)(3).  And it strictly forbids disclosure of the recordings

24 subject to limited exceptions.  *Id.* § 26806(b).  These limited exceptions allow law

25 enforcement to access the recordings only pursuant to a warrant or other court

26
   _____

       [2] State and federal law impose similar video surveillance requirements on
27 other industries, undermining any allegation of animus toward the firearms industry
   specifically.  *See* 12 C.F.R. § 326.3 (banking); Cal. Code Regs. tit. 4, §§ 12372,
28 12396 (gambling establishments); Cal. Code Regs. tit. 4, §§ 15044, 15000.3
   (cannabis businesses, including in-home licensees).

order, or for licensure inspection purposes for which a warrant is not otherwise required. *Id.* Such constraints and express limitations rule out the "open-ended, perpetual searches" that characterize a general warrant. Am. Compl. ¶ 180. Section 26806 accords with existing constitutional protections by allowing government access to the recordings only under those circumstances the Fourth Amendment already permits: either with a warrant or other court order, or because a warrant is not necessary or an exception applies.

Plaintiffs also make threadbare assertions that section 26806 violates California laws requiring the "consent of all parties being recorded." Am. Compl. ¶¶ 248-249. Plaintiffs do not appear to bring a separate state law claim under this theory, but any such claim would fail at the threshold because, under the Eleventh Amendment, federal courts lack jurisdiction to enjoin state institutions and state officials on the basis of state law. PI Order at 19; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-125 (1984); *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1153 (9th Cir. 2018).[3] Plaintiffs likewise casually suggest that section 26806 "should be found to be preempted by" the federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Am. Compl. ¶ 245, but they do not assert a separate preemption claim. Nor could they: there are no allegations plausibly demonstrating a conflict between the Wiretap Act and section 26806's requirements that firearms dealers implement a surveillance system and notify customers of the recording.

## III. PLAINTIFFS FAIL TO STATE A COGNIZABLE FIFTH AMENDMENT CLAIM

### A. Section 26806 Does Not Constitute a Per Se Physical Taking

Plaintiffs allege that the "installation of government surveillance equipment" constitutes a per se physical taking warranting compensation. Am. Compl. ¶ 146. This claim is without merit.

---

[3] Any such claim would also fail on the merits, as a matter of law. *See* Defs.' PI Opp'n (ECF No. 20) at 20-21.

1    Similar to the Fourth Amendment context, operators in a highly regulated
2  industry have less of an expectation of compensation under the Fifth Amendment
3  because of the environment in which they voluntarily operate. *Cal. Hous. Sec., Inc.*
4  *v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992); *Modern Sportsman, LLC v.*
5  *United States*, 145 Fed. Cl. 575, 581-83 (Fed. Cir. 2019), *aff'd*, No. 2020-1107,
6  2021 WL 4486419 (Fed. Cir. Oct. 1, 2021). Here, Plaintiffs undoubtedly operate in
7  a closely regulated industry because, as explained above and as this Court
8  recognized, *see supra* pp. 8-10; PI Order at 2, firearms dealers are subject to
9  numerous regulations and restrictions and have long been subject to government
10  regulation.

11    An "enforceable right[] sufficient to support a taking claim […] cannot arise in
12  an area voluntarily entered into and one which, from the start, is subject to
13  pervasive Government control." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212,
14  216 (Fed. Cir. 1993) (citation omitted). A party that "voluntarily enters such an
15  area"—as Plaintiffs have done here—"cannot be said to possess the right to
16  *exclude*." *Id.* (citation omitted). Plaintiffs have "voluntarily entered the firearms []
17  business, thereby knowingly placing [themselves] in the governmentally controlled
18  arena" of firearms dealing. *Id.* Thus, "[a]s a consequence of the regulated
19  environment in which [they] voluntarily operate[]," they hold "less than the full
20  bundle of property rights" and they "might be subjected to different regulatory
21  burdens over time." *Cal. Hous. Sec., Inc.*, 959 F.2d at 958-59.

22    Plaintiffs' reliance on *Loretto v. Teleprompter Manhattan CATV Corp.*, 458
23  U.S. 419 (1982) is misguided. Am. Compl. ¶ 156. *Loretto* held that a law requiring
24  a landlord to permit "a cable television company to install its cable facilities" on the
25  landlord's property constituted a physical taking because the government
26  authorized "the permanent occupation of the landlord's property by a third party."
27  *Id.* at 421, 440. But, critical to the Court's decision was the fact that the landlord
28  had "a historically rooted expectation of compensation" for interference with the

1   right to exclude, *id.* at 436, 441—such an expectation that is absent in the heavily

2   regulated firearms industry.  Indeed, the court in *California Housing Securities*

3   recognized the limits of *Loretto* as applied to highly regulated industries.  959 F.2d

4   at 957–58.  There, Saratoga, a federally-insured savings and loan association,

5   argued that by appointing a conservator and receiver that then transferred

6   Saratoga's assets to another new association, the federal government had violated

7   the Fifth Amendment's Takings Clause.  *Id.* at 955, 957.  The court, however,

8   declined to apply *Loretto* and held that the government's actions did *not* constitute

9   a taking.  *Id.* at 958–60.  Just like the banking business at issue in *California*

10  *Housing Securities*, firearms dealers operate in a highly regulated industry with

11  little expectation to Fifth Amendment compensation.  *See* PI Order at 12 (citing

12  banking as a similarly regulated industry to firearm sales).

13      Plaintiffs also allege that section 26806 "permits government agents to come

14  a-knocking at any time, to inspect the system or download its surveillance

15  recordings."  Am. Compl. ¶ 158.  But the government can "require property owners

16  to cede a right of access as a condition of receiving certain benefits, without causing

17  a taking."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 161 (2021); *see also CDK*

18  *Global LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021); *Verdun*, 51 F.4th at

19  1039.  Indeed, Plaintiffs already must submit to inspection by government agents as

20  part of the regulatory scheme of the highly regulated industry they have chosen.

21  *See, e.g.*, Cal. Penal Code §§ 26720, 26900; 11 C.C.R. § 4022.  Section 26806 does

22  not change that.

23      **B.    Section 26806 Does Not Constitute a Regulatory Taking**

24      Plaintiffs also fail to state a claim that section 26806 is a regulatory taking.

25  *See* Am. Compl. ¶ 160.  To determine if a regulatory taking has occurred, courts

26  look to three factors: (1) the "economic impact of the regulation"; (2) "the extent to

27  which the regulation has interfered with investment-backed expectations"; and

28  (3) "the character of the governmental action."  *CDK Global*, 16 F.4th at 1282

13

1    (quoting *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

2    None of these factors are met here.

3         *First*, Plaintiffs fail to plausibly allege that section 26806 will impose a

4    significant or prohibitive cost or economic impact on them and other firearms

5    dealers.  Economic impact can be demonstrated by comparing the pre-deprivation

6    and post-deprivation values of the property, or by "discounted future cash flows

7    produced by an income-producing property." *Colony Cove Props., LLC v. City of

8    Carson*, 888 F.3d 445, 451 (9th Cir. 2018).  The impact must be severe. *Id.* ("[W]e

9    have observed that diminution in property because of governmental regulation

10   ranging from 75% to 92.5% does not constitute a taking."); *MHC Fin. Ltd. P'ship

11   v. City of San Rafael*, 714 F.3d 1118, 1127-28 (9th Cir. 2013) (finding that 81%

12   diminution of property value was insufficient, and citing cases where diminutions

13   as high as 95% did not demonstrate a taking).  The allegations that some of the

14   plaintiffs have spent "thousands to tens of thousands of dollars" to maintain the

15   required surveillances systems, Am. Compl. ¶¶ 261-262, falls short of

16   demonstrating a severe impact or diminution in value.  As does the vague allegation

17   that unnamed plaintiffs have simply chosen not to incur the additional surveillance

18   costs, *id.* ¶ 263, which lacks any fact-based showing of significant or prohibitive

19   cost or any economic impact at all. *See Colony Cove Props.*, 888 F.3d at 451.

20   Thus, Plaintiffs have not plausibly alleged a sufficient diminution of value or loss

21   of future cash flow to establish this first factor for a regulatory taking.

22        *Second*, Plaintiffs mistakenly rely on the conclusory allegation that section

23   26806 upends their investment-backed expectations "as to the uses of their property

24   and the profit (and indeed livelihood) potential of operating a gun store in

25   California." Am. Compl. ¶ 164.  Yet "by reason of the State's traditionally high

26   degree of control over commercial dealings, [a property owner] ought to be aware

27   of the possibility that new regulation might even render his property economically

28   worthless." *CDK Global*, 16 F.4th at 1282 (citation omitted).  And Plaintiffs have

14

not alleged that section 26806 goes so far as to render their property economically worthless, just that they will have to bear the financial cost of buying the surveillance equipment. *See* Am. Compl. ¶ 163. Given the highly regulated nature of the firearms industry, Plaintiffs are aware that they must comply with regulations to operate their businesses—regulations that might reduce value. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) ("[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (citation omitted)); *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015) ("[T]hose who buy into a regulated field … cannot object when regulation is later imposed."); *Cal. Hous. Sec.*, 959 F.2d at 959 (finding that the investment-backed expectations prong was not met given the "long history of government regulation" and "notice that [the bank] might be subjected to different regulatory burdens over time"); *Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed. Cir. 1990) (finding no reasonable investment-backed expectation because "the nuclear industry has been highly regulated" "[f]rom the outset"). And the costs of the security system cannot be wholly unexpected or "unprecedented." Am. Compl. ¶ 164. By Plaintiffs' own admission, "many gun shops"—not to mention other retailers—"already have some form of security camera," *id.* at ¶ 53, so the cost of security surveillance systems already would have been factored into the cost of doing business.

And *third*, as discussed above, the governmental action here constitutes only a minimal invasion on Plaintiffs' business and property interests. *See Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 635–36 (9th Cir. 2020). Operators in a highly regulated industry, such as firearms dealers, do not have the same right to exclude as others, so any interference with Plaintiffs' property rights is minimal. Plaintiffs cannot support their claim on conclusory allegations that section 26806 eliminates all "meaningful domestic use" for home-based FFLs. Am. Compl.

¶ 165.  Section 26806's specifications do not require that home-based FFLs mount cameras in every room of their home, only that they record the limited areas where firearms sales and transactions occur.  Indeed, those who choose to operate firearms businesses inside their homes can and often do conduct their business in areas cordoned off from the rest of their homes or even in separate structures apart from their actual house.  *See* Decl. of Adam Richards ISO Pls.' App. for TRO & Prelim. Inj. Decl. ¶¶ 4, 6 (ECF No. 11-3).  In any event, any interference surveillance recording might cause occurs only because an individual has chosen to operate a highly regulated industry from their home, and would be outweighed by California's public safety interest in preventing gun theft and illegal purchases that underlies section 26806.

### C. Plaintiffs Do Not—and Cannot—Bring a Claim for "Compelled Waiver of Fifth Amendment-Protected Privileges"

Plaintiffs also make offhanded statements that section 26806 "invades the Fifth Amendment's privileges against disclosure of many conversations."  Am. Compl. ¶ 177.  But they do not base their Fifth Amendment claim, which clearly concerns only theories of government takings under the Takings Clause, on this threadbare notion.  *Compare id.* ¶¶ 273-288 (Second Cause of Action for violation of the Fifth Amendment only under the Takings Clause), *and id.* p. 72 "Prayer for Relief" ¶ 2 (seeking a declaration that section 26806 violates the Fifth Amendment under only the Takings Clause), *with id.* ¶¶ 167-177 (discussing various purportedly privileged communications).

In any event, the Court has already rejected this argument as a basis for a constitutional violation.  PI Order at 21-22.  Indeed, the Fifth Amendment privilege against self-incrimination applies in the criminal context and cannot underlay the civil constitutional claim at issue here.  *See generally Vega v. Tekoh*, 597 U.S. 134 (2022); *United States v. Bright*, 596 F.3d 683 (9th Cir. 2010).  The other purported privileges and confidentialities Plaintiffs invoke (e.g., "spousal privilege," "clergy

privilege," "doctor/patient privilege," Am. Compl. ¶¶ 168-172) are not implicated by the Fifth Amendment.  And section 26806 does not compel Plaintiffs or anyone else who chooses to conduct a firearms business in their homes or offices to disclose any purportedly privileged information, including attorney-client privilege. *See* Am. Compl. ¶¶ 173-175; PI Order at 22 ("Just as an attorney and client who speak loudly in a public space in the presence of others opens the door to waiving confidentiality, attorneys risk doing the same by conducting closely regulated business in the same space as their legal work.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint without leave to amend.

Dated:  August 2, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
CHRISTINA R.B. LOPEZ
Deputy Attorney General
CAROLYN DOWNS
Deputy Attorney General


*/s/ Todd Grabarsky*
TODD GRABARSKY
Deputy Attorney General
*Attorneys for Attorney General Rob Bonta in his official capacity*

SA2023306691

17

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Defendant Attorney General Rob

3  Bonta, in his official capacities, certifies that this brief contains 5,326 words, which

4  complies with the word limit of L.R. 11-6.1.

5

6  Dated:  August 2, 2024                Respectfully submitted,

7                                        ROB BONTA
                                         Attorney General of California
8                                        MARK BECKINGTON
                                         Supervising Deputy Attorney General
9                                        CHRISTINA R.B. LOPEZ
                                         Deputy Attorney General
10                                       CAROLYN DOWNS
                                         Deputy Attorney General
11

12
                                         */s/ Todd Grabarsky*
13                                       TODD GRABARSKY
                                         Deputy Attorney General
14                                       *Attorneys for Attorney General Rob*
                                         *Bonta in his official capacity*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, I electronically filed the foregoing document and any attachments thereto with the Clerk of the Court by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  August 2, 2024          */s/ Todd Grabarsky*
                               TODD GRABARSKY

C. D. Michel – SBN 144258
Joshua Robert Dale – SBN 209942
Tiffany D. Cheuvront – SBN 317144
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
cmichel@michellawyers.com

Attorneys for Plaintiffs Adam Richards, Jeffrey Vandermeulen, Gerald Clark, Jesse Harris, On Target Indoor Shooting Range, LLC, Gaalswyk Enterprises, Inc. (D/B/A Smokin' Barrel Firearms), Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, and California Rifle & Pistol Association, Incorporated

Donald Kilmer – SBN 179986
Law Offices of Don Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Don@DKLawOffice.com

Attorney for Plaintiff The Second Amendment Foundation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM RICHARDS, an individual; JEFFREY VANDERMEULEN, an individual; GERALD CLARK, an individual; JESSE HARRIS, an individual; ON TARGET INDOOR SHOOTING RANGE, LLC; GAALSWYK ENTERPRISES, INC. (D/B/A/ SMOKIN' BARREL FIREARMS); GUN OWNERS OF CALIFORNIA, INC.; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; and SECOND AMENDMENT FOUNDATION, a California Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, <br><br> Defendants. | Case No.: 8:23-cv-02413 JVS (KESx) <br><br> **AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

NOW COME Plaintiffs Adam Richards, Jeffrey Vandermeulen, Gerald Clark, Jesse Harris, On Target Indoor Shooting Range, LLC, Gaalswyk Enterprises, Inc. (D/B/A Smokin' Barrel Firearms), Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, California Rifle & Pistol Association, Incorporated, and The Second Amendment Foundation, and through their respective counsel, bring this action against Defendant Attorney General Robert Bonta in his official capacity, and make the following amended and supplemental allegations.

### INTRODUCTION

1.      Plaintiffs bring this suit to challenge the constitutionality of 2022 Cal. Stat. ch. 995, codified at California Penal Code section 26806, as a result of the passage of Senate Bill ("SB") 1384 in 2022 (alternatively "section 26806"). Section 26806 violates the constitutional rights of Plaintiffs by imposing Orwellian tactics by the state to view and overhear the private and confidential communications of anyone who enters a gun shop, gun show property, or home of a home-based Federal Firearms Licensee ("FFL").

2.      Not only does section 26806 violate the individual rights of those patrons, customers, family members, friends, clients, and the FFLs themselves, but it also chills the desire to exercise those rights for fear of being video and audio recorded in communications and situations that are confidential in nature.

3.      Section 26806 works to discourage persons who do not wish to abdicate their First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment rights from entering an FFL shop or private at-home FFL dealer space to exercise their Second Amendment rights.

4.      Section 26806 also mandates a government taking without just compensation by commandeering space within the FFL businesses or homes for the use of government tracking, and by forcing FFLs to purchase unwanted equipment to carry out the government's bidding on their private property. Section 26806 also forces dealers who engage in sales at gun shows on rented premises (usually fairgrounds and

AMENDED AND SUPPLEMENTAL COMPLAINT

exhibit halls) to comply with section 26806 despite the fact that such dealers do not own or control these temporary premises in a manner that would ever allow them to comply, even if they could afford the costs for installing such systems for a weekend show.

5. Finally, section 26806 requires the perpetual and unconstitutional warrantless search of businesses and homes by 24-hour-per-day video and audio recording. Such an intrusive, all-encompassing government trespass violates the privacy of individuals in gun shops, gun shows, and the private homes of FFLs who conduct business in their homes.

6. Section 26806 took effect on January 1, 2024, and since that time has either forced licensees, including members of Plaintiffs' organizations, to cease dealing in firearms, or has required them to spend tens of thousands of unreimbursed dollars to install a Panopticon recording regime for the sole benefit of the government and third parties.

7. Because section 26806 violates rights protected by the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment, Plaintiffs seek equitable relief in declaring the law invalid and enjoining its enforcement by Defendants, their employees, agents, successors in office, and all local and state law enforcement, District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office.

**JURISDICTION AND VENUE**

8. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

**AMENDED AND SUPPLEMENTAL COMPLAINT**

Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorney's fees is authorized by 42 U.S.C. § 1988.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. Further, the state of California maintains an office for service of process on the Attorney General in Los Angeles County at 300 South Spring Street, Los Angeles, California 90013-1230.

## PARTIES

### Plaintiffs

10. Plaintiff ADAM RICHARDS is a resident of El Dorado County, California. Mr. Richards is a home-based FFL and an attorney that keeps a home office at the same location where he conducts his FFL business. He was forced to become a home-based FFL when the City of Sacramento (where his office is located) made the permitting process so expensive that he could not afford to have the FFL located in the same space as his law firm. Rather than waste thousands of dollars on permitting, Mr. Richards chose to operate his FFL out of a separate structure at his residence. He has been an FFL since approximately 2021. The separate structure where the FFL business is conducted is also his home office where he works approximately 50% of his time on his legal practice. This work includes telephone calls with clients, opposing counsel, law enforcement and others. His family also frequently visits him in the mornings and evenings in this office/FFL space, and having his young children recorded in potentially a partial state of dress before bed and recording private conversations with his children or spouse are greatly concerning to Mr. Richards. Should section 26806's surveillance regime be allowed to continue, Mr. Richards will have to either stop being an FFL or risk exposing his clients and family to privacy violations because of the constant recording. Plaintiff Richards would continue his FFL business and his legal business out of his home were it not for the intrusiveness of SB 1384, which will force

AMENDED AND SUPPLEMENTAL COMPLAINT

him to remove the FFL business from his home.

11.     Plaintiff JEFFREY VANDERMEULEN is a resident of Amador County, California. Mr. Vandermeulen is a retired police officer in good standing and an FFL. Mr. Vandermeulen operates a retail sales firearm business and online firearm business, named MountainHouse Firearms, where he sells firearms to customers both inside and outside of California. MountainHouse Firearms is a locally owned business specializing in the sale of new and used consignment handguns, rifles, shotguns and accessories. Mr. Vandermeulen also operates a small aerial ash dispersal business out of his home. Through the operation of his multiple enterprises, Mr. Vandermeulen often has private conversations either with customers asking questions about firearm ownership, firearm collections from their families, or conversations with those who are seeking his services to have a loved one's ashes scattered. If Mr. Vandermeulen is forced to record all these private conversations in his home office, his customers would find this surveillance offensive, and he may lose business because of the requirement. He would be forced to place a sign, where these customers could see it, stating that they are being recorded, and he would have the expense of purchasing a commercial security system for his small at-home business. Mr. Vandermeulen would also have additional liability for recording people who have not given their consent to be recorded. Mr. Vandermeulen would also be forced to focus a recording device directly at his computer screen to capture online sales with his out-of-California customers, thus sharing information directly and placing those customers in a situation where the state of California is now monitoring their actions outside of the state as well and to which they did not consent. The cost of implementing SB 1384 along with the added liability and customer disapproval may force Plaintiff Vandermeulen to have to give up his home FFL business.

12.     Plaintiff GERALD CLARK is a resident of Orange County, California, and he is an NRA-certified and CRPA-certified instructor. Mr. Clark is the Training and Shooting Sports Director for CRPA. Mr. Clark regularly attends gun shows and

5

gun ranges and frequents gun shops. During Mr. Clark's visits to gun shows, ranges, and gun shops where he purchases lawful firearms and ammunition, Mr. Clark has discussions with the FFLs regarding the purchases, his personal information, and discusses politics surrounding the requirements of those purchases. Mr. Clark updates the FFLs on litigation and legislative issues the CRPA is championing. He has political conversations with the FFLs that are private discussions about the current state of gun control in California and what they can do to help protect the rights of the people. Mr. Clark has taught gun safety and training courses for 12 years and teaches those courses at gun shows, ranges, and gun shops. During the training courses, Mr. Clark talks to others about their rights, the importance of membership in the CRPA, and the Second Amendment and other constitutional rights. SB 1384 burdens Mr. Clark's right to engage in otherwise lawful speech in places (FFL counters, closed classes, gun shows, etc.) where he is discussing sensitive issues where he may now be constantly monitored. SB 1384 also prevents Plaintiff Clark from freely communicating with FFLs as to ongoing legal and legislative initiatives for fear of being recorded by the government. The use of recording devices with 24-hour monitoring will chill his ability to speak freely for fear of retribution by the government. But for Defendants' adoption and enforcement of SB 1384, Plaintiff Clark would continue attending, informing, teaching, and participating in gun shows and gun shop events.

13.     Plaintiff JESSE HARRIS lives in Siskiyou County, California, and is an FFL that operates out of his uncle's tire and tackle shop, where he leases a small space to conduct firearm transfers. Mr. Harris is also a firearms trainer and a field representative for the CRPA. The surveillance requirement of SB 1384 would impact Mr. Harris by driving away customers who do not wish to have their exchanges with Mr. Harris recorded. Mr. Harris has confidential conversations with his customers and discusses many issues affecting gun owners in California. Mr. Harris also works for CRPA as a Field Representative in Northern California and Mr. Harris is running for office in 2024. Mr. Harris feels that his speech about gun control, his campaign, and

AMENDED AND SUPPLEMENTAL COMPLAINT

the current politics of California may be chilled because he will constantly have to wonder if the California Department of Justice ("CA DOJ") is listening in. Mr. Harris also knows that the owner of the shop has confidential conversations with his attorney in the shop and has non-gun customers that frequent the premises. All of the attorney conversations and the tire and tackle customers who are not buying firearms would be subject to recording 24 hours per day just because Mr. Harris has a small section of the store that he leases. The requirements under SB 1384 are cost prohibitive to Mr. Harris and since it is a leased space, he does not have the ability to transform his uncle's store so that he can meet the requirements in SB 1384. If SB 1384 is enforced against Mr. Harris, it would ruin his small business (both financially and because customers will not want to be recorded) and would cause him to have to stop being an FFL.

14.    Plaintiff ON TARGET INDOOR RANGE ("On Target") is a for-profit brick-and-mortar gun shop and indoor shooting range located in Laguna Niguel, California. On Target specializes in firearms sales (in-store and e-sales), firearms transfers, ammunition sales, and training classes. As an FFL, On Target has confidential conversations with customers regarding their firearm and safety needs, about what type of training they need for their individualized situation, state and federal laws, and how they can be a part of changing those laws by joining groups like CRPA. On Target offers many training opportunities for new gun owners and is specially geared towards women and their unique shooting needs. Twice per month, On Target hosts interesting and informative discussion sessions with gun owners which would be completely recorded under SB 1384. The recording of these sessions would make gun owners less open to asking questions and less likely to attend for fear of the government watching and listening. SB 1384 would also open up Plaintiff On Target to additional liability for recording people who enter the premises without giving their consent to the recording. Plaintiff On Target would also be harmed by being forced to purchase costly commercial recording equipment to meet the requirements and to store the recordings for one full year.

15. Plaintiff GAALSWYK ENTERPRISES, INC (D/B/A "SMOKIN' BARREL FIREARMS") is a brick-and-mortar FFL shop in Visalia, California. Smokin' Barrel Firearms operates a 1300-square-foot location, which would require 5 cameras plus the hardware to record 24 hours per day (even when they are not open and transacting). Smokin' Barrel Firearms is a family-based business and the estimated $5,000 to $12,000 in order to comply with SB 1384 would be very challenging for them to pay. Smokin' Barrel Firearms handles the sale of firearms, transfers of firearms, layaways, consignment and e-transfers. Smokin' Barrel Firearms has confidential conversations with customers regarding their self-defense needs as well as collecting confidential and personal information in the transactions they conduct. Smokin' Barrel Firearms would also be forced to place a recording device directly at its computer screen to capture online sales with out-of-California customers, thus sharing information directly and placing those customers in a situation where the state of California is now monitoring their actions outside of the state as well and to which they did not consent. This would also create a "gun registry" that the CA DOJ could access any time they wanted to do so. They and their customers and students would be harmed by being forced to produce those recordings to the CA DOJ on demand as well as harmed by the fact that those recordings could be open to subpoena in civil and criminal matters. Plaintiff Smokin' Barrel Firearms would also have additional liability for recording persons who have not given their consent to be recorded. SB 1384 is too large of a burden for Plaintiff Smokin' Barrel Firearms and its customers.

16. Plaintiff GUN OWNERS OF CALIFORNIA, INC. ("GOC") is a nonprofit organization incorporated under the laws of the state of California, with headquarters in El Dorado Hills, California. GOC is dedicated to the restoration of the Second Amendment in California. To that end, GOC and its members frequent FFL shops and gun shows and discuss issues pertaining to legal and political issues with the FFLs to make sure they are aware of compliance issues and upcoming legislative changes. These conversations are not meant for the general public or the prying ear of

AMENDED AND SUPPLEMENTAL COMPLAINT

the government. GOC members often discuss these issues along with protection measures for their homes, families, and businesses with FFLs and those conversations are meant to be confidential and not public. GOC makes its publications and other materials available for prospective members and the general public in gun stores across California. Through this lawsuit, GOC represents not only its own interests as an entity that may discuss topics meant to be between GOC and gun dealers and their customers, but also the interests of its members as those who enter and transact business and conversations in a store or gun show where recording of those confidential conversations would take place. GOC and its members are supporters of the right to keep and bear arms for lawful purposes.

17. Plaintiff GUN OWNERS OF AMERICA, INC. ("GOA") is a California non-stock corporation and a not-for-profit membership organization with its principal place of business in Springfield, Virginia, and is organized and operated as a non-profit membership organization that is exempt from federal income taxes under § 501(c)(4) of the Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including residents within this judicial district and throughout the State of California. GOA members and supporters who patronize gun shops and gun shows are damaged by SB 1384 because of the numerous infringements on their constitutional rights. GOA makes its publications and educational materials available for prospective members and the general public in gun stores across California. GOA members and the general public seek out these materials and engage with gun stores and GOA about the information that is provided. GOA thus brings this challenge not only on behalf of itself as an organization (as section 26806 harms GOA's ability to spread its message, reach new members, and raise funds to perform its critical mission), but also on behalf of its members and supporters including gun stores, home-based dealers, and customers of the same, all of whom are directly harmed by section 26806's provisions.

18.     Plaintiff GUN OWNERS FOUNDATION ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia. GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under § 501(c)(3) of the Internal Revenue Code. GOF is supported by gun owners across the country and within this district. GOF's supporters include those who shop at California's gun stores.

19.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a nonprofit membership organization incorporated under the laws of California, with headquarters in Fullerton, California. Among its other activities, CRPA works to preserve and expand constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. CRPA accomplishes this through its educational offerings, publications, member engagement events, and legislative advocacy and initiatives. CRPA has over 500 business affiliates that they work with across the state, many of which are Federal Firearms Licensees. CRPA enters these Business Affiliate premises to conduct business, update the businesses on news and information, and to discuss important political and legal challenges in the state. CRPA also has trainers in some of these locations that host classes for members and non-member gun owners. CRPA trainers, members, and class participants would be open to privacy violations of having their discussions recorded that have nothing to do with a gun purchase just because they are having them in a store where firearms transactions occur. What's more, CRPA has tens of thousands of members and supporters, many of whom (including Plaintiffs Gerald Clark, Jesse Harris, and Adam Richards) frequent gun stores and gun shows to engage in lawful purchases, expressive activities with like-minded people, including discussions related to firearms, ammunition, accessories, the shooting sports, politics, and the Second Amendment. Recording conversations that are private and confidential and deal with the protection of self and family may be a deterrent to some walking into

a store to conduct these activities. Through this lawsuit, CRPA represents not only its own interests as an entity that may discuss other topics meant to be between CRPA and its Business Affiliate only but also the interests of its members as those who enter and transact business and conversations in a store or gun show where recording of those confidential conversations would take place. CRPA and its members are supporters of the right to keep and bear arms for lawful purposes.

20.    Plaintiff THE SECOND AMENDMENT FOUNDATION ("SAF") is a non-profit membership organization. It is incorporated under the laws of the state of Washington and was founded in 1974. SAF has over 720,000 members and supporters nationwide, including thousands of members in California. SAF is dedicated to promoting a better understanding of our constitutional heritage to privately own and possess firearms through educational and legal action programs designed to better inform the public about gun control issues. SAF has been a pioneer and an innovator in the defense of the right to keep and bear arms, through its publications and public education programs like the Gun Rights Policy Conference. SAF also expends significant sums of money sponsoring public interest litigation to defend its own interests and the interests of its members and supporters. It is critical to the success of SAF that its promotional material, publications, and messages about the "right to keep and bear arms" reach demographic groups that are saturated with gun owners, gun buyers, and people of the "gun culture." It is also crucial that SAF be able to communicate with gun owners in gun stores or at gun shows about political issues, legal cases, firearms and ammunition purchases, etc., without the fear of having every word collected by the government. SAF brings this action on behalf of itself and its members and supporters in California, including Federal Firearms Licensees (those with a storefront and those who operate from their homes) and customers of the same.

### Defendants

21.    Defendant ROBERT BONTA is the Attorney General of the State of California. He is the "chief law officer" of the state and has the duty to "see that the

AMENDED AND SUPPLEMENTAL COMPLAINT

laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1.

22. Additionally, Defendant Bonta has "direct supervision over every district attorney" within the State. *Id.* If, at any point a district attorney of the State fails to enforce adequately "any law of the State," Defendant Bonta "prosecute[s] any violations of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State of California, "shall assist any district attorney in the discharge" of duties when "required by the public interest or directed by the Governor. . . ." *Id.*

23. The injunctive and declaratory relief portions of this suit are brought against Defendant Bonta in his official capacity.

24. The true names and capacities of Defendants named as DOES 1 through 10, inclusive, are individual, corporate, associate, or otherwise, and are unknown to Plaintiffs. They are, however, believed to be responsible in some way for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned here was, a partner, agent, principal, co-conspirator, or is otherwise vicariously or directly responsible for the acts or omissions of the other defendants or themselves.

They are each sued individually and are joined as party defendants. Plaintiffs thus sue each Doe Defendant under Rules 15 and 21 of the Federal Rules of Civil Procedure. Plaintiffs are informed and believe that the Doe Defendants are all California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ascertained.

## FACTUAL ALLEGATIONS

### Regulations of Brick-and-Mortar Gun Shops in California

25. California law requires that essentially all transfers of firearms be done through a Federal Firearms Licensee retailer ("FFL"), including transfers between private parties, gun show sales, gifts, loans, and pawned or consigned weapon redemptions. Prospective firearm purchasers must submit an application to the FFL, who provides purchaser information to CA DOJ through electronic transfer. CA DOJ then checks state and federal records to determine whether the applicant is legally

12

disqualified from purchasing or possessing firearms under state or federal law. The Dealer Record of Sale ("DROS") system's records include the prospective purchaser information (name, date of birth, sex, race/ethnicity, address); date and time of transaction; the type of transaction (e.g., sale, denial, transfer, pawn); and identifiers for the seller.

26. Federal law requires all persons who intend to engage in a business involving the sale, manufacture, or importation of firearms to apply for and obtain an FFL. *See* 18 U.S.C. § 922(a). To obtain an FFL, a person must be at least 21 years of age, not be prohibited from owning or possessing firearms, not have willfully violated the federal Gun Control Act ("GCA") or its regulations, not have willfully failed to disclose material information or made any false statements on their application, and have a premises for conducting business. *See* 18 U.S.C. § 923(d)(1); 27 C.F.R. § 478.47(b).

27. FFL applicants must also certify their business will not be prohibited by state or local law where the premises are located, will comply with all state and local laws applicable to the conduct of the business, that no business will be conducted until all applicable state and local laws have been met, that they have notified their local law enforcement of their intent to apply for a license, and if seeking to operate as a dealer that secure gun storage or safety devices will be available at any place where firearms are sold. *Id.*

28. In California, no person may sell, lease, or transfer firearms unless they obtain a state-issued license. Cal. Penal Code § 26500 (West 2024). To obtain such a license, a person must have a valid FFL, have a regulatory or business license required by local government, have a valid seller's permit issued by the State Board of Equalization, have a certificate of eligibility issued by the CA DOJ, have any required local business license that states on its face "Valid for Retail Sales of Firearms" and is endorsed by the signature of the issuing authority, and be listed in the CA DOJ's centralized list of firearm dealers in the state. Cal. Penal Code § 26700 (West 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

29.     California Cities and Counties are generally free to impose additional licensing requirements beyond that required under state and federal law. *See* Cal. Penal Code § 26705(a) (West 2024) (stating "duly constituted licensing authority of a city [or] county . . . shall accept applications for, and may grant licenses. . . ."). For example, the City of San José prohibits persons from selling, leasing, or otherwise transferring firearms without first having obtained a Firearm Business License from the Chief of Police. *See* San José, Cal., Mun. Code § 6.90.090 (2024).

30.     Any individual applying for a license with the City of San José must also complete a personal history questionnaire, be fingerprinted at a location approved by the San José Police Department, be photographed and interviewed, sign an authorization for release of records and information that the Chief of Police considers necessary for a complete investigation, and be at least 21 years of age. *See* San José, Cal., Mun. Code § 6.90.210(B) (2024).

31.     Federal law requires all firearm acquisition and disposition ("A&D") records to be recorded in a logbook, commonly referred to as a "bound book," which is an orderly arrangement of loose-leaf pages maintained at the business premises in a format prescribed in federal regulations and numbered consecutively. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121, 478.125.

32.     Licensed dealers are required to record the acquisitions of a firearm in their bound book no later than the close of next business day, and no later than 7 days for dispositions. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.125.

33.     The sale or transfer of any firearm by a licensed dealer to an individual requires both the FFL and individual to jointly complete ATF Form 4473. *See* 27 C.F.R. § 478.124. The information contained in ATF Form 4473 is used by the FFL to ensure the individual's eligibility and to process the required federal background check through the National Instant Criminal Background Check System ("NICS"). *See* 18 U.S.C. § 922(t); 27 C.F.R. § 478.102. Generally, completed 4473 forms are retained by the FFL at its business premises indefinitely while the business remains in operation.

14
AMENDED AND SUPPLEMENTAL COMPLAINT

1  *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.129(b).

2      34.    California is one of 13 full point of contact ("POC") states, meaning CA

3  DOJ is designated to conduct firearm background checks for FFLs in California in lieu

4  of the FFL transmitting the information contained in ATF Form 4473 to NICS directly.

5  To process the required background check, California FFLs are instead required to

6  submit a Dealer Record of Sale ("DROS") through a web-based application known as

7  the DROS Entry System ("DES"). Regardless, California FFLs must still complete and

8  maintain ATF Form 4473 for all firearm transactions. California FFLs are then

9  required to print and retain a copy of the DROS paperwork in consecutive order with

10  the required ATF Form 4473. *See* Cal. Penal Code § 28215 (West 2024).

11      35.    Local jurisdictions in California may also impose additional

12  recordkeeping requirements.

13      36.    To ensure compliance with all licensing and recordkeeping requirements,

14  federal law requires FFLs to allow ATF officers to enter during business hours,

15  including places of storage, for purposes of inspecting or examining the records,

16  documents, ammunition, and firearms. *See* 27 C.F.R. § 478.23(b). ATF officers may

17  conduct such inspections for insuring compliance with the recordkeeping requirements

18  every 12 months, during a reasonable inquiry, during a criminal investigation of a

19  person or persons other than the FFL, or when such inspections may be required for

20  determining the disposition of one or more firearms during a bona fide criminal

21  investigation. *Id.*

22      37.    Similarly, California law allows CA DOJ to conduct inspections of FFLs

23  at least once every three years to ensure compliance with California firearm laws. *See*

24  Cal. Penal Code §§ 26720, 28480 (West 2024). During such inspections, the FFLs

25  bound book, DROS verification numbers, and any other records requested by CA DOJ

26  must be made available for review. *See id.,* § 26480(c). CA DOJ is required to audit a

27  sampling of at least 25 percent but no more than 50 percent of each record type. *See*

28  *id.,* § 26720(a)(2). FFLs are also required to pay an annual fee to cover the cost of this

inspection ($115). *See id.,* § 26720(b).

38.    Local jurisdictions are free to adopt their own inspection program to ensure compliance with firearms laws. As noted above, the City of San José imposes its own local ordinances regarding FFL inspections. *See* San José, Cal., Mun. Code § 6.90.340 (2024). In addition, San José requires FFLs to conduct a physical inventory check and report its findings to the Chief of Police in the form of a signed affidavit under penalty of perjury. *See id.*, § 6.90.350 (2024).

39.    FFL dealers who do not comply with these requirements are in violation and may be fined or, worse, not allowed to continue conducting business (or even criminally charged). Most FFLs take these requirements very seriously, as this is their livelihood.

**Gun Shows and Gun Shops Are a Cultural and Associative Experience**

40.    Gun shows are a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state and local governments for all manner of commerce. This convention-like setting is of incalculable benefit to the gun-buying consumer and promotes public safety.

41.    Gun shops provide a connection amongst like-minded individuals who come to the shop—in addition to acquiring Second Amendment protected "arms"—to discuss their rights and their needs for protection, the current laws of California, and political issues that may limit what they are able to acquire.

42.    Gun shows and gun shops, in general, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution.

43.    Gun shows and gun shops are places where parents can learn to protect their families and their homes, and how to stay in compliance with California's ever-changing gun laws.

44.    Gun shows, in particular, are held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the

constitutional principles that gun show participants hold dear. Gun show venues are used by many different public groups and constitute major event venues for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows. Affixing permanent cameras that record 24 hours per day would be a violation of not just gun owners' rights to not have the government spy on personal conversations but would broadly affect any other groups using the same venues.

45. The government spying on people, especially in a place where expressive activity occurs so frequently, is wholly inconsistent with our country's founding principles.

### **Impacts of SB 1384 Implementation on FFL Businesses**

46. The California Legislature, and particularly SB 1384 sponsor Senator Min, have made a big business of anti-gun legislation that they say will stop gun violence in California, sponsoring and passing multiple gun control laws each legislative session that are repeatedly challenged and overturned in the courts.

47. SB 1384, which added section 26806 to the California Penal Code, requires every licensed firearm dealer to have a digital audio/video surveillance system on their "business" premises:

(a) Commencing January 1, 2024, a licensee shall ensure that its business premises are monitored by a digital video surveillance system that meets all of the following requirements:

(1) The system shall clearly record images and, for systems located inside the premises, audio, of the area under surveillance.

(2) Each camera shall be permanently mounted in a fixed location. Cameras shall be placed in locations that allow the camera to clearly record activity occurring in all areas described in paragraph (3) and reasonably produce recordings that allow for the clear identification of any person.

(3) The areas recorded shall include, without limitation, all of the following:

(A) Interior views of all entries or exits to the premises.

(B) All areas where firearms are displayed.

17

AMENDED AND SUPPLEMENTAL COMPLAINT

(C) All points of sale, sufficient to identify the parties involved in the transaction.

(4) The system shall continuously record 24 hours per day at a frame rate no less than 15 frames per second.

(5) The media or device on which recordings are stored shall be secured in a manner to protect the recording from tampering, unauthorized access or use, or theft.

(6) Recordings shall be maintained for a minimum of one year.

(7) Recorded images shall clearly and accurately display the date and time.

(8) The system shall be equipped with a failure notification system that provides notification to the licensee of any interruption or failure of the system or storage device.

Cal. Penal Code § 26806(a) (West 2024).

48.     The information collected by the FFL shall not be used, shared, or accessed except as specified as follows:

(1) A licensee shall allow access to the system to an agent of the department or a licensing authority conducting an inspection of the licensee's premises, for the purpose of inspecting the system for compliance with this section, and only if a warrant or court order would not generally be required for that access.

(2) A licensee shall allow access to the system or release recordings to any person pursuant to search warrant or other court order.

(3) A licensee may allow access to the system or release recordings to any person in response to an insurance claim or as part of the civil discovery process, including, but not limited to, in response to subpoenas, request for production or inspection, or other court order.

Cal. Penal Code § 26806(b).

49.     The FFL "shall post a sign in a conspicuous place at each entrance to the premises that states in block letters not less than one inch in height" the following:

"THESE PREMISES ARE UNDER VIDEO AND AUDIO SURVEILLANCE. YOUR IMAGE AND CONVERSATIONS MAY BE RECORDED." Cal. Penal Code § 26806(c).

50.     A licensee shall, on an annual basis, provide certification to the

18

AMENDED AND SUPPLEMENTAL COMPLAINT

1    department, in a manner prescribed by the department, that its video surveillance

2    system is in proper working order. Cal. Penal Code § 26806(d).

3        51.    Recently, the Bureau of Alcohol, Tobacco, Firearms, and Explosives

4    promulgated a Notice of Proposed Rulemaking designed to vastly increase the number

5    of federally licensed gun dealers, who are also regulated by California, including under

6    section 26806. *See* Final Rule: Definition of "Engaged in the Business" as a Dealer in

7    Firearms, Definition 8, 2023 (Sept. 7, 2023) (to be codified at 27 C.F.R. pt. 478)

8    https://www.regulations.gov/document/ATF-2023-0002-0001 (last visited June 18,

9    2024). ATF estimates that the net effect of its proposed rule will be that a minimum of

10   *hundreds of thousands* of Americans must become licensed dealers, even if only to sell

11   a few personally owned firearms. *Id.* at 62009. ATF further estimates that most of

12   these new "dealers" will operate out of their homes. *See id.* Thus, the sum total of

13   section 26806 and this proposed federal rulemaking will be that many thousands more

14   gun-owning households will be under 24/7 audiovisual surveillance by California.

15   <u>**Section 26806 Has No Impact on Preventing Crime**</u>

16       52.    One of the ostensible purposes of section 26806 was to stop criminal

17   activity that supposedly takes place in gun stores such as theft of firearms and straw

18   purchases.

19       53.    Admittedly, many gun shops already have some form of security camera

20   to help deal with break ins and the like that may occur in stores. Just like every other

21   retail store in California, the incidence of retail theft is real. And just like every other

22   type of retail store in California that has video security, crime is not deterred by these

23   security systems or by even having security personnel in the stores. Most security

24   cameras are there for loss and insurance purposes, not to catch criminals.

25       54.    The authors of SB 1386 note that "the rate of gun store thefts seems to

26   have tapered slightly in recent years"[1] while retail theft across the board has increased

27

28       [1]   S. Comm. on Pub. Safety hearing on S. Bill 1384, at 7 (Cal. Apr. 19, 2022),
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB

AMENDED AND SUPPLEMENTAL COMPLAINT

in California.[2,3]

55.     Yet, with all of the retail crime on the rise in California, FFLs are the only ones being forced to set up costly government surveillance systems while simultaneously being the industry experiencing less crime in recent years according to SB 1384's author.

**The First Amendment Right to Free Speech, Association, Anonymity & Assembly**

56.     The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Fourteenth Amendment incorporates these protections against the states through its Due Process Clause.

**Section 26806 Violates Almost Every One of the Enumerated**

**First Amendment Rights.**

57.     First, section 26806 mounts a malicious attack on the freedom of association and second, violates the right to remain anonymous. *Antonyuk v. Chiumento*, 2023 WL 8518003, at *37 (2d Cir. Dec. 8, 2023) ("It is uncontroversial that the First Amendment protects the right to speak anonymously.").

58.     When engaging in protected speech—imposing a dystopian surveillance mandate that chills not just speech that is favorable of the Second Amendment but also quintessential political speech that is critical of California's draconian gun control

---

1384# (last visited June 18, 2024). A copy is attached to the original Complaint, ECF No. 1-1.

[2]     Magnus Lofstrom & Brandon Martin, *Retail Theft and Robbery Rates Have Risen Across California*, Pub. Pol'y Inst. of Cal. (Sept. 7, 2023), https://www.ppic.org/blog/retail-theft-and-robbery-rates-have-risen-across-california/ (last visited June 18, 2024).

[3]     Lee Ohanian, *Why Shoplifting is Now De Facto Legal in California*, Hoover Inst. (Aug. 3, 2021), https://www.hoover.org/research/why-shoplifting-now-de-facto-legal-california (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

regime, arguably the most severe outlier of any state in the nation.

59. Fourth, in something of a pièce de résistance, residential FFLs who lawfully sell firearms out of their homes face an Orwellian-level "telescreen" invasion of their privacy and *elimination of virtually all First Amendment freedoms in their own homes* with the "all knowing eye" of the government peering in.

60. Fifth and finally, section 26806 also is not content-neutral, but rather constitutes a blatant viewpoint discrimination as only those supporters of the Second Amendment (i.e., gun owners and gun dealers) are subjected to section 26806's onerous restrictions. No other industry in California is mandated to record video and audio of all activities, for all people coming and going, and all conversations 24 hours a day.

61. Section 26806 is patently violative of the First Amendment for any one of these reasons. But taken together, these compounded issues expose a grotesquely unconstitutional law that warrants the swiftest and most emphatic corrective action.

## **Section 26806 Decimates Freedom of Association**

62. Contrary to section 26806's unprecedented surveillance mandate, the Supreme Court has long held that "the right of individuals to associate for the advancement of political beliefs" ranks "among our most precious freedoms" and "is protected by the First Amendment." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

63. Attacks on constitutional rights are, unfortunately, nothing new in this country. But the Second Amendment right to keep and bear arms has been subject to an assault perhaps unparalleled in scope and duration.

64. As then-Arkansas Attorney General Leslie Rutledge noted in 2020, the Second Amendment is constantly "under assault."[4] Others have observed that "[t]he

---

[4] Leslie Rutledge, *Guns, the NRA and the Second Amendment Are Under Assault from the Left*, NBC News (Aug. 21, 2020), https://www.nbcnews.com/think/opinion/guns-nra-second-amendment-are-under-assault-left-ncna1237712 (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

Second Amendment is the most attacked right,"[5] so much so that the Supreme Court has had to warn openly hostile lower courts that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2156 (2022). And yet, retired Supreme Court Justice John Paul Stevens has even called for a total repeal of the Second Amendment[6].

65.     The volume and duration of the attacks on this right have, of course, also engendered the creation of Second Amendment associations, such as Plaintiff Gun Owners of America which, in addition to providing educational materials to the public and litigating to preserve constitutional rights, also engages in lobbying, advocacy, and even endorsement of candidates for political office who support the Second Amendment.

66.     But attacks on the constitutional right to keep and bear arms inevitably involve attacks on other constitutional rights as well. For example, Plaintiff GOA has filed briefs in numerous Fourth Amendment cases,[7] because the freedom from unreasonable searches and seizures often results in confluence with Second Amendment-protected keeping and bearing of arms. Similarly, firearms-related activities have long engendered First Amendment-protected free associations of citizens for related (and unrelated) purposes, such as during hunting, target shooting, self-defense training, and gun collecting.

---

[5]     Heather Smith, *Second Amendment: What Are the Facts?*, Jews for the Pres. of Firearms Ownership (Oct. 19, 2020), https://jpfo.org/articles-2020/2a-what-are-facts.htm?awt_a=A4_P (last visited June 18, 2024).

[6]     Ellis Kim, *How Difficult Would It Be to Repeal the Second Amendment?*, PBS (Mar. 27, 2018), https://www.pbs.org/newshour/nation/how-difficult-would-it-be-to-repeal-the-second-amendment (last visited June 18, 2024).

[7]     *See, e.g.*, Brief for Gun Owners of America, Inc., et al. as Amicus Curiae in Supp. of Pet., *Torcivia v. Suffolk Cnty., NY*, 143, S. Ct. 438 (2022) (No. 21-1522), https://www.lawandfreedom.com/wordpress/wp-content/uploads/2022/07/Torcivia-Amicus-Brief.pdf (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

67.     Inextricably linked to the right to keep and bear arms is the First Amendment's protection of the freedom of association, which section 26806 chills severely.

68.     California has made no secret of its open declaration of war on the Second Amendment and the right to keep and bear arms. In an echo of former Justice Stevens, Governor Gavin Newsom has issued a press release calling for a "28th Amendment" to ban millions of commonly owned semiautomatic rifles.[8] Joining this initiative, State Senator Aisha Wahab called support of the Second Amendment a "gun fetish culture." *Id.* And if California's hostility to the Bill of Rights was not yet clear, the Governor has even proposed to double taxes on firearms and ammunition, comparing such a measure to a "sin tax."[9]

69.     In California's political climate, given the outward animus towards gun owners, it is probable (if not certain) that, in stores where customers gather to purchase firearms and ammunition, one will hear statements and conversations among like-minded individuals criticizing the Governor and the Attorney General or other powerful California politicians who openly oppose the right to keep and bear arms.

70.     Yet should section 26806 be permitted to take effect, those conversations will now be recorded and accessible to government investigators (by the same department that makes determinations as to who may carry a firearm). Such intrusive surveillance into the realm of political discourse invariably will have a chilling effect on the associational rights of those who wish to gather and discuss the Second Amendment or criticize the politicians who oppose it.

---

[8]     *Governor Newsom Proposes Historic 28th Amendment to the United States Constitution to End America's Gun Violence Crisis*, Off. of Gov. Gavin Newsom (June 8, 2023), https://www.gov.ca.gov/2023/06/08/28th-amendment/ (last visited June 18, 2024).

[9]     Emma Colton, *NRA Slams Newsom's 'Sin Tax' Comments on Gun Law amid Spiraling Crime: 'Ignoring Criminals,'* Fox News (Sept. 27, 2023), https://www.foxnews.com/politics/nra-slams-newsoms-sin-tax-comments-gun-law-spiraling-crime-ignoring-criminals (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

71. Unfortunately, this chilling effect on association is not speculative. Eight years ago, High Bridge Arms, the last gun store in San Francisco, closed its doors, strong-armed out of business by city ordinances nearly identical to section 26806: "The store announced on Facebook that it would close for 'a variety of reasons' – among them, gun regulations in San Francisco. Specifically, new measures the city is currently considering would require the store to videotape gun purchases and report ammunition sales to the police … regulations[] which have already upset customers. 'We're getting phone calls: So, if I buy a box of bullets from you, are you going to report us to the police department?'"[10]

72. It is no coincidence that the Supreme Court recently has had to remind California that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2382 (2021). That "[p]rotected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (emphasis added).

73. Moreover, the "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462 (1958).

74. For example, as discussed in the declarations of Sam Paredes and Richard Minnich, Plaintiffs GOC and CRPA distribute the organizations' literature, including fliers, newsletters, and membership applications, to hundreds of gun stores across California. *See* Decl. of Samuel A. Paredes in Supp. of original Compl., ECF No. 1-8,

---

[10]  Sam Harnett, *San Francisco's Last Gun Shop Calls It Quits*, NPR (Oct. 27, 2015), https://www.npr.org/2015/10/27/451202615/san-franciscos-last-gun-shop-calls-it-quits (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

¶¶ 8-12; Decl. of Richard Minnich in Support of original Compl., ECF No. 1-9, ¶¶ 5-9.[11] The dealers typically are thankful to receive the material, because patrons frequently visit their stores not only to purchase firearms, but also to discuss firearms-related issues. *See* Paredes Decl., ¶ 8; Minnich Decl., ¶ 6. The GOC and CRPA materials thus provide a convenient way for gun stores to provide relevant literature to inquiring customers. *See* Paredes Decl., ¶ 8; Minnich Decl., ¶ 6. Oftentimes, this distribution leads to discussion about Second Amendment issues and to new GOC and CRPA members joining at their local gun store. *See* Paredes Decl., ¶ 8; Minnich Decl., ¶ 6. Many GOC and CRPA members report having initially obtained information about GOC and CRPA from their local gun store. *See* Paredes Decl., ¶ 8; Minnich Decl., ¶ 6. Plaintiffs Clark and Harris oftentimes leave this literature and talk to the FFLs in the stores about the politics of gun control in the state. *See* Clark Decl., ¶ 7; Harris Decl., ¶ 5.

75.     Similarly, as discussed in the declaration of Erich Pratt, Plaintiff GOA maintains a "Caliber Club," a "partnership program" comprised of more than five thousand gun stores and shooting ranges across the country, many of which are in California. GOA distributes various literature, brochures, patches, stickers, newsletters, and other items to its Caliber Club members, who make those items available for interested customers. This distribution leads to literature about events of concern to GOA and its members being disseminated widely, and also leads to the acquisition of new members and supporters. CRPA and SAF have similar programs working closely with FFLs across the state.

76.     Section 26806 would surveil, monitor, and record all of this quintessential First Amendment speech about Second Amendment rights, which is generally politically unpopular in California. Knowing they are under constant government surveillance, gun store patrons will be less likely to speak their minds and to seek out

---

[11]  In lieu of relodging these declarations, which are unchanged from their prior iterations, they are incorporated herein.

AMENDED AND SUPPLEMENTAL COMPLAINT

information about pro-gun groups like Plaintiffs GOA, GOC, CRPA, and SAF. This will harm Plaintiffs' ability to disseminate their message and communicate with gun owners.

77.    Also, as section 26806 will inevitably result in less political speech involving the organizational Plaintiffs, this will result in fewer members signing up and fewer donations received, directly harming GOA, GOC, CRPA, and SAF as organizations and impeding their ability to perform their nonprofit mission to secure and preserve the right to keep and bear arms in California.

78.    Finally, section 26806 quite literally will result in California's creation of a partial list of members of GOA, GOC, CRPA and SAF as everyone who signs up as a member of either organization will be monitored and surveilled by the state, clearly violating the First Amendment's prohibition against such government activity. *See NAACP*, 357 U.S. at 462; *see also Shelton v. Tucker*, 364 U.S. 479 (1960) (prohibiting forcing schoolteachers to list their political affiliations); *Bates v. City of Little Rock*, 361 U.S. 516 (1960) (prohibiting forced disclosure of membership list through regulatory scheme).

79.    Of course, "disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public,'" as is the case here, where FFLs must record at the government's behest—but generally not publish—identities and interactions of gun owners. *Ams. for Prosperity Found.*, 141 S. Ct. at 2388.

80.    In other words, section 26806 goes far beyond requiring the constitutionally repugnant disclosure of mere names on lists, requiring instead the images, likenesses, and utterances of all who may seek to purchase a firearm or even just explore the options of firearms within the state.

81.    To illustrate just how seriously federal courts have treated the freedom of association, even otherwise proper civil discovery obligations to the government risk running afoul of the First Amendment: "In cases pitting the government against a private association, the Supreme Court has required that the government's interest be

AMENDED AND SUPPLEMENTAL COMPLAINT

demonstrated to be 'compelling' and bear a 'substantial relation' to the disclosure sought. Additionally, the government must show that the sought-after disclosure represents the 'least restrictive means' for accomplishing its objectives and will not unnecessarily sweep constitutional rights aside. Finally, the Court charges us to weigh against the government's interest in disclosure the likelihood of injury to an association, or its members, if the desired information is released." *Adolph Coors Co. v. Wallace,* 570 F. Supp. 202, 208 (N.D. Cal. 1983).

82.    California can meet none of these requirements. In particular, the state could never show that the 24/7 audiovisual recording of a business engaged in constitutionally protected conduct and commerce is the *least restrictive* means of accomplishing section 26806's alleged goal of "public safety and education."

83.    Section 26806 offends the "vital relationship between freedom to associate and privacy in one's associations." *Ams. for Prosperity Found.*, 141 S. Ct. at 2382. It is an attack not only on the Second Amendment but on the First Amendment freedom of association as well.

84.    Because section 26806 abridges the freedom of association, it is unconstitutional as violative of the First Amendment.

## Section 26806 Abridges the Right to Speak Anonymously, Including to Criticize the Government

85.    As noted, section 26806 requires ubiquitous audio and video surveillance and recording of every bit of speech that occurs within California's thousands of gun stores. In other words, there is no possibility that a customer or visitor can speak anonymously with others in such locations, on any topic. Rather, all private conversations will be swept up and monitored by the government.

86.    In stark contrast to section 26806's provisions, this nation's Founders placed great value on the *anonymous* exercise of constitutional rights. In accordance with this rich historical tradition, the Supreme Court has explained that "an author's decision to remain anonymous, like other decisions concerning omissions or additions

27

to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 343 (1995).

87.     Indeed, "[a]nonymity is a shield from … tyranny [which] exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *Id.* at 357 (citation omitted). Naturally, "[t]he decision in favor of anonymity may be motivated by fear of … official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be … the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry." *Id.* at 341-42.

88.     Other federal courts have elaborated on the importance of this constitutional protection for anonymous speech: "The right to speak anonymously was of fundamental importance to the establishment of our Constitution. Throughout the revolutionary and early federal period in American history, anonymous speech and the use of pseudonyms were powerful tools of political debate. The Federalist Papers (authored by Madison, Hamilton, and Jay) were written anonymously under the name 'Publius.' … Anonymous speech is a great tradition that is woven into the fabric of this nation's history." *Doe v. 2themart.com Inc.,* 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001).

89.     Foreshadowing the Panopticon-like risks section 26806's attack on anonymity would bring, the Supreme Court has cautioned that "the fear of public disclosure of private conversations might well have a chilling effect on private speech. In a democratic society, the privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas." *Bartnicki v. Vopper,* 532 U.S. 514, 533 (2001).

AMENDED AND SUPPLEMENTAL COMPLAINT

90.     Section 26806, however, replaces the "stranger" intentionally monitoring the conversation with the State's executive branch, controlled by the powerful Governor of California, a sworn political enemy of the very constitutional right a gun store customer is attempting to exercise. The First Amendment chilling effect thus is at its zenith. Section 26806's effect on speech related to Second Amendment rights is equivalent to a law mandating audio and video recording of services and parishioner prayers in every California church, mosque, and synagogue.

91.     Unsurprisingly, customers at gun stores (gun owners) likely are motivated to engage in speech which is critical of Governor Newsom and other California politicians who advocate for, enact, and enforce laws, regulations, and policies that target gun owners. Indeed, the Executive Branch contains the very officials enforcing the very laws that gun store customers engage in protected political speech to criticize. If such speakers know their comments will be heard only by a sympathetic gun store owner and other like-minded patrons, they are likely to feel free to speak their minds. Conversely, if the government wishes to squelch "political debate" and enable "official retaliation" against critics, what better way than requiring 24/7 facial and voice recording at locations where citizens, exercising a disfavored but enumerated constitutional right, are likely to assemble?

92.     For example, Plaintiffs Harris, Vandermeulen, Smokin' Barrel Firearms, and On Target declarations explain that local gun stores provide a vital First Amendment platform in their communities, in addition to being a place where Californians can exercise their Second Amendment right to acquire firearms. On a typical weekend morning, there are numerous customers and visitors in these stores at any given time, representing people from all walks of life and from all over the area, but who are generally united in their enjoyment of firearms, their desire to provide for their own self-defense, and their motivation to protect and preserve their Second Amendment rights. *See* Decl. of Jesse Harris in Supp. of original Compl., ECF No. 1-8, ¶¶ 4-7; Decl. of Jeffrey Vandermeulen in Supp. of original Compl., ECF No. 1-3, ¶ 6;

Decl. of Robert Gaalswyk in Supp. of original Compl., ECF No. 1-7, ¶¶ 7, 9; and Decl. of Gregg Bouslog in Supp. of original Compl., ECF No. 1-6, ¶¶ 5-8.

93.      Such persons, like Plaintiffs Harris, Richards, GOC, GOA, CRPA, SAF, and Gerald Clark use these local gun stores and gun shows to engage in First Amendment speech about Second Amendment rights including, for example, potential government legislation, executive actions related to firearms, current events, firearms activities such as firearms training and target shooting, and other firearms-related news and issues (not to mention topics dealing with the firearms themselves).

94.      In other words, today, gun stores serve the same purpose as once served by 19th- and early 20th-century General Stores, where Americans gathered to discuss local and national issues.[12] *See* Harris Decl., ¶¶ 4-7; Vandermeulen Decl., ¶ 6; Gaalswyk Decl., ¶¶ 7, 9; Bouslog Decl., ¶¶ 5-8.

95.      Section 26806 puts a torch to this important channel for Plaintiffs to meet others and exercise First Amendment speech and association rights on Second Amendment issues.

96.      Section 26806 is California's latest effort to target, marginalize, and drive from the market dissenters wishing to exercise the right to keep and bear arms. Stripping gun owners (and those seeking to become gun owners) of their rights to anonymous discourse about political matters, section 26806 permits the very government officials being criticized to monitor the speech and identify the individuals speaking critically of them. It would be hard to conceive of a more tyrannical system than section 26806 imposes. Section 26806 clearly violates the First Amendment right to engage in anonymous speech and must be enjoined.

/ / /

---

[12]   *See, e.g.*, Ronald Taylor, *The Old-Time General Store Was a Symbol of American Enterprise*, Allegany Cnty. Hist. Soc'y, https://www.alleganyhistory.org/culture/stories-and-folklore/fact-based-stories/465-the-old-time-general-store-was-a-symbol-of-american-enterprise (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

**Section 26806 Imposes a Pervasive and Dystopian Surveillance Regime on Home-Based Licensees**

97.     In his dystopian work "1984," George Orwell described an unthinkable world dominated by constant government surveillance of the most private affairs of its citizens: "The telescreen received and transmitted simultaneously. Any sound that Winston made, above the level of a very low whisper, would be picked up by it, moreover, so long as he remained within the field of vision . . . he could be seen as well as heard. There was of course no way of knowing whether you were being watched at any given moment. . . . It was even conceivable that they watched everybody all the time. You had to live . . . in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized."[13]

98.     Beginning in 2024, section 26806 brings this dystopian fiction to life.

99.     Section 26806 requires 24/7 audiovisual recording, sufficient to "identify [all] parties" and "activit[ies]," at all "[i]nterior views of all entries or exits to the premises, [a]ll areas where firearms are displayed, [and a]ll points of sale, sufficient to identify the parties involved in the transaction."

100.   Yet even as tyrannical as these requirements are when applied to traditional brick-and-mortar gun stores, the stark reality is that more than 60 percent of gun dealers use their home as their business premises.[14]

101.   Section 26806's requirements will destroy the entire spectrum of First Amendment rights exercised by home-based sellers. For numerous such dealers, being home-based makes their business affordable: "Selling firearms is a fairly low-margin business. Depending on the model you're selling, you can expect to charge 12-20 percent more than your wholesale cost on a new gun. These low margins make it

---

[13]   George Orwell, *1984*, at 3-4 (1949).

[14]   Katherine Anderson, *Home-Based FFL Requirements*, Zenti.com (Apr. 11, 2023), https://zenti.com/blog/home-based-ffl-requirements/ (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

difficult to run a retail gun store profitably. However, a home-based FFL business has much lower maintenance and labor costs. . . ." *Id.*

102.    Section 26806 would consign home-based FFLs to the unenviable Hobson's choice of either losing their business or giving up their most basic First Amendment rights in the (former) privacy of their own homes. To require 24/7 surveillance of the interior of one's home is Orwellian, to say the least.

103.    The pervasiveness of this surveillance cannot be understated. Many American homes contain multiple "entries or exits," including a front door, rear door, garage door, basement door, etc. Under section 26806, "the "interior view[]" of each would require constant surveillance, regardless of whether the dealer is currently using his home for business purposes. Section 26806 also requires surveillance in "all areas where firearms are displayed," without limitation to only business firearms inventory. Thus, even personally owned firearms housed in a glass display case in a living room, or hunting rifles secured in a rack hung on an office wall, would require additional cameras and audio recording. Finally, section 26806 requires surveillance at "all points of sale." For home-based dealers, colloquially known as "kitchen table FFLs," this would mean 24-hour surveillance of, for example, a person's kitchen table, as well.

104.    Section 26806 would impose great harm to at-home FFL dealers such as Adam Richards who not only operates as an FFL out of his home, but also works as an attorney and has multiple confidential conversation per day that would be fully recorded and break his duty of confidentiality with clients. Section 26806 also impacts Plaintiff Richards' personal life by placing every small detail of his family into the lens a camera like being on a reality show that they did not sign up for. *See* Decl. of Adam Richards in Supp. of original Compl., ECF No. 1-2, ¶¶ 3-5, 9, 10.

105.    It thus is hardly inconceivable to estimate that a home-based dealer will be required to install government surveillance systems in virtually every corner of the home, perhaps aside from a bedroom or bathroom (the only private places left to escape California's prying eye).

AMENDED AND SUPPLEMENTAL COMPLAINT

106.   Sweeping up virtually all activity that takes place within the home (on a 24-hour basis), section 26806's surveillance mandate thus strikes at the heart of several important First Amendment protections.

107.   For example, the Supreme Court has long recognized the importance of confidential marital communications, to the point that disclosure of such speech cannot be compelled by the government, even in criminal cases: "the protection of marital confidences [is] regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." *Wolfle v. United States,* 291 U.S. 7, 14 (1934). Section 26806 eviscerates that privilege, even in one's own home, mandating the recording of conversations between spouses, on the most private of topics, including health, sex, religion, political beliefs, personal finances, the rearing of children, and the list goes on.

108.   Section 26806's application to home-based business also strikes at the free exercise of religion. The chilling effect of 24/7 government monitoring inside the homes of spiritual citizens should be too obvious for argument. For example, Plaintiffs who regularly pray in thanks before meals at the kitchen table may be captured because it is done at the same place he conducts firearms transfers. People may feel that they lack privacy in their own homes and be forced to change rooms, change their habits, alter their religious practices, etc. because of the constant surveillance by the government.

109.   Plaintiffs' concerns about section 26806's violation of religious freedom are more than theoretical. In 2014, Houston, Texas mayor Annise Parker, the city's first lesbian mayor, issued subpoenas to a group of pastors opposed to her "equal rights ordinance," demanding that they turn over copies of any sermons or communications with parishioners dealing with homosexuality, gender identity, or Parker herself, for

AMENDED AND SUPPLEMENTAL COMPLAINT

review by city attorneys.[15] The move sparked a massive national outcry, and resulted in a motion to quash filed by Alliance Defending Freedom on behalf of the pastors. As ADF noted, "[t]hese requests, if allowed, will have a chilling effect on future citizens."[16] Eventually, and unsurprisingly, Parker and the city backed down.[17]

110.  Yet Section 26806 will accomplish the same ends, and through more nefarious means. Personal religious conversations between spouses, parents and children, and homeowners and houseguests will be subject to monitoring by the state. Free exercise of religion in Californians' own homes doubtlessly will be chilled by such monitoring, as will political comments in opposition to politicians such as Governor Newsom, and state policies attacking the right to bear arms.

111.  Indeed, the more one thinks about section 26806, the worse it gets. Besides the obvious chilling effects its surveillance will have on political speech and the rights to anonymity and free association, section 26806 will eviscerate free expression almost entirely.

112.  Section 26806(a)(1) requires surveillance equipment to "clearly record images and … audio." The phrase "clearly record" modifies a conjunctive requirement; therefore, such equipment must also "clearly record … audio." Moreover, under section 26806(a)(2), cameras providing such "clear[] record[ing]" of audio must "reasonably produce recordings that allow for the clear identification of any person." A person's voice is just one way they may be clearly identified.

113.  Taken together, these provisions require a practically sterile audio

---

[15] Todd Starnes, *City of Houston Demands Pastors Turn Over Sermons*, Fox News, https://tinyurl.com/y9h72yt8 (May 7, 2015).

[16]  Mem. in Supp. of Nonparty Pastors' Amended Mot. to Quash Subpoenas at 5, *Woodfill v. Parker*, No. 2014-44974 (Tex. Dist. Ct. Harris Cnty. Oct. 9, 2014), https://adfmedialegalfiles.blob.core.windows.net/files/WoodfillQuashBrief.pdf (last visited June 18, 2024).

[17]  Todd Starnes, *Houston Mayor Drops Bid to Subpoena Pastors' Sermons*, Fox News (May 7, 2015), https://www.foxnews.com/opinion/houston-mayor-drops-bid-to-subpoena-pastors-sermons (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

environment in order for surveillance recordings to comply with the law. Were it otherwise, gun dealers could simply install "white noise" machines next to all audio surveillance devices, which would still capture a "clear[] record[ing]" of "audio" within the store, just not anything helpful to the government. What is more realistic is that a fan in the shop or other noises in the course of business would make it difficult for the recording to pick up anything useful, and therefore, section 26806 is asking FFLs to record their lives, which may be completely unusable.

114.    Indeed, if cameras must clearly record audio such that persons are clearly identifiable, then section 26806 effectively prohibits ambient audio interference. That means a store clerk cannot listen to a TV show, for fear of its audio garbling the surveillance recording. Christmas music—or any music, for that matter—is similarly verboten. But for home-based FFLs, the implications get worse and worse. Section 26806 does not lift its "clear[] record[ing]" mandate outside of business hours; indeed, household occupants will find themselves actors on the set of a 24/7 reality TV show, ensuring the microphones "clearly record" the contents of conversations such that everyone remains identifiable at all times. Of course, the political debate broadcast on the radio will be off-limits, as will be the televised religious sermon, because section 26806 requires ambient sterility.

115.    California no doubt will demur that the surveillance recordings under section 26806 are for limited purposes and promise that they will be used only for firearms-related purposes, such as providing evidence of criminal transfers, or tracking down thieves who rob gun stores. But that misses the whole point about a "chilling effect" on protected speech; the government's ultimate actions are not the only concern, but rather the effect the restrictions have on persons' willingness and freedom to speak their minds in the first place. As Winston quipped, "[t]here was of course no way of knowing whether you were being watched. . . . You had to live . . . in the assumption that . . . every movement [was] scrutinized."

116.    As applied to home-based FFLs, section 26806 imposes a dystopian

35

AMENDED AND SUPPLEMENTAL COMPLAINT

Panopticon that will eviscerate constitutional rights and destroy small business, because no home-based FFL could possibly be expected to comply with such tyrannical demands by the government. To prevent these irreparable harms, section 26806 must be enjoined.

**Section 26806 Is Presumptively Unconstitutional Because It Subjects Disfavored Viewpoints to Discriminatory Treatment**

117.    Section 26806 constitutes nefarious viewpoint discrimination in violation of the First Amendment. It targets only stores engaged in the exercise of Second Amendment rights to possess and transfer firearms. And it punishes only those individuals exercising the right—those with a favorable view of the Second Amendment—with 24/7 surveillance, and not those who disagree with, criticize, or decline to exercise the right themselves.

118.    Section 26806's discriminatory nature is clear on its face: "The test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam,* 582 U.S. 218, 248 (2017) (Kennedy, J., concurring).

119.    Although this Court need not proceed beyond section 26806's plain text and real-world effects, the government's discriminatory intent bears emphasis. Indeed, the hostility of Governor Newsom and the California legislature to the right to keep and bear arms is well-documented. Governor Newsom "has for years crusaded against the gun industry and reaped the political benefits."[18] From the Governor on down, California has made crystal-clear its opposition to the Second Amendment and its intention to burden, and where possible shut down, those who attempt to exercise the right.

120.    Of course, a law that "reflects the Government's disapproval of a subset

---

[18]  Christopher Cadelago & Jeremy B. White, *Gavin Newsom Wants 28th Amendment for Guns in U.S. Constitution*, Politico (June 8, 2023), https://www.politico.com/news/2023/06/08/newsom-gun-control-amendment-00100954 (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

of messages it finds offensive … is the essence of viewpoint discrimination." *Tam*, 582 U.S. at 249 (Kennedy, J., concurring).

121. Accordingly, the Supreme Court has emphasized that, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. . . . The government **must** abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added).

122. Consequently, "viewpoint discrimination is an 'egregious form of content discrimination' and is 'presumptively unconstitutional,'" subject to strict scrutiny. *Iancu v. Brunetti,* 139 S. Ct. 2294, 2299 (2019). The commercial context of section 26806's discrimination is inapposite. *See Tam*, 582 U.S. at 251 (Kennedy, J., concurring) ("[D]iscrimination based on viewpoint, including a regulation that targets speech for its offensiveness, remains of serious concern in the commercial context.").

123. Defendants bear the burden of justifying their novel surveillance scheme, and they cannot. Section 26806 therefore violates the First Amendment's prohibition of viewpoint discrimination as well.

## Section 26806 Constitutes an Uncompensated Government Taking Under the Fifth Amendment

124. Section 26806 imposes upon licensee Plaintiffs a legal obligation to purchase government approved video surveillance systems, and to operate, maintain, and store the resulting video and audio recordings, all at the expense of the licensee.

125. Section 26806 imposes on licensee Plaintiffs a legal obligation to undertake continuous digital video surveillance of their own private property, and to permit government agents to freely enter upon their property to perpetually access and view, at-will, that digital video surveillance.

126. Mandating that lawful possessors or owners of private property may not

AMENDED AND SUPPLEMENTAL COMPLAINT

interfere with governmental agents who freely enter their property at-will, to perpetually access and view all on-site surveillance video and audio recordings, is a physical appropriation of that property, and a governmental surveillance easement of the private property.

127. Such surveillance itself, in addition to at-will entry onto Plaintiffs' property, constitutes a permanent physical occupation of their property.

128. Such at-will surveillance, entry, and viewing are neither intermittent nor of a temporary nature.

129. Such at-will surveillance, entry, and viewing impair Plaintiffs' right to exclude other persons from their property.

130. Such at-will surveillance, entry, and viewing impair Plaintiffs' right to freely use their property, free from the prying eyes of the government.

131. Such at-will surveillance, entry, and viewing impair Plaintiffs' right to transact business.

132. Such at-will surveillance, entry, and viewing authorize the government to possess and use Plaintiffs' own property as it pleases, and impair Plaintiffs' right to possess, use, and dispose of their own property as they please, in violation of the Fifth and the Fourteenth Amendments.

133. Defendants have failed to compensate Plaintiffs for the permanent physical taking or the permanent easement imposed upon Plaintiffs' property.

134. Section 26806 commandeers private property owners and lessees to implement and then accommodate a sweeping and perpetual government surveillance scheme without any form of compensation for the significant costs incurred or the severe limitations on property rights suffered. What is more, once California has its section 26806 recording regime in place (with private industry having done all the legwork), California reserves the right to insert itself into gun dealers' stores and

AMENDED AND SUPPLEMENTAL COMPLAINT

homes for compliance inspections as often as it pleases – at the dealers' cost.[19]

135.   California's message to businesses engaged in constitutionally protected conduct and commerce is clear: "First, you will spy on your patrons' lawful conduct for us. Second, you are to bear the costs of our surveillance. Third, you will give us access, on demand, to what you have recorded. Fourth, *you* will pay *us* for *your* trouble."

136.   Designed to curtail such egregious abuses of power, the Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." The protections of the Takings Clause are incorporated against the states via the Fourteenth Amendment Due Process Clause. *Chi., Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226 (1897).

137.   After *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), Plaintiffs need not exhaust state-court remedies prior to filing a Takings claim in federal court, because such a requirement would have preclusive effect on any subsequent federal claims under *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005). Accordingly, "[a] property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation. . . ." *Knick*, 139 S. Ct. at 2179.

138.   As the Founders recognized uniformly, "the protection of private property is indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

139.   Among the most vital rights of property ownership is the right to exclude others, from private individuals to the government itself. *Cedar Point*, 141 S. Ct. at 2072. Indeed, without the right to decide who may enter upon your property and what they may do while there, the right to property does not exist. *See Loretto v.*

---

[19]   California has granted itself the right to inspect gun dealers "at least once every three years," language that contains no upper limit to inspection frequency. *See* Cal. Penal Code § 26720(a)(1). Indeed, weekly inspections occur "at least once every three years." Moreover, California compels gun dealers to cover the costs of their own regulatory oversight. *See id.*, § 26720(b).

AMENDED AND SUPPLEMENTAL COMPLAINT

*Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("the power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle. . . ."); *id.* ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.' To the extent that the government permanently occupies physical property, it effectively destroys each of these rights.").

140.   Accordingly, several types of governmental interference with property rise to the level of "takings" within the meaning of the Fifth Amendment, for which the government must pay "just compensation."

141.    While the formal condemnation or physical possession of property by government clearly suffice as "takings," so too do physical intrusions and use restrictions. Indeed, "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation," *Cedar Point*, 141 S. Ct. at 2072, and the "essential question is not … whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)," but rather "whether the government has physically taken property for itself or someone else—*by whatever means*—or has instead restricted a property owner's ability to use his own property." *Id.* (emphasis added).

142.   In 2020, a minority of eight dissenting Ninth Circuit judges wrote that "[t]he right to enter onto the land of another to take some action is the epitome of an easement in gross. … The Access Regulation gives multiple union organizers the right to enter onto employers' private property to 'meet[ ] and talk[ ] with employees and solicit[ ] their support' for three hours a day, 120 days a year. … Accordingly, we have the 'classic taking' … Because California has 'appropriate[d] private property for its own use,' there has been 'a per se taking that requires compensation.'" *Cedar Point Nursery v. Shiroma*, 956 F.3d 1162, 1171-72 (9th Cir. 2020) (Ikuta, J., dissenting). Of course, their minority view was vindicated by the Supreme Court the following year.

143.   Worse even than California's "Access Regulation," section 26806 makes the Plaintiff licensees Adam Richards, Jesse Harris, Jeffrey Vandermeulen, On Target,

AMENDED AND SUPPLEMENTAL COMPLAINT

and Smokin' Barrel Firearms set aside their property for the state's exclusive use, purchase the state's electronic equipment on their own dime (in essence install their own wiretap in their private space), and then stand aside while state officials enter upon said property to access the system at their pleasure. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355 (Fed. Cir. 2002) (permanent physical taking when the government "sunk concrete wells on … property to monitor groundwater pollution from a nearby superfund site," and thereafter government "workers … entered to … maintain[] and monitor them. . . . The permanency of the wells and the quasi-permanent right of entry provided to the government workers who monitored and maintained them led us to apply the *per se* takings theory of *Loretto*.").

### Section 26806 Constitutes an Uncompensated Per Se Physical Intrusion

144.   "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred" and just compensation must be paid. *Cedar Point*, 141 S. Ct. at 2072. A finding of a *per se* physical taking is dispositive; "a permanent physical occupation constitutes a *per se* taking regardless whether it results in only a trivial economic loss" and "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Cedar Point*, 141 S. Ct. at 2073 (quoting *Loretto*, 458 U.S. at 434-35).

145.   In other words, when a *per se* physical taking has occurred, the only question is *how much* compensation must be paid, not *whether* it should be paid. *See, e.g.*, *Cedar Point*, 141 S. Ct. at 2074 (citation omitted).

146.   Section 26806's provisions meet this standard and thus constitute a *per se* physical taking because section 26806 compels the installation of government surveillance equipment (video cameras, audio recording devices, etc.) at various locations throughout commercial businesses and private homes across California. *See Otay Mesa Prop. L.P. v. United States*, 86 Fed. Cl. 774, 790-91 (2009), *aff'd*, 670 F.3d 1358 (Fed. Cir. 2012).

147.   Section 26806 is fairly specific about where such government monitoring

41

AMENDED AND SUPPLEMENTAL COMPLAINT

devices must be placed – so as to capture "interior views of all entries or exits," at "all places where firearms are displayed," and at "all points of sale."

148.    Section 26806 removes any discretion from Plaintiff licensees Jesse Harris, Adam Richards, Jeffrey Vandermeulen, On Target, and Smokin' Barrel Firearms how or where to install the government's surveillance devices and, under section 26806, such devices may not be removed ("[e]ach camera shall be permanently mounted in a fixed location").

149.    In a typical business, section 26806's mandates likely would mean cameras near the front and rear doors, along with at the gun counter, capturing all handguns in display cases, all long guns on wall racks, and at the cash register and/or computer where background checks are performed. It also means a "sign in a conspicuous place at each entrance to the premises" providing government-mandated warnings that government-mandated surveillance is in progress.

150.    Section 26806's mandates take priority over a shop owner's other uses for the real estate of his walls, ceilings, etc.

151.    Section 26806 thus constitutes a permanent,[20] physical, government occupation of numerous portions of (and uses of) Plaintiffs' property where government surveillance equipment must be installed, and additionally for all space upon the property where cameras and audio equipment are pointed and recording.

152.    For gun shops, the effect that this law will have on their business is almost indescribable. Tens of thousands of dollars spent on purchasing recording and storage equipment so the government can track them and their customers. Losses in revenue because customers refuse to give up their bundle of other rights in order to exercise a few. Limits to the conversations that would normally happen around gun safety, security needs of the individual and constitutional rights of the gun owner quashed

---

[20]    Even if section 26806 did not blatantly use the word "permanent," a taking does not become "temporary" merely because "the government can always change its mind at a later time. . . ." *Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991).

42

because people are too afraid to have these conversations while under the microscope of a government lens.

153. In fact, since SB 1384 took effect, one of the largest firearm retailers in California, Big 5 Sporting Goods, stopped selling firearms altogether in lieu of incurring the costs of installing audio/visual monitoring equipment in compliance with SB 1384.[21] Some of Plaintiffs' members have also ceased dealing in firearm in lieu of compliance.

154. For home-based gun dealers, the physical intrusion is even greater, as surveillance equipment must be installed within one's own home. Mom's ornamental plates on the wall of the dining room must give way to a sterile-looking video camera with a flashing light. Dad's deer antlers on the living room wall must be moved so that more government eavesdropping devices can be affixed to the studs. The most intimate of situations may be recorded and even used against the homeowners in civil or criminal litigation.

155. All of the surveillance equipment mandated by section 26806 is permanent ("shall be permanently mounted"). It must record 24 hours a day, 7 days a week. It cannot be removed for special occasions (Christmas dinner), and it may not be turned off or covered while the premises are not open to the public for business.

156. Indeed, section 26806 is on all fours with the facts of *Loretto*, where the owner of an apartment building objected to installation of electronic devices (cable TV antennas and boxes) on the *exterior* roof of her building. Here, section 26806 mandates installation of electronic devices (cameras, microphones, computers) on the *interior* of Plaintiffs' businesses, and "literally adds insult to injury" because it makes Plaintiffs pay to be surveilled. *See Loretto*, 458 U.S. at 436.

157. Nor is section 26806 permissible under "the State's power to require

---

[21] *See* Big 5 Sporting Goods Corp., Annual Report (Form 10-K) (Feb. 28, 2024) at 17, https://www.sec.gov/ix?doc=/Archives/edgar/data/1156388/000095017024021829/bgfv-20231231.htm (last visited June 5, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building," with no "physical occupation of a portion of his building by a third party." *Loretto*, 458 U.S. at 440. The government surveillance equipment required by section 26806 in no way relates to devices the government requires be installed for the benefit of those within the property.[22] Rather, section 26806's mandated surveillance equipment is *for the benefit of the government alone*. *See Cedar Point*, 141 S. Ct. at 2072 ("Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place.").

158.    Indeed, section 26806 explicitly provides that the gun store "shall not use … recordings" but "shall allow access" to the government at any time. **Under the plain language of section 26806, a gun store could not even examine video and audio recordings after a burglary to attempt to identify the perpetrators.** In other words, section 26806 clearly mandates an "occupation" by the government, forcing gun stores to purchase and install government property, for the sole use and benefit of the government. *See Loretto*, 458 U.S. at 440. And section 26806 permits government agents to come a-knocking at any time, to inspect the system or download its surveillance recordings.[23]

159.    Compounded by the sheer costs of complying with section 26806's novel surveillance scheme, this intrusive digital dragnet plainly constitutes a physical taking for which just compensation must be paid.

---

[22]    But even if California's surveillance system somehow benefited the gun store, that does not mean that section 26806 does not constitute a taking. *See Loretto*, 458 U.S. at 422, 438 (concluding, with respect to the installation of "a 'noncrossover' line—*i.e.*, one that provided CATV service to appellant's own tenants," that there is "no constitutional difference between a crossover and a noncrossover installation").

[23]    Similarly, a requirement that property owners allow non-governmental private parties a right of access on their land is a physical taking under the Fifth Amendment. *Cedar Point*, 141 S. Ct. at 2080.

AMENDED AND SUPPLEMENTAL COMPLAINT

**Enforcement of Section 26806 Constitutes an Uncompensated Regulatory Taking**

160.   In the alternative, section 26806 is a restriction on the use of property that goes "too far" and therefore amounts to a "regulatory taking." *Cedar Point*, 141 S. Ct. at 2072.

161.   Whether a use restriction rises to the level of compensable "regulatory taking" requires analysis of the factors identified in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). This factual inquiry entails "'[t]he economic impact of the regulation on the [property owner],' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'" *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021) (alterations in original) (quoting *Penn Central*, 438 U.S. at 124). Elaborating on the "character" factor, the *Penn Central* Court observed that a regulatory "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government." *Penn Central*, 438 U.S. at 124.

162.   Of course, the case at bar is nothing like *Penn Central*, which simply maintained the status quo by denying Penn Central's ability to construct an office building above Grand Central Terminal, a historic landmark. *Penn Central*, 438 U.S. at 136 (noting that "the New York City law does not interfere in any way with the present uses of the Terminal").

163.   In stark contrast, section 26806 upends the status quo entirely, imposing onerous new surveillance requirements at a significant (and for some, altogether prohibitive) cost. Businessowners and affected homeowners alike will have to change how they use their own properties, as the installation of a Bentham's Panopticon invariably alters how people under observation behave: "'The fact that you *won't* do things, that you will self-censor, are the worst effects of pervasive surveillance,' reiterates security expert Bruce Schneier, a fellow at the Berkman and in the cybersecurity program of the Kennedy School's Belfer Center for Government and International Affairs. 'Governments, of course, know this. China bases its surveillance

45
AMENDED AND SUPPLEMENTAL COMPLAINT

on this fact. It *wants* people to self-censor. . . .'"[24] Thus, the "character of the governmental action" here is as tyrannical as it gets.

164.  Egregious as these effects are, the *Penn Central* factors make all the more clear that section 26806 effectuates a regulatory taking. Indeed, section 26806 entirely upends dealers' "investment-backed expectations," especially those who are homeowners. In its surveillance-state zeal, section 26806 imposes prohibitively expensive regulatory burdens that will price countless small-scale gun dealers out of existence. These unprecedented costs naturally interfere with Plaintiffs' expectations as to the uses of their property and the profit (and indeed livelihood) potential of operating a gun store in California.

165.  In the context of a home-based dealer, such regulatory limitation amounts to a complete taking because no meaningful domestic use remains if occupants are to be surveilled within their own homes. Indeed, Plaintiffs Richardson and Vandermeulen would rather move out of their homes or quit their businesses than star in section 26806's version of "The Truman Show." In addition to the weighty cost of purchasing, installing, and maintaining section 26806's surveillance system, the economic impacts caused by loss of use of a property (especially a home) are crippling.

166.  Thus, even if the Court finds that section 26806 is not a *per se* physical taking of property for government use, it still constitutes an overbearing regulatory taking for which compensation is due.

**Unconstitutionally Compelled Waiver of Fifth Amendment-Protected Privileges**

167.  By mandating both visual and audio recording 24/7 inside Plaintiffs' premises, including the homes of home-based dealers, section 26806 forcibly intrudes into areas where many privileged communications occur.

168.  First, with respect to home-based gun dealers, the recording mandate

---

[24]  Jonathan Shaw, *The Watchers: Assaults on Privacy in America*, Harvard Mag. (Jan.-Feb. 2017), https://www.harvardmagazine.com/2016/12/the-watchers (last visited June 18, 2024).

AMENDED AND SUPPLEMENTAL COMPLAINT

treads into an area which the courts have recognized is essential to protect: spousal communications. *Wolfle v. United States*, 291 U.S. 7, 14 (1934). While case law supports the concept that spousal communications made in public, or where the spouses know that the communication is not in confidence, fall outside the protection, it appears implicit in these decisions that courts differentiate such communications *because* they occur outside the home. *See, e.g.*, *United States v. Tartaglione*, 228 F. Supp. 3d 402 (E.D. Pa. 2017).

169.   Indeed, various courts have recognized that the home is different, as the very "purpose of the spousal privilege is to protect the sanctity of the *marriage and home*." *In re Marriage of Sarsfield*, 671 P.2d 595, 600 (Mont. 1983) (emphasis added). The entire concept of waiver of privilege is that one who gives up the privilege could have retreated to a safe space, such as the home, in order to make the communication. Here, the government effectively removes the ability to retreat by requiring recording *within* the sanctity of the home.

170.   Especially for home-based dealers, section 26806 pays no concern as to other privileges which it might obliterate, such as the doctor/patient privilege. The doctor/patient privilege "reflects 'the imperative need for confidence and trust' inherent in the doctor-patient relationship and recognizes that 'a physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment.'" *Conant v. Walters*, 309 F.3d. 629, 636 (9th Cir. 2002) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

171.   Plaintiffs Richards and Harris express concerns over legal conversations that happen in their home office or shop to which Defendants would be made a party should section 26806 be implemented. *See* Richards Decl., ¶ 4, 7, 8; Harris Decl., ¶ 5, 9.

172.   Likewise, the priest-penitent or clergy privilege may also be implicated for individuals who choose to, for example, receive counseling or therapy, or otherwise contact a pastor or priest for guidance on spiritual issues while under government

surveillance at home. *See, e.g.*, *Stevens v. Brigham Young University-Idaho*, 2018 U.S. Dist. LEXIS 100491, at *19 (D. Idaho June 11, 2018) ("'[t]he privilege applies to protect communications made (1) to a clergyperson, (2) in his or her spiritual professional capacity (3) with a reasonable expectation of confidentiality.'").

173.   Finally, section 26806 egregiously invades the attorney-client privilege. For example, due to the complex regulatory nature of the firearms business, many gun stores frequently communicate with counsel to receive guidance on complex compliance needs. However, given the nonstop nature of the recording under section 26806, and the demand for audio recording in particular, proprietors looking for counsel must *leave* their licensed premises to ensure that their communications with their lawyer are not captured and recorded, which would waive their privilege.

174.   Of course, leaving the premises (which is now recorded) to call counsel is not feasible in many cases, as gun stores may require guidance *about their records*, which they are statutorily forbidden from removing from the licensed premises. *See* 27 C.F.R. § 478.129.

175.   Indeed, many gun stores have retained counsel via programs to conduct mock audits and provide them advice at the licensed premises.[25]

176.   These privileged interactions would now be recorded under section 26806.

177.   Section 26806 thus invades and violates all of the most fundamental privileges against disclosure of conversations. By mandating that every gun store owner and home-based dealer record all of their conversations for review by the State, section 26806 invades the Fifth Amendment's privileges against disclosure of many conversations.

## **Right to Privacy Under the Fourth Amendment**

178.   The Fourth Amendment provides that "[t]he right of the people to be

---

[25]   *See, e.g.*, *FFL DealerShield*, U.S. LawShield, https://www.uslawshield.com/ffl/#:~:text=With%20FFL%20DealerShield%20from%20U.S.,business%20for%20an%20ATF%20audit (last visited Dec. 8, 2023).

AMENDED AND SUPPLEMENTAL COMPLAINT

secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *See Mapp v. Ohio*, 367 U.S. 643 (1961); *Ker v. California*, 374 U.S. 23 (1963); *Aguilar v. Texas*, 378 U.S. 108 (1964).

179.   The Fourth Amendment was a direct repudiation of the oppressive writs of assistance and general search warrants that colonial merchants suffered under British rule. These writs operated without expiration and granted officials wide latitude in searches because they did not enumerate specific items, places, persons, or timeframes for governmental intrusion. *Payton v. New York*, 445 U.S. 573, 583-84 (1980); and *Boyd v. United States*, 116 U.S. 616, 625 (1886) ("The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods. . . .").

180.   Rejecting these open-ended, perpetual searches, the Founders sought to protect the people from unreasonable governmental intrusions. Consequently, "the principles reflected in the Amendment 'reached farther than the concrete form' of the specific cases that gave it birth, and 'apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life.'" *Payton*, 445 U.S. at 585 (quoting *Boyd*, 116 U.S. at 630).

181.   The protection against unreasonable searches and seizures naturally "extends to commercial premises." *De La O v. Arnold-Williams*, 2006 U.S. Dist. LEXIS 91919, at *15 (E.D. Wash. Dec. 20, 2006). The Fourth Amendment also applies with equal force in civil and criminal contexts, because unreasonable governmental intrusions are odious no matter the form they take or the penalty they impose. *See Safaie v. City of Los Angeles*, 2020 U.S. Dist. LEXIS 87227, at *6 (C.D. Cal. Mar. 23, 2020) ("Whether the search is conducted pursuant to a civil or criminal investigation, *i.e.*, whether the potential penalty is an arrest or citation, is irrelevant for

49

Fourth Amendment purposes.").

182.   In order "[t]o state a Fourth Amendment claim based upon an unreasonable search, [a] plaintiff must allege (1) government conduct that constitutes a search within the meaning of the Fourth Amendment; and (2) that the search was unreasonable. *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019)

183.   As the Supreme Court has observed, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013); *see also id.* at 6 ("entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner").

184.   Departing from the Fourth Amendment's property-rights foundation in the 20th century, the Supreme Court alternatively has found "official intrusion[s] into th[e] private sphere" to qualify as "searches" when an individual has a "reasonable expectation of privacy." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (explaining doctrinal history); *see also United States v. Jones*, 565 U.S. 400, 406-07 (2012) (" 'reasonable expectation of privacy' . . . did not repudiate" the property focus).

185.   Under either conception (property or privacy), Section 26806 mandates an unreasonable Fourth Amendment "search."

186.   The compelled installation of audiovisual surveillance on private property undoubtedly is a Fourth Amendment search because such surveillance is a physical intrusion on and occupation of private property for the purpose of collecting information.

187.   Section 26806 mandates the installation of surveillance equipment in private homes and businesses for the collection and long-term retention of information to which California will then have the right to access. In other words, California will physically intrude upon these locations and permanently install its "eyes" and "ears" to observe all that goes on.

50

AMENDED AND SUPPLEMENTAL COMPLAINT

## **Section 26806 Operates as a Forbidden General Warrant**

188.   Section 26806 operates as a general warrant, contrary to the Fourth Amendment's "precise and clear" command that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

189.   A general warrant allows government officials to "rummage . . . in an unrestrained search for evidence of criminal activity," *Riley v. California*, 573 U.S. 373, 403 (2014), and therefore is *per se* unreasonable without further analysis. *Weeks v. United States*, 232 U.S. 383, 390 (1914) (describing "unreasonable searches and seizures, such as were permitted under the general warrants" of British rule).

190.   Among the most oppressive historical general warrants were writs of assistance. These "hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford*, 379 U.S. at 481.

191.   Like the repudiated general warrant, section 26806 grants enforcement officials blanket authority to examine **all locations** identified in the statute without any particularized suspicion of criminal activity. *Cf. Stanford*, 379 U.S. at 481 ("blanket authority to search where they pleased").

192.   Like the general warrant, section 26806 operates without expiration, remaining in effect on a permanent basis. *Cf. James Otis: Against Writs of Assistance*, Nat'l Humans. Inst. (Feb. 1761), https://teachingamericanhistory.org/document/speech-against-writs-of-assistance/ (last visited June 26, 2024) https://teachingamericanhistory.org/document/speech-against-writs-of-assistance/ ("perpetual; there is no return").

193.   Like the general warrant, section 26806 fails to interpose between the property owner and the executive officer a neutral judicial officer who first must be satisfied that the places and people to be searched have been described with

51

particularity. *Cf. James Otis: Against Writs of Assistance*, *supra* ("A man is accountable to no person for his doings."); *Weeks*, 232 U.S. at 390 ("there had been invasions of the home and privacy of the citizens and the seizure of their private papers in support of charges, real or imaginary, made against them"); *see also California v. Acevedo*, 500 U.S. 565, 586 (1991) (Stevens, J., dissenting) (describing the Fourth Amendment "as a bulwark against police practices that prevail in totalitarian regimes").

194.　And like the general warrant, section 26806 authorizes intrusions into *homes* and *businesses* engaged in California's disfavored sort of commerce. *Cf. James Otis: Against Writs of Assistance*, *supra* ("a person with this writ, in the daytime, may enter all houses, shops, etc., at will").

195.　Accordingly, section 26806 violates the Fourth Amendment's prohibition of general warrants and is *per se* unconstitutional.

### Section 26806's Surveillance Scheme Invades Plaintiffs' Property Without License or Warrant and Is Therefore "Unreasonable"

196.　Although this Court may resolve its Fourth Amendment question based on the flat historical prohibition of general warrants, section 26806's constitutional defects do not end there. Indeed, section 26806 compels intrusions into individuals' private property without individual permission, judicial warrant, or any claim of superior property interest in Californians' shops and homes. Under the Fourth Amendment's traditional protection of property rights, such intrusions cannot stand.

197.　Under *Jones* and *Jardines*, an unconsented and unwarranted physical intrusion onto an individual's property to gather information for the government constitutes an unreasonable search without regard to any privacy expectations. *Jones*, 565 U.S. at 404-05 ("The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."); *see also id.* at 413 (Sotomayor, J., concurring) ("I join the

Court's opinion because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum, '[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area.'"); *Jardines*, 569 U.S. at 7 (examining whether a search "was accomplished through an unlicensed physical intrusion").

198.   In other words, in order to commit a trespass against an individual's property for a search, the government must prove a superior property interest in the "person[], house[], paper[], [or] effect[]," U.S. Const. amend. IV, such as through a warrant based upon probable cause, a seizure of stolen property (in which the individual has no property interest), or a seizure of contraband (in which no individual can claim lawful interest).

199.   Section 26806, without any warrant, oath or affirmation, or probable cause of any wrongdoing, "physically occupie[s] private property for the purpose of obtaining information" by requiring the installation of government recording equipment against the will of businessowner and homeowner alike. *Jones*, 565 U.S. at 404. Accordingly, there is "no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404-05.

200.   While an intrusion (and indeed occupation) of Plaintiffs' private property is dispositive on the unreasonable-search question, section 26806's edicts are especially intolerable for home-based dealers.

201.   Indeed, invasive household surveillance implicates *all* of the property interests identified in the Fourth Amendment's text. Not only will Plaintiffs' "houses" be searched while on camera, but so will their "persons" be, as will their relatives and guests be, should they find themselves within view of one of the likely multiple permanently mounted cameras required by section 26806. What previously may have been an underwear-clad, late-night traipse to the bathroom is now, under section 26806, essentially a public outing. Similarly, all personal property (papers and effects)

within view will be unable to escape California's prying eyes. As a result, California has managed to violate the entirety of an amendment's text in one fell swoop.

202. Because section 26806 mandates physical intrusions of Plaintiffs' property for the purpose of gathering information, such a mandate violates the Fourth Amendment's protection against unreasonable searches of "persons, houses, papers, and effects," which must be "secure."

### Section 26806 Violates Plaintiffs' Reasonable Expectations of Privacy

203. The Supreme Court's "privacy" doctrine provides a distinct basis for relief under the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347 (1967). According to this principle, "a person must show he had a 'legitimate expectation of privacy.' To establish a 'legitimate' expectation of privacy, he must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was 'one that society is prepared to recognize as reasonable.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).

204. Using this "reasonable expectation of privacy" formulation, the Supreme Court has "found a [Fourth Amendment] violation in attachment of an eavesdropping device to a public telephone booth." *Jones*, 565 U.S. at 406 (citing *Katz*, 389 U.S. at 351).

205. Section 26806 violates this test multiple times over by installing eavesdropping devices on all *private* properties where firearm dealing occurs— including the home.

206. Section 26806's eavesdropping devices collect much more than just audio, which the Court already has found to be intolerably intrusive. *See Kyllo v. United States*, 533 U.S. 27, 35 (2001) (discussing "*Katz*, where the eavesdropping device picked up only sound waves that reached the exterior of the phone booth"); *cf.* Cal. Penal Code § 26806(a) (requiring audio *and* video *inside* the proverbial phone booth).

207. Section 26806 captures all manner of information, locations, and conduct to which individuals maintain a reasonable expectation of privacy. For instance,

Plaintiffs Richardson and Vandermeulen legitimately expect their homes to be private and free from constant governmental surveillance of their family, visitors, conversations, and all aspects of private daily life. This expectation is plainly "reasonable" under the Fourth Amendment because "'at the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home'" and "there be free from unreasonable governmental intrusion." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992); *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Nerber*, 222 F.3d at 602.

208. Similarly, Plaintiffs Jesse Harris, On Target, and Smokin' Barrels Firearms legitimately expect their businesses to be private to the extent that it is free from constant governmental audiovisual surveillance of all employees, patrons, conversations, and transactions. This expectation is "reasonable" under the Fourth Amendment because society does not expect constitutionally protected commerce to be subject to such intrusive surveillance. Indeed, it never has been in the past.

209. Section 26806 undoubtedly sanctions "searches" under the Court's "privacy" test. *See Katz*, 389 U.S. at 353 (noting that "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure"); *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring) (emphasis added) (citation omitted) ("Nonetheless, as Justice Alito notes, physical intrusion is now unnecessary to many forms of surveillance. With increasing regularity, the government will be capable of duplicating the monitoring undertaken in this case by enlisting factory- ***or owner-installed*** . . . devices. . . .").

210. California has no legitimate interest in recording the identities and interactions of people exercising their constitutional rights, which will serve only to chill the exercise of those rights. No state can claim an interest in chilling the exercise of constitutional rights, the very negative rights that the state is tasked with *not* violating. *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms. And the

AMENDED AND SUPPLEMENTAL COMPLAINT

government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse.").

### The "Highly Regulated Industry" Exception to the Warrant Requirement Cannot Save Section 26806

211.   To be sure, courts have recognized an exception to the warrant requirement for administrative searches in so-called "highly regulated industries," to which firearm dealers have been found to belong. *See, e.g.*, *United States v. Hamad*, 809 F.3d 898, 905 (7th Cir. 2016) ("sellers of alcohol and firearms are highly regulated and licensed and therefore subject to the administrative search exception").

212.   To be "reasonable," a warrantless administrative search of a highly regulated industry "must be specifically authorized by statute, and the parameters of any exception to the search warrant requirement must be found in the statute." *Taylor v. Va. Alcoholic Beverage Control Auth.*, 827 S.E.2d 15, 25 (Va. Ct. App. 2019) (citing *Biswell*, 406 U.S. at 315 (1972)). While statutes may authorize warrantless administrative searches, these searches remain susceptible to overbreadth challenges if they sweep too far. *See Rush v. Obledo*, 756 F.2d 713, 719 (9th Cir. 1985).

213.   Violating that principle, section 26806 subjects home-based dealers to searches "at any time of the day or night" because surveillance must be continuous and uninterrupted. *Rush*, 756 F.2d at 721.

214.   Section 26806 does not lift its surveillance mandate during non-business hours, despite the fact that a home-based dealer "at all other times is a private residence." *Rush*, 756 F.2d at 721. Indeed, section 26806 contains no limiting principle whatsoever. Accordingly, Section 26806 is "thus invalid under the Fourth Amendment as [a] general search[]." *Rush*, 756 F.2d at 723.

### Hypothetical Costs

215.    To demonstrate the costs, take a hypothetical gun store with a simple 20' x 20' floorplan, with gun racks lining one full 20' wall and an 18' glass display counter in front of it, with 4' of space between the counter and the racks for employees to

work.

216.    Further, this hypothetical store will have one point-of-sale ("POS") system where transactions occur, which is located on the display counter in the corner where the counter meets the wall. The National Instant Criminal Background Check ("NICS") station is located immediately next to the computer, between the POS and the wall.

217.    There is only one door that leads to the outside of the store. It is used as the sole entrance and exit for clients, employees, and inventory deliveries (unlikely in most gun stores). On the wall opposite the firearm display, there is a bathroom and an office that doubles as a stockroom.

218.    Finally, there are no other displays or obstructions in the middle of the showroom. The gun store has a drop ceiling and sheetrock walls with wood studs, and there is neither a basement nor an attic. *See* Fig. 1.1:



219.    **Cameras.** Section 26806 requires that cameras must be "digital,"

AMENDED AND SUPPLEMENTAL COMPLAINT

"permanently mounted in a fixed location," that the system record "audio," and that it capture images capable of "clear identification of any person."

220.   The cameras must be of sufficient quantity to record all interior views of "entries and exits," "all areas where firearms are displayed," and all POS stations "sufficient to identify the parties involved in the transaction." Cal. Penal Code § 26806.

221.   Based on those statutory requirements, in the above hypothetical gun store, a minimum of eight cameras would be required: one camera capturing customers entering the store, one capturing people leaving the store, one capturing the doors to the bathroom and office/storeroom, one focused on the POS from mid-store, one on the same wall as the POS capturing a portion of the display counter and gun rack, one on the wall opposite the POS capturing the display counter and part of the gun rack, one mid-store aiming towards the counter and gun rack, and finally one aiming from the gun rack towards the opening for the display counter.

222.   Even then, it would be difficult to capture everything that the statute demands. *See* Fig. 1.2:



223.   Because the statute fails to specify what resolution cameras are acceptable, a middle-of-the-road camera system was chosen: Luma Surveillance 420 Series 4MP Dome IP cameras with built-in microphones and motorized varifocal lenses that allow the cameras to be customized to the shot. These cameras have an MRSP of $518.00 each. Eight cameras would cost approximately $4,144.00.

224.   **Recording.** The statute requires the ability to record high-quality audio and video continuously, 24 hours a day, at a minimum of 15 frames per second, and to store that information for a minimum of one year. Cal. Penal Code § 26806.

225.   Recording video alone and omitting the audio, would require roughly 105 terabytes ("TB") of storage using H.265 compression.[26]

226.   Additionally, in order to comply with Section 26806's requirements, the network video recorder ("NVR") necessary for recording would need to be secure, send notifications when it goes down, and accurately display the date and time. Cal. Penal Code § 26806.

227.   For example, a Luma Surveillance 820 Series 32-Channel Network Video Recorder would accommodate the needed storage. The NVR itself has an MSRP of $3,238.00 and can handle a maximum of eight 18TB hard drives for a total capacity of 144TB, greater than the 105TB estimated requirement for video recordings. The extra space should be sufficient to accommodate the audio recording but, of course, is insufficient to provide a redundant backup.

228.   Installed within that NVR could be, for example, Western Digital WD Purple Pro Smart Video 18TB Hard Drives, at $369.99 each, for a total of $2,959.92. Together, the NVR and hard drives come to $6,197.92.

229.   Of course, a redundant backup system could double this cost.

---

[26]   *See Surveillance Storage Calculator*, Seagate.com, https://www.seagate.com/video-storage-calculator/ (last visited June 18, 2024) ("8" cameras; "15" frames per second; "24" hours per day; "365" days stored; "high" video quality; double "1080P" results = 105.4TB; compare to "3MP" + half the difference between "5MP" = 104.3TB).

AMENDED AND SUPPLEMENTAL COMPLAINT

230. **Power.** Power to the cameras likely would be provided by the NVR through power-over-ethernet ("POE") connection. The NVR would require an uninterruptible power supply ("UPS") of sufficient size to ensure that audio and video continued to record, even during utility maintenance or power outages.

231. A Wattbox IP UPS Kit, which offers 12 controllable outlets, surge protection, power conditioning, and a 2000VA battery backup has an MSRP of $2,476.95.

232. **Accessories**. To house and secure the system and to prevent tampering, unauthorized access or use, or theft—as required by statute—it would require a lockable rack system (at a minimum). A Strong FS Series 21U Rack System Package with DC cooling fans would cost approximately $1,039.45.

233. **Installation**. Obviously, installation costs can vary, but an estimate of $250.00 per camera to mount each camera and run its respective wiring through walls, ceiling, under carpet or flooring, etc., is reasonable. Accordingly, eight cameras might cost $2,000.00 to mount and wire.

234. Installing and configuring the hard drives likely would cost $50.00 per hard drive, or $400.00 in total.

235. Installing and configuring the components into the rack system would easily cost another $200.00.

236. Setting up and fine-tuning the entire system, configuring settings, remote access, and alerts so that everything operates smoothly, and providing store employees with instruction on proper use of the system, would be an additional $600.00.

237. Total installation costs for this small system thus could be expected to be approximately $3,200.00.

238. **Total**. Estimating $4,144.00 for cameras, $6,197.92 for the NVR and hard drives, $2,476.95 for surge protection and UPS, $1,039.45 for a rack system to protect and house the components, and $3,200.00 in labor totals approximately $17,058.32 prior to sales tax, shipping, or other costs not specifically identified herein.

AMENDED AND SUPPLEMENTAL COMPLAINT

239. This estimate also does not take into account ongoing system maintenance, to include replacing cameras that malfunction, hard drives that eventually wear out, or additional redundant recording systems, should the original system go down or otherwise not function properly.

240. Of course, depending on the type of store, this figure can vary wildly to the upside, as not all retail stores are simple squares with easily determined mounting locations to capture all of the places, images, and audio the statute requires.

241. For example, Plaintiff GOC has heard from at least one large retailer who reportedly already has spent in excess of $250,000 in order to comply with section 26806. Of course, many California dealers have not yet complied with section 26806.

242. Needless to say, the costs imposed on California gun stores and dealers (including home dealers) are astronomical.

243. For many gun stores, such as Plaintiffs On Target, Smokin' Barrels Firearms, and Harris, this cost is prohibitive.

244. For home-based dealers, such as Plaintiffs Richards and Vandermeulen, this cost is prohibitive and will drive them out of business entirely.

## Section 26806's Recordings are Unlawful Under Federal Law

245. The federal Wiretap Act, 18 U.S.C. § 2511(1)(a), prohibits "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication. . . ." Subsections (c) and (d) provide additional penalties for "disclosure" and "use" of that wiretapped conversation. Here, there is no exception if "one of the parties to the communication has given prior consent to such interception," because it is California (a third party) that has imposed the surveillance requirement on gun dealers. Again, Plaintiffs do not consent to California recording their conversations. Section 26806 thus appears to legislate a violation of federal law or, alternatively, should be found to be preempted by federal law.

246. Plaintiffs routinely speak with customers over the phone, in order to take

orders, schedule pickups, receive payments, arrange appointments, etc. Oftentimes, Plaintiffs uses the phone's "speaker phone" in order to work the computer, review paperwork, or otherwise multitask when talking with customers by phone. Section 26806 thus would result not only in Plaintiffs' side of the conversation being recorded, but also that of his customers, suppliers, other dealers, and more.

247. Naturally, Plaintiffs' customers who call in by phone will be unable to see the "conspicuous" signage posted on the exterior of the store required under section 26806, warning them that their conversation is being recorded.

### Section 26806 Opens FFLs Up to Criminal and Civil Liability

248. Additionally, section 26806 places FFLs in danger of legal action against them for recording customers and patrons who have not given their consent to be recorded. Even with the mandatory sign placement, California is a mutual consent state and requires the consent of all parties being recorded. If an individual does not consent to be recorded carrying out a constitutional right to purchase a firearm, they will not be able to purchase a firearm at all in the state. It is either forced compliance to the government listening to private conversations or not purchasing a firearm or ammunition at all.

249. Many FFLs operate their small businesses out of their homes. Many do the firearm transfer paperwork with a client at the kitchen table. Imagine the shocking intrusion that a fixed camera, recording all conversations 24 hours per day, would have on the entire household or anyone visiting the home, even when no firearms transactions are taking place. Every dinner guest, handyman, child's playdate, or potentially the client of a spouse who works from home would have to give consent to be recorded. Every telephone conversation or intimate family issue, recorded. It is unfathomable the reach that Section 26806 has in the intrusion upon the private lives and private conversations of people simply because they are visiting the premises of an FFL.

AMENDED AND SUPPLEMENTAL COMPLAINT

## SB 1384 Will Not Stop Gun Violence and Crime

250.   The bill comments by Senator Min note that the need for this bill is "[t]o ensure gun owners are educated about the dangers of firearm usage." *See* S. Comm. on Pub. Safety hearing on S. Bill 1384, at 5 (Cal. Apr. 19, 2022), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB 1384#. It is unclear how forcing recorded conversations (video and audio) will help gun owners to be more educated about the "dangers of firearm usage." Defendants offer no evidence to support that section 26806 will accomplish these governmental goals.

251.   A recent article stated that "we find evidence that some retailers contribute disproportionately to the supply of crime guns, though much less dramatically than statistics often cited would suggest. The data indicate that there may be somewhat fewer problematic dealers now than there were a decade ago." This, directly from conversations with CA DOJ and the impact they have already had in shutting down dealers who do not comply under current laws.[27]

252.   A statewide dealer regulation was also passed in 2013, requiring all persons engaged in the business of selling firearms to possess a state Certificate of Eligibility and be named on the state's Centralized List of firearms retailers. Cal. Pen. Code § 28450.

253.   The California Senate Public Safety Committee's April 19, 2022, analysis of AB 1384 relied on studies on retail gun theft that are either older (2016 or earlier) or that deal with nationwide issues and not specifically any issues with gun shops in California. *See* S. Comm. on Pub. Safety hearing on S. Bill 1384, at 9 5 (Cal. Apr. 19, 2022),

---

[27]   Hannah S. Laqueur, et al., *Trends and Sources of Crime Guns in California: 2010-2021*, J. of Urban Health (Sept. 11, 2023), https://link.springer.com/article/10.1007/s11524-023-00741-y (last visited Dec. 3, 2023).

AMENDED AND SUPPLEMENTAL COMPLAINT

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB 1384#. Much has changed in California over the past decade, and relying on factual data that is that far out of touch with our current reality makes little sense to those truly searching for the science behind the issues of our time.

254.    The sponsors of SB 1384 were hopeful that somehow adding costly surveillance and audio requirements would stop theft of gun shops,[28] but as retail crime rises in California, the use of video surveillance does not seem to be any kind of deterrent to criminals willing to break the law. *See, e.g.,* Lofstrom & Martin, *Retail Theft and Robbery Rates Have Risen Across California*, *supra*; Ryan Fonseca, *What We Know (and Don't) About the Rise in Retail Theft*, LA Times (Oct. 18, 2023), https://www.latimes.com/california/newsletter/2023-10-18/what-we-know-and-dont-about-the-rise-in-retail-theft-essential-california (last visited June 18, 2024) (paywalled); *As retailers close stores due to shoplifting, are the concerns real or overblown?* PBS NewsHour, https://www.youtube.com/watch?v=1Mnwgh5XGhk (last visited June 18, 2024).

## Section 26806 Improperly Conditions the Exercise of One Enumerated Right on the Forfeiture of Others

255.    Under section 26806, Californians seeking to exercise their Second Amendment rights to acquire firearms must leave many other constitutional rights at the gun shop door.

256.    The Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968) (recognizing an "undeniable tension" between the exercise of Fourth and Fifth Amendment rights when the government uses testimony in support of

---

[28]    *But see* S. Comm. on Pub. Safety hearing on S. Bill 1384, at 7 (Cal. Apr. 19, 2022), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB 1384# ("the rate of gun store thefts seems to have tapered slightly in recent years since peaking in 2016 (690), with 208 reported thefts in 2021.").

a suppression motion at a later trial to prove guilt); *see also United States v. Jackson*, 390 U.S. 570, 581 (1968).

257.   Californians seeking to purchase firearms should not be forced, even temporarily, to surrender their First Amendment rights to criticize California policies and politicians in order to exercise their Second, Fourth, or Fifth Amendment rights. But that will be the direct result of section 26806's chilling effect when persons visit California gun stores. "The loss of First Amendment freedoms, for even minimal periods of time (like while in a gun store), unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

258.   Likewise, courts have had no trouble concluding that recording one's personal biometric information without consent is equivalent to an "act of trespass." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020). "Consent" to be recorded for the "privilege" of exercising a constitutional right cannot be mandated by governmental edict, nor the refusal to give "consent" criminalized. Indeed, "[government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which [it] could not command directly. Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quotation omitted); *see also Miller v. United States*, 230 F.2d 486, 490 (5th Cir. 1956).

259.   Where, as under section 26806, the nonconsensual recording is mandated by government as a condition to exercise an enumerated constitutional right (the right to freely and anonymously speak and associate), California's apparent "constructive consent" argument (that citizens give "consent" by entering a facility marked "conspicuously" with a "recording" notice) collapses.

AMENDED AND SUPPLEMENTAL COMPLAINT

**Supplemental Allegations Since the Filing of the Complaint**

260.   As noted, many FFLs went out of business or ceased the portion of their business that included sales of firearms, in lieu of complying with SB 1384's costly and draconian recording mandates.  This cessation of sales included one of the highest volume dealers in California, Big 5 Sporting Goods.

261.   Plaintiffs, including Adam Richards, have spent thousands to tens of thousands of dollars to install compliant audio/video recording equipment simply to remain in business after January 1, 2024.

262.   Members of associational Plaintiffs, including Matthew Gene Peterson-Haywood and Turner's Outdoorsman, have spent thousands to tens of thousands of dollars to install compliant audio/video recording equipment simply to remain in business after January 1, 2024. *See, e.g.,* Decl. of Matthew Gene Peterson-Haywood in Supp. of Mot. for Prelim. Inj., ECF No. 27-1, ¶¶ 8-11. For member Peterson-Haywood, the cost to stay in business was equivalent to most of his annual income from this licensed business. *See id.*, ¶ 11.

263.   Some Plaintiffs, including members of associational Plaintiffs, have been unable to afford the mandate, and as a result, have stopped dealing in firearms since the beginning of 2024.

264.   Although Defendants have claimed that they do not intend to enforce the requirements of SB 1384 as to dealers conducting transactions at gun shows, nonetheless, none of these promises are legally binding, and Defendants refuse to stipulate in a binding manner to such a representation. Because the state recently enacted a law which facially applies to dealers at gun shows, but refuses to enforce it *because this lawsuit attempting to challenge its application to dealers at gun shows is pending*, the voluntary cessation exception to any claim of mootness raised by Defendants applies in this instance. As such, even following the filing of this complaint, a justiciable dispute exists as to whether Defendants can or will seek to impose SB 1384's installation and recording requirements at venues where it is

AMENDED AND SUPPLEMENTAL COMPLAINT

physically impossible for Plaintiffs and their members to comply.

## FIRST CAUSE OF ACTION

### Violation of the Right to Free Speech Under U.S. Const. amend. I

### 42 U.S.C. § 1983

### (By All Plaintiffs Against All Defendants)

265.    Plaintiffs incorporate by reference paragraphs 1 through 264 of this Complaint as though fully set forth herein in their entirety.

266.    Defendants, acting under color of state law, are enforcing SB 1384, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

267.    On its face and as applied, section 26806 is an unconstitutional abridgement of Plaintiffs' right to free speech under the First Amendment because it casts such a wide net that it directly prohibits Plaintiffs' pure speech related to the lawful possession and use of lawful firearms without any compelling governmental interest.

268.    Section 26806 violates virtually every right protected by the First Amendment. The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Fourteenth Amendment incorporates these protections against the states through its Due Process Clause.

269.    Defendants have no compelling (or even legitimate) governmental interest in recording video and audio of lawful gun owners constantly for the mere hope of catching a criminal somewhere in the thousands of hours of tape. But in reviewing that tape, one would have to review private and confidential matters that the government has no right to.

270.    Further, section 26806 is neither narrowly tailored to nor the least

AMENDED AND SUPPLEMENTAL COMPLAINT

restrictive means of achieving the state's dubious interests. Indeed, it sweeps up all communications—even communications concerning lawful (and constitutionally protected) products and communications that are private and confidential and have nothing to do with the process of transactions for the purchase of a firearm.

271. Section 26806 is unconstitutionally overbroad because, in an effort to "catch a criminal," the law seriously and deliberately burdens a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment.

272. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free speech, right to assembly, and right to remain anonymous, entitling them to declaratory and injunctive relief. Absent intervention by this Court through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## SECOND CAUSE OF ACTION

### Violation of Government Taking Without Just Compensation

### Under U.S. Const. amend. V

### 42 U.S.C. § 1983

### (By All Plaintiffs Against All Defendants)

273. Plaintiffs incorporate by reference paragraphs 1 through 264 of this Complaint as if fully set forth herein in their entirety.

274. The Fifth Amendment to the U.S. Constitution states no private property shall be taken for public use without just compensation.

275. "A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation. . . ." *Knick*, 139 S. Ct. at 2179.

276. As the Founders recognized uniformly, "the protection of private property is indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

277. Among the most vital rights of property ownership is the right to exclude

68

others, from private individuals to the government itself. *Cedar Point*, 141 S. Ct. at 2072. Indeed, without the right to decide who may enter upon your property and what they may do while there, the right to property does not exist. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("the power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle. . . .").

278.    Section 26806 imposes upon licensee Plaintiffs a legal obligation to purchase government approved video surveillance systems, and to operate, maintain and store the resulting video and audio recordings, all at the expense of the licensee.

279.    Section 26806 imposes on licensee plaintiffs a legal obligation to undertake continuous digital video surveillance of their own private property, and to permit government agents to freely enter upon their property to perpetually access and view, at-will, that digital video surveillance. Such surveillance, mandated to be located on the private property of a business owner, or their home where they conduct business, constitutes a permanent physical occupation of their property by the government.

280.    Such at-will surveillance and viewing impair Plaintiffs' right to exclude other persons from their property.

281.    Such at-will surveillance and viewing impair Plaintiffs' right to freely use their property, free from the prying eyes of the government.

282.    Such at-will surveillance and viewing authorize the government to possess and use Plaintiffs' property as it pleases, and impairs Plaintiffs' right to possess, use, and dispose of their own property as they please, in violation of the Fifth and the Fourteenth Amendments.

283.    Defendants have failed to compensate Plaintiffs for the permanent physical taking or the permanent easement imposed upon Plaintiffs' property.

284.    Section 26806 commandeers private property owners and lessees to implement and then accommodate a sweeping and perpetual government surveillance

AMENDED AND SUPPLEMENTAL COMPLAINT

scheme without any form of compensation for the significant costs incurred or the severe limitations on property rights suffered.

285.   What is more, once California has its section 26806 recording regime in place (with private industry having done all the legwork), California reserves the right to insert itself into gun dealers' stores and homes for compliance inspections as often as it pleases, at the dealers' cost.

286.   Section 26806 thus constitutes a permanent, physical, government occupation of numerous portions of (and uses of) Plaintiffs' property where government surveillance equipment must be installed, and additionally for all space upon the property where cameras and audio equipment are pointed and recording.

287.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of a government taking under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

288.   In the alternative, to the extent that Section 26806 does not constitute a physical taking, it is an unconstitutional regulatory taking.

**THIRD CAUSE OF ACTION**

**Violation of the Right to Privacy Under U.S. Const. amend. IV**

**42 U.S.C. § 1983**

**(By All Plaintiffs Against All Defendants)**

289.   Plaintiffs incorporate by reference paragraphs 1 through 264 of this Complaint as if fully set forth herein in their entirety.

290.   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

70

**AMENDED AND SUPPLEMENTAL COMPLAINT**

291.   The Fourth Amendment prohibits unreasonable searches and seizures without a warrant. Generally, law enforcement must obtain a warrant when a search would violate a person's "reasonable expectation of privacy."

292.   The Fourth Amendment also requires that warrants be supported by probable cause and describe with particularity the places to be searched and persons to be seized.

293.   Particularly for at-home FFL dealers, the business space is more than just where they conduct transactions; it is where they sleep, eat, go to school, have family gatherings, host holidays, and participate in everyday private activities just like those not running a business in their home.

294.   In *Katz v. United States*, the Court held that the Fourth Amendment protects people, not places: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection, but what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. 347 (1967).

295.   Section 26806 violates the privacy of the people by intrusion into places and conversations that are meant to remain private from the prying eyes of the government.

296.   The Fourth Amendment protects not only property interests but certain expectations of privacy as well. *Katz v. United States,* 389 U. S. 347, 351. Thus, when an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," official intrusion into that sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith v. Maryland,* 442 U. S. 735, 740 (internal quotation marks and alterations omitted).

297.   While communicating private information always risks betrayal of confidence by the other party, from a privacy perspective, repeating private information secondhand is quite different from recording the information for potential

71

AMENDED AND SUPPLEMENTAL COMPLAINT

dissemination to countless recipients. *Smith v. LoanMe, Inc.,* 11 Cal. 5th 183, 200 (2021).

298. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1. A declaration that SB 1384, codified at California Penal Code section 26806, violates Plaintiffs' free speech, anonymity, free association, and assembly rights under the First Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

2. A declaration that SB 1384, codified at California Penal Code section 26806, enacts an actual or regulatory governmental taking without just compensation in violation of the Fifth Amendment to the United States Constitution, on its face and as applied to Plaintiffs;

3. A declaration that SB 1384, codified at California Penal Code section 26806, violates the Plaintiffs' right to privacy under the Fourth Amendment to the United States Constitution, on its face and as applied to the Plaintiffs;

4. A preliminary and permanent injunction prohibiting all Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing SB 1384, codified at Penal Code section 26806;

5. Damages pursuant to government taking which would reimburse FFLs for costly systems mandated by the government, payments for technical expertise and installation, and damages for the physical intrusion of permanent structures by the government upon private property;

1    6.     An award of costs and expenses, including attorney's fees, pursuant to 42

2 U.S.C. § 1988 or other applicable state or federal law; and

3    7.     Any such other relief the Court deems just and equitable.

4

5 Dated: June 28, 2024                   MICHEL & ASSOCIATES, P.C.

6                                        *s/ C.D. Michel*
                                         C.D. Michel
7                                        Attorneys for Plaintiffs Adam Richards,
                                         Jeffrey Vandermeulen, Gerald Clark, Jesse
8                                        Harris, On Target Indoor Shooting Range,
                                         LLC, Gaalswyk Enterprises, Inc. (D/B/A
9                                        Smokin' Barrel Firearms), Gun Owners of
                                         California, Inc., Gun Owners of America, Inc.,
10                                       Gun Owners Foundation, and California Rifle
                                         & Pistol Association, Incorporated
11

12 Dated: June 28, 2024                  LAW OFFICES OF DONALD KILMER, APC

13                                       *s/ Donald Kilmer*
                                         Donald Kilmer
14                                       Attorney for Plaintiff Second Amendment
                                         Foundation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED AND SUPPLEMENTAL COMPLAINT

## ATTESTATION OF E-FILED SIGNATURES

I, C.D. Michel, am the ECF User whose ID and password are being used to file this AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: June 28, 2024

*s/ C.D. Michel*
C.D. Michel

AMENDED AND SUPPLEMENTAL COMPLAINT

## CERTIFICATE OF SERVICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Richards, et al. v. Newsom, et al.*
Case No.: 8:23-cv-02413 JVS (KESx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

Todd Grabarsky
Deputy Attorney General
todd.grabarsky@doj.ca.gov
Christina R.B. Lopez
Deputy Attorney General
christina.lopez@doj.ca.gov
Office of the Attorney General for California
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6044
  *Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 28, 2024.

Laura Palmerin